## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- x
                                                  :
LLOYD J. HELLER,                                  :
                                                  :
                  Plaintiff,                      :          07 Civ. 3704 (RWS)
                                                  :
        v.                                        :
                                                  :
GOLDIN RESTRUCTURING FUND, L.P.,                  :          ELECTRONICALLY FILED
GOLDIN CAPITAL PARTNERS, L.P., GOLDIN             :
CAPITAL MANAGEMENT, L.P., GOLDIN                  :
ASSOCIATES, L.L.C., HARRISON J. GOLDIN,           :
DAVID PAUKER, and LAWRENCE J. KRULE,              :
                                                  :
                  Defendants.                     :
                                                  :
------------------------------------------------- x
```

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS

Michael Carlinsky, Esq.
Daniel L. Brockett, Esq.
Susheel Kirpalani, Esq.
Molly Stephens, Esq.

**QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

SUMMARY OF PLAINTIFF'S COMPLAINT ........................................................................2

    A.    The Goldin Restructuring Fund ........................................................................3

    B.    Heller's Investment Decision .............................................................................4

    C.    The Offering Memorandum and Related Documents ........................................4

    D.    The MedSpa Investment ....................................................................................5

    E.    Plaintiff's Claims ..............................................................................................6

STANDARD FOR MOTION TO DISMISS .............................................................................7

ARGUMENT ............................................................................................................................7

II.    PLAINTIFF HAS NOT STATED A VALID CLAIM FOR BREACH OF
FIDUCIARY DUTY ......................................................................................................7

    A.    The Partnership Agreement Restricts the Liability of the Fund's General
Partner and Manager to Acts of Willful Misconduct and Gross Negligence ..........8

    B.    The Medspa Investment Was Expressly Authorized by the Parties'
Partnership Agreement and Offering Memorandum ............................................11

    C.    Plaintiff's Breach of Fiduciary Duty Claim Is Preempted by the Martin
Act. .......................................................................................................................13

III.    PLAINTIFF HAS NOT STATED A CLAIM FOR VIOLATION OF SECTION
10(B) OR RULE 10B-5 ...............................................................................................14

    A.    The Supreme Court's New Standard for Pleading Fraudulent Intent ....................15

    B.    Plaintiff Has Failed to Plead Facts Giving Rise to a Strong Inference of
Scienter .................................................................................................................17

    C.    Plaintiff Fails Adequately To Plead Loss Causation .............................................20

    D.    Plaintiff's Alleged Misrepresentations or Omissions Are Not Actionable ...........21

        1.    Plaintiff Cannot Rely on Oral Misrepresentations or Omissions ..............21

2.      The Alleged Misrepresentations and Omissions are Contradicted
        By The Written Offering Materials ...........................................................22

3.      Failure To Disclose That The Fund's Investment Objective May
        Not Be Achievable Is Not Actionable In Light of the Disclaimers
        in the Offering Memorandum..................................................................23

CONCLUSION .............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

ATSI Communications, Inc. v. Shaar Fund, Ltd.,
2007 WL. 1989336 (2d Cir. July 11, 2007) .......................................................... 17

In re Axis Capital Holdings Ltd., Sec. Litig.,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................ 23

In re Bayou Hedge Fund Litig.,
2007 WL. 2319127 (S.D.N.Y. 2007) .................................................................. 14

Bell Atlantic Corp. v. Twombly,
127 S. Ct. 1955 (2007) ...................................................................................... 17

Brickell Partners v. Wise,
794 A.2d 1 (Del. Ch. 2001) ......................................................................... 11, 12

CPC Int'l Inc. v. McKesson, Corp.,
70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987) .............................. 13

Castellano v. Young & Rubicam, Inc.,
257 F.3d 171 (2d Cir. 2001) .............................................................................. 13

Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.,
1996 WL. 506906 (Del. Ch. 1996) .................................................................... 10

In re Comshare Inc. Sec. Litig.,
183 F.3d 542 (6th Cir. 1999) ............................................................................. 15

Conley v. Gibson,
355 U.S. 41 (1957) ............................................................................................ 17

Continental Ins. Co. v. Rutledge & Co., Inc.,
750 A.2d 1219 (Del. Ch. 2000) ...................................................................... 8, 12

Douzinas v. American Bureau of Shipping, Inc.,
888 A.2d 1146 (Del. Ch. 2006) ........................................................................... 8

Dura Pharmaceuticals, Inc. v. Broudo,
544 U.S. 336 (2005) ..................................................................................... 20, 21

Eagle Tenants Corp. v. Fishbein,
182 A.D.2d 610, 582 N.Y.S.2d 218 (N.Y. App. Div. 1992) ................................ 13

Ernst & Ernst v. Hochfedler,
425 U.S. 986 (1976) .......................................................................................... 15

Gagliardi v. TriFoods Intern., Inc.,
    683 A.2d 1049 (Del. Ch. 1996) ....................................................................10, 11

Globis Capital Partners, L.P. v. Stonepath Group, Inc.,
    2007 WL. 1977236 (3d Cir. July 10, 2007)................................................... 17

Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,
    817 A.2d 160 (Del. 2002).................................................................................8, 9

Halperin v. Ebanker USA.com, Inc.,
    295 F.3d 352 (2d Cir. 2002) ...................................................................2, 23, 24

Helwig v. Vencor, Inc.,
    251 F.3d 540 (6th Cir. 2001) ............................................................................ 16

Higginbotham v. Baxter Int'l, Inc.,
    2007 WL. 2142298 (7th Cir. July 27, 2007) .................................................. 17

Horn v. 440 East 57th Co.,
    151 N.Y.S.2d 1 (1st Dept. 1989) ...................................................................... 13

Int'l Audiotext Network, Inc. v. AT&T Co.,
    62 F.3d 69 (2d Cir. 1995) ....................................................................................7

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ............................................................................. 15

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005) .............................................................................20

Louros v. Kreicas,
    367 F. Supp. 2d 572 (S.D.N.Y. 2005) ............................................................ 14

Miller v. Lazard, Ltd.,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) .........................................................7, 22

Nanopierce Tech., Inc. v. Southridge Capital Management LLC,
    2003 WL. 22052894 (S.D.N.Y. 2003) ........................................................13, 14

In re Nokia Corp. Sec. Litig.,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................ 15

Olkey v. Hyperion 1999 Term Trust, Inc.,
    98 F.3d 2 (2d Cir. 1996) ...............................................................................23, 24

Securities Exchange Act of 1934,
    S.E.C. Rule 10b ......................................................................................................7

Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,
    2001 WL. 396521 (S.D.N.Y. 2001) ..................................................................22

Sonet v. Timber Co.,
    722 A.2d 319 (Del. Ch. 1998) .........................................................................8, 12

Tellabs, Inc. v. Makor Issues & Rights,
  127 S. Ct. 2499 (2007)...............................................................................16, 17, 19, 20

In re Towers Financial Corporation Noteholders Litigation,
  1996 U.S. Dist. LEXIS 22674 (S.D.N.Y. 1996)................................................................24

Trenwick America Litig. Trust v. Ernst & Young, L.L.P.,
  906 A.2d 168 (Del. Ch. 2006) ...........................................................................................10

In re Walt Disney Co. Derivative Litig.,
  906 A.2d 27 (Del. 2006).....................................................................................................10

## Statutes

6 Del Code § 17-1101(c) ...............................................................................................................8

6 Del. Code § 17-1101(d) ..............................................................................................................8

6 Del. Code § 17-1101(e) ........................................................................................................11, 13

6 Del. Code § 17-1101(f) .........................................................................................................8, 11

15 U.S.C. § 78u-4(b)(1) ..............................................................................................................16

15 U.S.C. § 78u-4(b)(2) ..............................................................................................................15

15 U.S.C. § 78u-4(b)(4) ..............................................................................................................20

Fed. R. Civ. P. 12(b)(6) ..............................................................................................................24

N.Y. Gen. Bus. L. §§ 352 ...........................................................................................................13

N.Y. Gen. Bus. L. § 352-c(1) .....................................................................................................13

Securities Exchange Act of 1934, Section 10(b)..............................................6, 15, 16, 20, 22, 23

Securities Exchange Act of 1934, Rule 10b-5.........................................................6, 15, 16, 22, 23

## Other Authorities

S. Rep. No. 104-98 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 690 ........................................15

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' OF MOTION TO DISMISS

Defendants Goldin Restructuring Fund, L.P. (the "Fund"), Goldin Capital Partners, L.P.,

Goldin Capital Management, L.P., Goldin Associates, L.L.C., Harrison J. Goldin, David Pauker,

and Lawrence J. Krule (collectively, "Defendants") respectfully submit this memorandum of law

in support of their motion, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil

Procedure and Sections 21D and 21E of the Private Securities Litigation Reform Act (the

"Reform Act"), for an order dismissing plaintiffs' Complaint for failure to state a claim and

failure to plead with particularity.

### Preliminary Statement

In February 2005, plaintiff Lloyd Heller ("Heller" or "Plaintiff"), a business owner,

purchased a limited partnership interest in Goldin Restructuring Fund, L.P. The Fund was

established to invest in distressed and underperforming companies and to fund corporate

turnarounds and reorganizations. (Compl. ¶¶ 22-25). After raising about $40 million, the Fund

made its first investment, a medical spa business then in bankruptcy. (Compl. ¶ 67).

Unfortunately, the medical spa business performed poorly, was written down, and it now appears

that the limited partners may lose money on this particular investment. (Compl. ¶¶ 1, 71-73).

Disappointed with the results of his high-risk investment to date, Heller now claims he

was defrauded into purchasing his limited partnership interest. With the benefit of hindsight,

Heller is quick to criticize the Fund for its decision to enter the medical spa business. But a lack

of clairvoyance does not constitute securities fraud or breach of fiduciary duty. Though laced

with a litany of alleged wrongs, Plaintiff's 30-page complaint fails to state the essential elements

of a cause of action.

First, Heller's fiduciary breach claim is barred by the parties' limited partnership agreement, which limits the liability of the Fund's general partner and manager to acts of willful misconduct or gross negligence. Heller has pleaded no facts showing willful or grossly negligent conduct. To the contrary, the Fund's investment in Medspa was expressly authorized by the Partnership Agreement and Confidential Offering Memorandum. Under Delaware law, a general partner is not deemed in breach of fiduciary duty where he has relied in good faith on an express authorization in the Partnership Agreement. In any case, because Heller's breach of fiduciary duty claim arises in the context of alleged securities fraud occurring in New York, it is preempted by the Martin Act.

Second, Heller has failed to plead the most fundamental element of any securities fraud claim -- particularized facts that create a strong inference of fraudulent intent. Plaintiff also fails to plead loss causation, and several of his alleged misrepresentations and omissions are either contradicted by the offering documents or immaterial as a matter of law. As the Second Circuit has recognized time and again, "[a]n offeror is not liable for securities fraud simply because the investment did not turn out as the investor hoped." *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002).

## **Summary of Plaintiff's Complaint**

Plaintiff Heller is a business owner and sophisticated investor. (Compl. ¶ 11; Subscription Documents, Ex. A, pp 2-3). He brings this action against the Fund, a Delaware limited partnership; Goldin Capital Partners, L.P. and Goldin Capital Management, L.P., which are respectively the Fund's general partner and manager; Goldin Associates, L.L.C., a well-respected financial and strategic advice firm with which the Fund is associated; and individual

defendants Harrison J. Goldin, David Pauker, and Lawrence Krule, who are principals of the Fund's general partner and active in management of the Fund. (Compl. ¶¶ 13-18).

A.    **The Goldin Restructuring Fund**

The Complaint alleges that the Fund was formed in 2004 to invest in distressed and underperforming companies. (Compl. ¶ 12, 22). The Fund intended to pursue opportunities in middle-market companies by purchasing strategic pieces of their capital structure and then exerting influence or control over their restructuring. (Compl. ¶ 24; Offering Memorandum, Ex. B, p. 10).

The Offering Memorandum provided to investors stated that the Fund sought to raise capital commitments of $200 million, though no assurance was made that the Fund could raise this amount. (Compl. ¶ 24; Offering Memorandum, Ex. B, pp. 1, 10). The general partner of the Fund agreed to commit at least 1.5 percent of the total capital commitment of the Fund, an investment that could approach $3 million. (Offering Memorandum, Ex. B, pp. 2, 12). The individual defendants put their own capital at risk in this venture.

The fund-raising process was to occur in two stages -- a first closing and a final closing. On the first closing date, which occurred in late January 2005, the Fund would close on the initial investors' capital commitments and commence operations. (Compl. ¶ 25). Investors were specifically told that the Fund would begin to purchase portfolio companies after this first closing but before the final closing. (Offering Memorandum, Ex. B, pp. 2, 12, 23). The Fund would then continue to seek additional capital commitments from new investors (or additional commitments from existing investors) until the final closing date, expected to occur nine to 12 months after the first closing date. (Compl. ¶ 25; Offering Memorandum, Ex. B, pp. 2, 17-18). Investors agreed to be locked-in to their capital commitments for a period of three years. (Compl. ¶ 25).

**B.**    <u>Heller's Investment Decision</u>

Heller alleges that he decided to invest in the Fund based on oral and written statements made at a meeting held on February 1, 2005, at Goldin Associates' offices. (Compl. ¶¶ 33, 85). The written statements were allegedly contained in five documents that he received and reviewed -- a Confidential Offering Memorandum (the "Offering Memorandum"), a draft of the Fund's Amended and Restated Limited Partnership Agreement (the "June 2004 LP Agreement"), a printed presentation describing the Fund, the Fund's subscription documents, and promotional materials describing the manager of the Fund. (Compl. ¶ 33).[1]

**C.**    <u>The Offering Memorandum and Related Documents</u>

The Offering Memorandum provided to Heller cautioned prospective investors that investing in the Fund involved a "high degree of risk." (Offering Memorandum, Ex. B, pp. i, 28). The Offering Memorandum outlined the Fund's investment strategy, but then warned in bold print that "no assurance can be given that the Fund will achieve its investment objectives." (*Id.*, p. i). The Offering Memorandum also stated that the interests were suitable only for "sophisticated investors" and that an investor could lose his "entire investment." (*Id.*, pp. i, 28).

The Offering Memorandum also disclosed the very risks of which Plaintiff now complains. For example, under the heading "Risk Factors," the Offering Memorandum stated that because the Fund's investments generally would involve a high degree of risk, "poor performance by even a ***single Portfolio company*** could severely affect the total returns to Limited Partners." (Offering Memorandum, Ex. B, p. 30) (*emphasis added*). In the next paragraph, the Offering Memorandum warned that "[t]he Fund may be unable to find a sufficient

---

[1] Three of these documents incorporated by reference in the Complaint (the Offering Memorandum, the June 2004 LP Agreement, and the subscription documents) are attached hereto as Exhibits A through C. The final limited partnership agreement, dated January 31, 2005 (the "January 2005 LP Agreement"), which is also incorporated by reference in the Complaint (Compl. ¶ 54), is attached hereto as Exhibit D.

number of attractive opportunities to meet its investment objectives or fully invest its committed capital." (*Id.*)

As an unregistered offering of securities, interests in the Fund were offered only to accredited investors who met certain eligibility requirements. Before being allowed to invest, Heller was required to certify that he had a net worth in excess of $1 million, that he had sufficient knowledge and experience in business and financial matters to evaluate the risks of an investment in the Fund, and that he could withstand the loss of his entire investment. (Subscription Documents, Ex. A, pp. 2-3, 15). Heller also signed a Subscription Agreement warranting that he had read the offering documents and had made his decision to invest relying "solely upon the Memorandum, the Partnership Agreement and independent investigation made by the Investor." (*Id.*, pp. 2-3).

**D.    The MedSpa Investment**

Consistent with the Offering Memorandum, after the first closing in January 2005, the Fund selected its first investment. In June 2005, it purchased the assets of a bankrupt company called Skin Nuvo International, L.L.C. ("Medspa"), which operated a chain of retail medical spas. (Compl. ¶ 67). The Fund paid $7 million for the assets of Medspa and then injected an additional $10 million in working capital before concluding that the investment would have to be liquidated. (Compl. ¶¶ 5, 67, 70). Heller alleges he lost approximately 40 percent of his $1 million capital commitment. (Compl. ¶ 73).

### E.    Plaintiff's Claims

Plaintiff alleges two causes of action: breach of fiduciary duty and securities fraud. The fiduciary breach claim is based on the Fund's alleged "imprudent" decision to make the Medspa investment. Specifically, Heller alleges that Defendants breached their fiduciary duties to Plaintiff by, among other things, failing to manage the Fund prudently, failing prudently to diversify the Fund's investments, and investing an imprudent proportion of the Fund's total capital commitments in the Medspa venture. (Compl. ¶¶ 75-76).

The securities fraud claim is brought under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. The gist of Heller's claim is that the Fund failed to disclose it was undercapitalized and bet $17 million, or 42 percent of its capital, on a single venture. (Compl. ¶¶ 2-6). Heller alleges the Fund falsely represented it would raise $200 million and would have a diversified portfolio of 8 to 12 investments, each in the $15 to $25 million range. (Compl. ¶¶ 2, 24, 82). He alleges that the Fund failed to disclose its capital-raising shortfall and misrepresented that a single, well-known investor would commit $40 to $50 million. (Compl. ¶¶ 3, 40, 42, 82). Heller also alleges that the Fund failed to disclose that other investors were not likely to join the Fund and misrepresented that he (Heller) would lose the opportunity to invest if he did not do so immediately. (Compl. ¶¶ 25, 82).

Heller further alleges that the Fund failed to disclose that its investment objectives were unobtainable (Compl. ¶¶ 22, 24, 45, 82); failed to disclose that the first closing date had been delayed from July 2004 (Compl. ¶ 82); falsely represented that the Fund had not made any investments prior to February 2005 because the Fund was waiting for the right investment (Compl. ¶ 82); and failed to disclose a 1977 report of the SEC allegedly concluding that Harrison Goldin had misled investors during his tenure as New York City's comptroller (Compl. ¶¶ 59, 82).

## Standard for Motion to Dismiss

In deciding a motion to dismiss, the Court accepts as true all well-pleaded allegations in the Complaint and determines whether a plaintiff has stated a cause of action as a matter of law. *See Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007). "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995). "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Id.* (considering on a motion to dismiss the terms of an agreement relied upon, but not incorporated into, a complaint).

Accordingly, on the present motion to dismiss, the Court should consider the well-pleaded factual allegations, along with the documents on which Plaintiff alleges he relied, including the Offering Memorandum, the Fund's subscription documents, and the June 2004 and January 2005 LP Agreements. (Compl. ¶¶ 33, 54).

## Argument

## II.

## PLAINTIFF HAS NOT STATED A VALID CLAIM FOR BREACH OF FIDUCIARY DUTY

Plaintiff's first cause of action purports to state a claim for "common law breach of fiduciary duty." (Compl. ¶¶ 75-76). This claim fails for three basic reasons: (1) the parties by agreement eliminated Plaintiff's right to bring ordinary breach-of-fiduciary duty claims except in cases of willful misconduct or gross negligence; (2) the specific investment of which Plaintiff

complains was expressly permitted by the parties' Partnership Agreement and the Offering

Memorandum; and (3) Plaintiff's claim is preempted by the Martin Act.

### A.    <u>The Partnership Agreement Restricts the Liability of the Fund's General Partner and Manager to Acts of Willful Misconduct and Gross Negligence</u>

Plaintiff acknowledges that the Fund is a Delaware limited partnership. (Compl. ¶ 12).

Delaware partnership law is based on the principle of freedom of contract. 6 Del Code § 17-

1101(c). The Delaware Revised Uniform Limited Partnership Act ("DRULPA") expressly

empowers a Delaware limited partnership to modify "any and all liabilities for . . . breach of

duties (including fiduciary duties) of a partner or other person to a limited partnership or to

another partner." 6 Del. Code § 17-1101(d), (f).

Delaware courts have read this provision as giving parties contractual freedom to expand

or restrict fiduciary duties in Delaware limited partnerships. *Gotham Partners, L.P. v. Hallwood*

*Realty Partners, L.P.*, 817 A.2d 160, 170 (Del. 2002) (holding that § 17-1101 "expressly

authorizes the ... modification, or enhancement of . . . fiduciary duties in the written agreement

governing the limited partnership"); *see also Douzinas v. American Bureau of Shipping, Inc.*, 888

A.2d 1146, 1149-50 (Del. Ch. 2006) (citing § 17-1101 and noting, in the context of limited

partnerships, "it is frequently impossible to decide fiduciary duty claims without close

examination and interpretation of the governing instrument of the entity"). This flexibility is

precisely the reason many chose the limited partnership form in Delaware. *Continental Ins. Co.*

*v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1235 n.37 (Del. Ch. 2000) ("Many opt for the limited

partnership form in Delaware precisely in order to embrace [its] flexibility"); *Sonet v. Timber*

*Co.*, 722 A.2d 319, 322-23 (Del. Ch. 1998) (same).

Thus, under Delaware limited partnership law, a claim of breach of fiduciary duty must

first be analyzed in terms of the operative governing instrument -- the partnership agreement.

Only where the partnership agreement is silent or ambiguous will a court begin to look for guidance from traditional concepts of fiduciary duty. *See, e.g., Gotham Partners, L.P.*, 817 A.2d at 170-71; *Sonet*, 722 A.2d at 324.

As is customary in investment partnerships, the parties in this case agreed to limit the liability of the Fund's manager and general partner. The Partnership Agreement governing the Fund expressly provides:

> [N]one of the Manager, the General Partner, their Affiliates and their members, partners, officers, directors, shareholders, agents and employees (each, an "<u>Indemnified Party</u>"), shall be liable to the Partnership or to any Partner for . . . any act or omission taken or suffered by such Indemnified Party in connection with the conduct of the affairs of the Partnership or otherwise in connection with this Agreement or the matters contemplated herein, ***unless such act or omission resulted from fraud, willful misconduct, the commission of a felony, gross negligence or a material violation of applicable securities laws . . . ;*** <u>provided</u> that . . . such Indemnified Party acted in good faith and, as to matters on behalf of the Partnership, in a manner reasonably believed to be in the best interests of the Partnership.

January 2005 LP Agreement, Ex. D, ¶ 4.3(a) (*emphasis added*); *see also* June 2004 LP Agreement, Ex. C, ¶ 4.3(a). As this provision makes clear, neither the manager nor the general partner of the Fund is liable to limited partners for ordinary negligence or breach of duty. Instead, they are liable only for acts of fraud, willful misconduct, commission of a felony, gross negligence, or securities law violations.

Judged by this standard, Heller's Complaint fails to pass muster. He alleges that defendants "failed to manage the Fund prudently," "failed prudently to diversity the Fund's investments," invested "an imprudent proportion of the Fund's total capital commitments in a single venture," and raised the investment in the venture "to an even more imprudent proportion of the Fund's total capital commitments." (Compl. ¶ 76). But he does not allege that the Fund

managers acted in bad faith, personally profited or benefited from the investment, took a position

adverse to the Fund, or secretly competed with it. Thus, he does not allege facts showing the

type of bad-faith conduct for which Defendants can be liable under the Partnership Agreement.

*See, e.g., In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 64-67 (Del. 2006).

Nor does Heller allege facts that rise to the level of "gross negligence." Delaware courts

have repeatedly defined gross negligence as "reckless indifference to or a deliberate disregard of

the whole body of stockholders" or actions that are "without the bounds of reason." *In re Walt

Disney Co. Derivative Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005). It is evident from recent

Delaware cases that this standard is very high, *Trenwick America Litig. Trust v. Ernst & Young,

L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006), especially in cases alleging improper investment by a

fund manager or fiduciary. *Gagliardi v. TriFoods Intern., Inc.*, 683 A.2d 1049, 1052-54 (Del.

Ch. 1996) (dismissing a fiduciary duty claim and holding that "to allege that a corporation has

suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by

a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim

for relief against that fiduciary no matter how foolish the investment may appear in retrospect"

(emphasis omitted)); *see also Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv.

of Cincinnati, Inc.*, 1996 WL 506906, at *18-*19 (Del. Ch. 1996) (general partner's management

was not grossly negligent as a matter of law).

Even accepting Heller's allegations as true, the Fund's decision to make the Medspa

investment does not rise to the level of gross negligence. The investment was an exercise of

business judgment by the Fund's managers, and there are no allegations that the Fund was

uninformed or failed to carry out sufficient due diligence. Heller instead alleges only that the

investment was "imprudent" because the Fund committed more than one-third of its capital to a single opportunity. (Compl. ¶¶ 66-67, 76).

But, as demonstrated in Point I(B) below, the Medspa investment was specifically authorized by the Offering Memorandum and the Partnership Agreement. As a matter of law, a Fund manager cannot be deemed grossly negligent when he acts in reliance on a specific provision of the Partnership Agreement in making an investment. *See Gagliardi*, 683 A.2d at 1052-54; 6 Del. Code § 17-1101(e); *Brickell Partners v. Wise*, 794 A.2d 1, 3-4 (Del. Ch. 2001) (dismissing breach of fiduciary duty claim with prejudice because defendants' conduct complied with partnership agreement).

Simply put, plaintiff's first cause of action is, at most, a run-of-the-mill negligent mismanagement claim -- not an action for fraud, willful misconduct, the commission of a felony, gross negligence, or a material violation of applicable securities laws. The claim is therefore barred by the Fund's Partnership Agreement. *See* 6 Del. Code § 17-1101(f); January 2005 LP Agreement, Ex. D, ¶ 4.3(a); *see also* June 2004 LP Agreement, Ex. C, ¶ 4.3(a).

### B.    The Medspa Investment Was Expressly Authorized by the Parties' Partnership Agreement and Offering Memorandum

Apart from the waiver provisions of the Partnership Agreement, Plaintiff's fiduciary breach claim fails because the Medspa investment was expressly authorized by the Partnership Agreement and the Offering Memorandum. Under Delaware law, a general partner is not deemed in breach of his fiduciary duties where he has complied with an express authorization in the Partnership Agreement. *See* 6 Del. Code § 17-1101(e) (eliminating liability for "good faith reliance on the provisions of the partnership agreement"); *Brickell Partners*, 794 A.2d at 3-4; *Sonet*, 722 A.2d at 327 (dismissing fiduciary duty claim based on merger proposal because the partnership agreement provided that a merger could be proposed on any terms).

Both the Partnership Agreement and the Offering Memorandum contained specific guidelines for investments by the Fund. Heller focuses on the guidelines for investments made *after* the final closing, but those guidelines did not apply to the Medspa investment, which was made in June 2005 -- *before* the final closing. (Compl. ¶ 67). The explicit guidelines for investments made prior to the final closing were that the total investment by the Fund in any single portfolio company could not to exceed the *greater* of "(A) 20% of aggregate Capital Commitments or (B) *$20 million*." (June 2004 LP Agreement, Ex. C, ¶ 4.1(b); January 2005 LP Agreement, Ex. D, ¶ 4.1(b); Offering Memorandum, Ex. B, p. 12). Because the Fund invested a total of $17 million in Medspa before it took steps to unwind the investment, (Compl. ¶ 67), the total investment was under $20 million and squarely within the investment guidelines stated in the Partnership Agreement and Offering Memorandum.

These investment guidelines were fully disclosed to limited partners. (Offering Memorandum, Ex. B, p. 12). The investors thus knew the Fund was going to make investments before the full $200 million had been raised and that the guidelines for these interim investments would differ from those applicable to later investments, depending on how much money the Fund actually raised. The Offering Memorandum contemplated that the Fund would begin operations after the first closing date and before it was known how much capital would ultimately be raised. (Offering Memorandum, Ex. B, p. 2). These interim investments were expressly permitted so long as they did not exceed the stated concentration ratios.

Plaintiff seeks to hold the Fund liable for an act that was expressly authorized by the parties' Partnership Agreement. Delaware law prohibits him from doing this. *Brickell Partners*, 794 A.2d at 3-4; *Sonet*, 722 A.2d at 327; *see also Continental Ins. Co.*, 750 A.2d at 1235 ("In the

limited partnership context, Delaware law resolves [the conflict between contract principles and fiduciary duties] in favor of contract law."); *see also* 6 Del. Code § 17-1101(e).

### C.   Plaintiff's Breach of Fiduciary Duty Claim Is Preempted by the Martin Act.

Even if Plaintiff could state a breach of fiduciary duty claim consistent with the Partnership Agreement -- which he cannot -- the claim is preempted by the Martin Act, New York's blue sky law. The Martin Act prohibits various fraudulent and deceitful practices in the distribution, exchange, sale, and purchase of securities. *N.Y. Gen. Bus. L.* § 352-c(1).

The New York Court of Appeals has held that there is no implied right of action under the Martin Act, *CPC Int'l Inc. v. McKesson, Corp.*, 70 NY 2d 268, 275, 519 N.Y.S. 2d 804, 514 N.E. 2d 116 (1987), and other courts have determined that allowing a breach of fiduciary duty claim in the context of securities fraud "would effectively permit a private right of action under the Martin Act." *Eagle Tenants Corp. v. Fishbein*, 182 A.D.2d 610, 582 N.Y.S.2d 218, 219 (N.Y. App. Div. 1992). Such a claim would also be inconsistent with the Attorney General's exclusive enforcement powers under the Martin Act. *See N.Y. Gen. Bus. L.* §§ 352 *et seq.*

New York state and federal courts have uniformly held that the Martin Act preempts common law claims by private litigants that broadly relate to the "issuance, distribution, exchange, sale, negotiation, or purchase" of securities "within or from" New York. *Nanopierce Tech., Inc. v. Southridge Capital Management LLC*, 2003 WL 22052894, at *2 (S.D.N.Y. 2003). As a result, breach of fiduciary duty claims "in the context of securities fraud" occurring in New York are preempted. *See id.* at *4-*6; *see also Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001); *Horn v. 440 East 57th Co.*, 151 N.Y.S.2d 1, 5 (1st Dept. 1989).

Plaintiff alleges a breach of fiduciary duty claim in the context of an alleged securities fraud occurring in New York. Specifically, he contends that the breach of fiduciary duty occurred in connection with the alleged scheme to defraud plaintiff into investing in the Fund.

According to the Complaint, "a substantial part of the events or omissions giving rise to the action" occurred in New York. (Compl. ¶ 9). Indeed, the subscription documents effecting Plaintiff's purchase of his limited partnership interests were executed in New York. (*See* Subscription Documents, Ex. A, p. S-6).

Citing *Louros v. Kreicas*, 367 F. Supp. 2d 572, 595-96 (S.D.N.Y. 2005), Plaintiff argues that preemption does not apply because his breach of fiduciary duty claim alleges mismanagement of his investment after he had subscribed to the Fund rather than dishonesty in his initial commitment. But this Court recently distinguished *Louros* and made clear that "[c]laims relating to 'investment advice' have been deemed 'activities within the Martin Act's purview.'" *In re Bayou Hedge Fund Litig.*, 2007 WL 2319127, at *14 (S.D.N.Y. 2007) (dismissing breach of fiduciary duty claim based on investment advisor's failure to perform adequate due diligence on an investment as preempted by the Martin Act).

As the Court explained, given the Martin Act's "broad reach and purpose," breach of fiduciary duty claims "arising in the securities context" are preempted. *Id.* at *16. In any event, Plaintiff's breach of fiduciary duty claim involves dishonesty, as purportedly required by *Louros*, because Heller alleges that Defendants knew the Fund would not be able to achieve its investment objective but hid that fact from him in order to make the investment in Medspa. (Compl. ¶¶ 66, 68).

Accordingly, Plaintiff's breach of fiduciary duty claim is preempted by the Martin Act . *Nanopierce*, 2003 WL 22052894, at *4-*6.

### III.

### PLAINTIFF HAS NOT STATED A CLAIM FOR VIOLATION OF SECTION 10(B) OR RULE 10B-5

Plaintiff has failed to allege key elements of a claim for securities fraud. "To state a claim for relief under Section 10(b) and Rule 10b-5, [a plaintiff] must adequately allege (1) that [a defendant] made misstatements or omissions of material fact, (2) with scienter, (3) upon which plaintiffs relied, and (4) that plaintiffs' reliance was the proximate cause of their injury." *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006). The failure to establish any one of these elements is fatal to a Section 10(b) claim.

A.    **The Supreme Court's New Standard for Pleading Fraudulent Intent**

In late 1995, Congress enacted the Reform Act to weed out meritless securities cases early in the process, before the costs associated with burdensome discovery were incurred. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999) ("Congress concluded that . . . frivolous securities litigation 'unnecessarily increases the cost of raising capital and chills corporate disclosure, [and is] often based on nothing more than a company's announcement of bad news, not evidence of fraud'") (quoting S. Rep. No. 104-98 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690)).

One of Congress' objectives in enacting the Reform Act was to set a uniform, heightened pleading standard for Section 10(b) actions. It did so by strengthening the pleading requirements with respect to the element of *scienter*, or intent, which has been a required part of a plaintiffs' pleading and proof in securities fraud cases since the Supreme Court's 1976 decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 986 (1976). Under Section 21D of the Reform Act, securities fraud plaintiffs must state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).

The Reform Act also heightened the Rule 9(b) standard by requiring that plaintiffs set forth "each statement alleged to have been misleading, the reason or reasons by why the

statement is misleading; and, if an allegation regarding the statement or omission is made on information and belief, that the complaint state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Thus, with the Reform Act, "Congress has mandated a **special standard** for measuring whether allegations of scienter survive a motion to dismiss." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001) (*emphasis added*).

On June 21, 2007, the United States Supreme Court decided *Tellabs, Inc. v. Makor Issues & Rights*, 127 S. Ct. 2499 (2007), which was the Court's first opportunity to address the Reform Act's heightened pleading requirement for *scienter*. *Tellabs* vacated the Seventh Circuit's decision, in which that Court held it was enough for a plaintiff to plead facts from which "a reasonable person could infer" fraudulent intent. *Id.* at 2504-05. The Supreme Court rejected that standard, finding that it did not "capture the stricter demand Congress sought to convey" in the Reform Act. *Id.* The Court said instead that a complaint alleging a Section 10(b) and Rule 10b-5 violation must plead facts giving rise to an inference of *scienter* that is "more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*

Noting that "if not adequately contained," private securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law," the Court recognized that "[e]xacting pleading requirements are among the measures" that Congress included in the Reform Act. *Id.* at 2504. These pleading standards were designed to "curb perceived abuses" of private actions under Section 10(b) and Rule 10b-5 including, among other things, "nuisance filings, targeting deep-pocket defendants, vexatious discovery requests, and manipulation by class action lawyers." *Id.* at 2508.

Under the Supreme Court's new standard, a court must consider *all* of the facts collectively and compare inferences of *scienter* with opposing inferences of nonfraudulent intent. *Id.* at 2509. According to the Court, an "inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *Id.* at 2504. A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510.[2]

Since *Tellabs* was decided in June, at least three Courts of Appeals (including the Second Circuit) have now applied the Supreme Court's new standard to affirm dismissals of securities fraud actions. *See Higginbotham v. Baxter Int'l, Inc.*, 2007 WL 2142298 (7th Cir. July 27, 2007); *Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, 2007 WL 1977236 (3d Cir. July 10, 2007); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 2007 WL 1989336 (2d Cir. July 11, 2007). These decisions confirm that *Tellabs* is leading to an even more rigorous and intense scrutiny of factual allegations in a securities fraud complaint and that the lower federal courts are vindicating the Reform Act's goal of eliminating abusive securities actions at the pleading stage.

## B.    Plaintiff Has Failed to Plead Facts Giving Rise to a Strong Inference of Scienter

---

[2]    *Tellabs* continues recent efforts by the Supreme Court to provide lower courts with guidance on ways to weed out meritless cases of all kinds, even where the heightened pleading requirements prescribed by statute may not directly apply. In June, in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), the Court recognized the "potentially enormous expense of discovery," and expressly rejected the assumption that federal courts can be expected to "weed[] out" groundless cases early in the discovery phase through "careful case management." *Id.*, at 1967. *Twombly* also explicitly abandoned the pleading standard the Court had articulated 50 years earlier in *Conley v. Gibson*, 355 U.S. 41, 45 (957) where the Court held that a complaint was sufficient unless there was "no set of facts" that could support its allegations. This widely held standard had been embedded in decisions about the sufficiency of pleadings, but it has now been jettisoned by the Supreme Court.

Considered in their entirety, Plaintiff's allegations do not support an inference of scienter, much less a "strong" or "cogent" inference. Other than the conclusory allegation that Defendants "purposely concealed and misrepresented the omitted material facts in order to induce Plaintiff to purchase a limited partnership interest in the Fund," (Compl. ¶ 83), Plaintiff alleges no facts supporting an inference that Defendants intended to defraud him. The Complaint is wholly conclusory on the issue.

Far from compelling an inference of fraudulent intent, the allegations actually give rise to the opposite inference -- that Defendants had no intent to deceive Heller. First, Defendants did not receive *anything* when Plaintiff made his $1 million capital commitment. Instead, Plaintiff was required to make an actual capital contribution only on an "as needed" basis, when the Fund identified appropriate investments. (Offering Memorandum, Ex. B, p. 18).

Plaintiff's first contribution (of $385,632) did not occur until June 30, 2005, when the Fund invested in Medspa. (Compl. ¶ 72). Shortly after that contribution, on August 15, 2005, Defendants themselves disclosed the supposed "undercapitalization" of the Fund to Plaintiff. (Compl. ¶ 68). Defendants then asked for an additional contribution to Medspa, which Plaintiff provided. (Compl. ¶ 72). If Defendants had actually intended to defraud Plaintiff, they surely would not have disclosed the alleged "undercapitalization" while they were in the midst of asking Plaintiff for more money.

Second, when Plaintiff committed $1 million to the Fund, Defendants made their own capital commitment to the Fund. Defendants were obligated to make a capital commitment on the first closing date greater than or equal to 1.5 percent of the aggregate capital commitments by investors. (Offering Memorandum, Ex. B, p. 17). Defendants had as much at stake -- indeed, more at stake -- in this Fund than did Heller. This is not a case of insider selling, a circumstance

often viewed as creating a strong inference of *scienter*. Although Defendants stood to make management fees from operation of the Fund, they also put their own capital at risk, which undercuts any inference that Defendants set out to defraud Heller into investing in the same venture.

Finally, Plaintiff made his investment at or around the time of the first closing (February 1, 2005). (Compl. ¶¶ 25, 49). As Plaintiff alleges, Defendants "would continue to seek additional capital commitments from new investors (or additional commitments by existing investors)" after the first closing. (Compl. ¶ 25). This additional fundraising would continue until a final closing date, which would occur nine to 12 months after the first closing. (Compl. ¶¶ 25, 54).

Because Defendants had raised $40 million of the Fund's maximum $200 million in capital commitments by the first closing (Compl. ¶ 28), they were seeking $120 million in additional capital commitments by the final closing. Defendants therefore had every incentive not to defraud the investors in the first closing because that would jeopardize their success in raising the remaining $120 million of capital commitments. Plaintiff's theory that the Fund set out to defraud investors in the first phase of the fundraising makes no sense whatsoever.

In short, Plaintiff has offered no plausible motive or explanation as to why Defendants would want to deceive him into investing in this Fund. Certainly, there is no "strong" or "cogent" inference of fraudulent intent as required by the Supreme Court's new standard. While Plaintiff alleges that the Fund "desperately" needed more capital and therefore had a "motive" to defraud Heller, Congress has stated that more is required than mere suspicions or bald assertions. *Tellabs* makes clear that this court must weigh the competing inferences to determine if a case can survive a motion to dismiss. As a comparison of the competing inferences makes clear,

Plaintiff's allegations are not "cogent and at least as compelling as" the inferences of

nonfraudulent intent. At the very least, the inference of nonfraudulent intent is equally

permissible as any inference of fraudulent intent. Under *Tellabs*, that is insufficient to satisfy the

pleading requirement of *scienter*.

### C.    <u>Plaintiff Fails Adequately To Plead Loss Causation</u>

Plaintiff's Section 10(b) claim should be dismissed for the separate and independent

reason that Plaintiff cannot establish loss causation. *See* 15 U.S.C. § 78u-4(b)(4) ("In any private

action arising under this chapter, the plaintiff shall have the burden of proving that the act or

omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff

seeks to recover damages"); *see also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336

(2005).

Although alleging that a misstatement induced a plaintiff to invest may suffice to plead

*transaction* causation, *loss* causation requires the plaintiff to point to some causal link between

the alleged misrepresentation and a concrete decline in the value of his security interest. *Lentell*

*v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). "Transaction causation is akin to

reliance, and requires only an allegation that 'but for the claimed misrepresentations or

omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Id.*

"Loss causation 'is the causal link between the alleged misconduct and the economic harm

ultimately suffered by the plaintiff.'" *Id.* "[T]o establish loss causation, 'a plaintiff must allege . .

. that the *subject* of the fraudulent statement or omission was the cause of the actual loss

suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when

disclosed, negatively affected the value of the security." *Id.* at 173.

Plaintiff alleges a litany of misrepresentations and omissions concerning a variety of

subjects -- the Fund's current and future capitalization, the timing of capital commitments, the

Fund's investment objective, closing dates, past investment activity, and the background of

Harrison Goldin.  (Compl. ¶ 82).  But none of these statements has anything to do with the

economic loss Plaintiff allegedly suffered.  The limited partners lost money in the Fund because

the Medspa investment failed.  That failure, having to do with unique factors related to the

specific investment, is not causally connected to any of the misstatements and omissions alleged

by Heller.  As numerous courts have held, an intervening collapse of a business or market --

whether the Internet, telecommunications, oil & gas, or even a retail chain of medical spas --

breaks the causal connection and undermines plaintiff's ability to establish loss causation.  *See,*

*e.g.*, *Dura Pharmaceuticals*, 544 U.S. at 342-43.

### D.    Plaintiff's Alleged Misrepresentations or Omissions Are Not Actionable

Plaintiff identifies several categories of alleged representations and omissions made in

the offering materials presented to him on February 1, 2005.  But many of these are not

actionable as a matter of law because (i) Plaintiff represented and warranted that he was relying

solely on the Offering Memorandum and Partnership Agreement, (ii) certain of the alleged

omissions are contradicted by the written disclosures that Plaintiff received, and (iii) the alleged

disclosure about the Fund not achieving its investment objectives is immaterial as a matter of

law.

### 1.    Plaintiff Cannot Rely on Oral Misrepresentations or Omissions

Plaintiff's securities fraud claim is built primarily around allegations that Defendants

made "oral" misrepresentations and omissions at a meeting on February 1, 2007.  (Compl. ¶ 82).

But in the Subscription documents, Plaintiff specifically represented that he was not relying on

oral representations, but instead was relying "solely upon the Memorandum, the Partnership, and

independent investigations made by the Investor."  (Subscription Documents, Ex. C, p. 2).

Plaintiff cannot base a securities fraud claim on purported "oral" misrepresentations or omissions

when the Plaintiff previously represented specifically his reliance solely on the written offering

documents. *See Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, 2001 WL 396521, at *5

(S.D.N.Y. 2001) (enforcing disclaimer of reliance on oral misrepresentation and holding that

"Plaintiff cannot now, when faced with investments gone bad, claim under Section 10(b) or Rule

10b-5 that it relied upon oral misrepresentations").

## 2.    The Alleged Misrepresentations and Omissions are Contradicted By The Written Offering Materials

Plaintiff alleges that Defendants failed to disclose that the Fund was undercapitalized in

February 2005 and failed to disclose that the Fund would remain open for capital commitments.

(Compl. ¶ 82). But these alleged misstatements and omissions contradict the plain language of

the Offering Memorandum and the Court need not accept them as true on this motion. *See, e.g.,*

*Miller v. Lazard, Ltd.,* 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007).

The Offering Memorandum specified that the Fund was seeking a *maximum* of $200

million in capital commitments over a two-phased, fund-raising process. (Offering

Memorandum, Ex. B, p. 2). There was no guarantee that the Fund would receive $200 million in

capital commitments or that the Fund would receive a certain amount in capital commitments by

the first closing date. In fact, Plaintiff was given documents showing the amount of the Fund's

capital commitments as of the time of his investment.[3] His allegations of "undercapitalization"

cannot be deemed fraudulent in light of the specific, written disclosures that were made to him.

Plaintiff's allegation that he did not know the Fund would remain open beyond the date of

his investment is likewise contradicted by the written disclosures he received. The Offering

---

[3] On May 19, 2005, Heller received an initial capital call regarding the Fund's investment in Medspa. The call drew down 36.8% of Heller's $1 million capital commitment for a $15 million investment in Medspa. The basic math ($15 million/ .368 indicates that the Fund had approximately $40.75 million of committed capital at this time. This communication clearly contradicts the allegations in paragraph 68 of the Complaint.

Memorandum provided to Heller stated expressly that there would be a final closing approximately nine months after the first closing, in which Plaintiff invested. (Offering Memorandum, Ex. B, pp. 2, 17-18). Heller alleges that defendants "pressured" him to invest quickly because the Fund was about to close and he might lose the opportunity (Compl. ¶ 3), but that allegation is contradicted by the Offering Memorandum which specifically disclosed a second closing down the road.

Plaintiff cannot base a claim under Section 10(b) or Rule 10b-5 on omissions and representations that are not fraudulent. *See, e.g.*, *In re Axis Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 584 (S.D.N.Y. 2006).

### 3. Failure To Disclose That The Fund's Investment Objective May Not Be Achievable Is Not Actionable In Light of the Disclaimers in the Offering Memorandum

Plaintiff's key allegation of fraud is that Defendants failed to disclose that the Fund's investment objective may not achievable. But, given the disclosures in the Offering Memorandum, no reasonable investor could have been defrauded by this alleged omission.

In evaluating whether an alleged omission is material, the "touchstone of the inquiry" is "whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). The Court must consider the alleged omission within the context of the offering materials as a whole. *See id.*; *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).

Under the "bespeaks caution" doctrine, "[c]ertain alleged misrepresentations in a[n] . . . offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of the adequate cautionary language set out in the same offering." *Halperin*, 295 F.3d at 357. For example, if cautionary language expressly warns

about the risk that is the subject of the alleged misrepresentation or that caused plaintiff's loss, the misrepresentation is immaterial as a matter of law. *See id.* at 359-60 (finding the failure to disclose that future registration of securities was dependant on an IPO and the unlikelihood of an IPO immaterial because the offering memoranda explicitly warned investors of the risk that the securities may never trade in a liquid market); *Olkey*, 98 F.3d at 5 (finding the representation that a trust's investments would be balanced immaterial because the prospectus warned investors that losses could occur).

Oral misrepresentations are immaterial if they are "contradicted" by "plain and prominently displayed language" in the written offering materials. *See Olkey*, 98 F.3d at 9. The Second Circuit "has consistently affirmed Rule 12(b)(6) dismissal of securities claims where risks are disclosed in the prospectus." *Id.* There is also ample precedent for the notion that written disclaimers in an offering memorandum can negate reliance as a matter of law. *See, e.g., In re Towers Financial Corporation Noteholders Litigation*, 1996 U.S. Dist. LEXIS 22674 (S.D.N.Y. 1996).

The Offering Memorandum disclosed the precise risk that Plaintiff now alleges defrauded him -- that the Fund might be able to invest in only one venture, which could fail. (Compl. ¶¶ 67, 73). Indeed, the Offering Memorandum specifically warned that the Fund might not be able to invest in multiple ventures. (Offering Memorandum, Ex. B, p. 30) ("**Difficulty of Locating Suitable Investments.** The Fund may be unable to find a sufficient number of attractive opportunities to meet its investment objectives or fully invest its committed capital"). The Offering Memorandum also warned that even one failed venture could severely impact an investor's investment. (Offering Memorandum, Ex. B, p. 30) ("**Risk of Limited Number of Investments.** . . . Since the Fund may make only a limited number of investments and since the

Fund's investments generally will involve a high degree of risk, poor performance by even a single Portfolio Company could severely affect the total returns to Limited Partners").  The Offering Memorandum also warned that "[i]nvestors must be able to withstand the loss of their entire investment."  (Offering Memorandum, Ex. B, p. 30).

In light of these disclosures, no reasonable investor could have been defrauded by the failure of Defendants to tell Plaintiff orally that the Fund might not achieve its investment objectives.  Plaintiff was specifically warned of this very possibility in the Offering Memorandum that he received and read before he decided to invest in the Fund.  Thus, Plaintiff cannot claim there was a material omission regarding achievement of the Fund's investment objective.

### Conclusion

For the foregoing reasons, Defendants respectfully request that their motion to dismiss be granted and that Plaintiff's complaint be dismissed in its entirety.


DATED:  October 22, 2007            QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP


                                    By _Daniel Brockett_____
                                    Daniel L. Brockett, Esq.
                                    Attorneys for Defendants

                                    **QUINN EMANUEL URQUHART
                                    OLIVER & HEDGES LLP**
                                    51 Madison Avenue, 22nd Floor
                                    New York, New York  10010
                                    (212) 849-7000