UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

LLOYD J. HELLER,

               Plaintiff,

     vs.

GOLDIN RESTRUCTURING FUND, L.P., GOLDIN
CAPITAL PARTNERS, L.P., GOLDIN CAPITAL
MANAGEMENT, L.P., GOLDIN ASSOCIATES,
L.L.C., HARRISON J. GOLDIN, DAVID PAUKER,
AND LAWRENCE J. KRULE,

               Defendants.

-----------------------------------------------------------------x

07 Civ. 3704 (RWS)

ECF Filed

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**LOVELL STEWART HALEBIAN LLP**
John Halebian (JH-8005)
Adam C. Mayes (AM-1101)
500 Fifth Avenue
New York, New York 10110
Telephone (212) 981-6760
Telecopier: (212) 208-6806
jhalebian@lshllp.com

Attorneys for Plaintiff Lloyd J. Heller

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................... ii

**PRELIMINARY STATEMENT** .................................................................................1

**THE ALLEGATIONS OF THE COMPLAINT** ........................................................4

**ARGUMENT** ..............................................................................................................8

I.  **LEGAL STANDARDS** .....................................................................................8

II.  **PLAINTIFF HAS PROPERLY PLED THE SECURITIES FRAUD CLAIM**...........8

    A.  **The Complaint Demonstrates a Strong Inference of Scienter**...........8

    B.  **Plaintiff Properly Alleged Loss Causation** .......................................11

    C.  **Defendants' Misrepresentations and Omissions Are Actionable**.................13

III.  **PLAINTIFF'S FIDUCIARY DUTY CLAIMS SHOULD BE UPHELD** .................19

    A.  **On This Motion, Defendants Are Not Entitled to Rely on the Limitations of Liability in the Partnership Agreement**.....................19

    B.  **The Martin Act Preemption Is Inapplicable** .....................................22

**CONCLUSION** ........................................................................................................23

# TABLE OF AUTHORITIES

## Federal Cases

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ......................................................16

*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................................9

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004) .........9

*Bayou Hedge Fund Litig. v. Hennessee Group LLC*,
    2007 WL 2319127 (S.D.N.Y. July 31, 2007) ...............................................................................23

*Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct 1955 (2007) ......................................13, 21

*In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000).................................................9

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001).............................................23

*In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314 (S.D.N.Y. 2001) .............................17

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) .................................................9

*Darquea v. Jarden Corp.*, 2007 U.S. Dist. LEXIS 65739 (S.D.N.Y. Sept. 5, 2007) ....................11

*In re Donald J. Trump Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993) .......................................................18

*DuPont v. Brady*, 828 F.2d 75 (2d Cir. 1987)...............................................................................16

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)...............................................................12, 13

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ........12

*EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000) .........................................16

*Finance One Public Co. Ltd. v. Lehman Bros. Special Fin. Inc.,* 414 F.3d 325 (2d Cir. 2005)....22

*Flickinger v. Brown*, 947 F.2d 595 (2d Cir. 1991) ..................................................................11, 15

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ...........................................................9

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985).........................................................................8

*Glidepath Holding, B.V. v. Spherion Corp.*,
    2007 U.S. Dist. LEXIS 54889 (S.D.N.Y. July, 26, 2007) ..........................................................11

*Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184 (2d Cir. 1998) ...............................................8

*Halperin v. Ebanker USA.Com, Inc.*, 295 F.3d 352 (2d Cir. 2002)....................................................17

*Hunt v. Alliance North American Govt. Income Trust, Inc,*, 159 F.3d 723 (2d Cir. 1998) ...........18

*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005) ...............................13

*Kline v. First Western Govt. Sec. Inc.*, 24 F.3d 480 (3rd Cir. 1994) ......................................17, 18

*Lentell v. Merrill Lynch & Co.*, 396 F. 3d 161 (2d Cir. 2005).......................................................12

*Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001) ....................................................8

*In re Marsh & McLennan Cos. Sec. Litig.*,
     2006 U.S. Dist. LEXIS 49525 (S.D.N.Y. July 19, 2006) ..........................................................23

*McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576 (2d Cir. 1990) ..........................17, 18

*Nanopierce Techs. v. Southridge Capital Mgmt. LLC*,
     2002 U.S. Dist. LEXIS 24049 (S.D.N.Y. Oct. 10, 2002)..........................................................23

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ................................................................................9

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ..............................................18

*Parnes v. Gateway 2000, Inc.*, 122 F.3d 539 (8th Cir. 1997) .........................................................18

*In re Refco Sec. Litig.*, 2007 WL 1280649 (S.D.N.Y. April 30, 2007) ............................................8

*In re Regeneron Pharm., Inc. Sec. Litig.,* 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)....................9

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)...............................................................................9

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .........................................................................................8

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2000) ..................................................9, 10

*Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*,
     200 WL 396521 (S.D.N.Y. Apr. 19, 2001) ..............................................................................14

*Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92 (2004) .........................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct 2499 (2007)...................10, 11

*In re Tower Air Inc.*, 416 F.3d 229 (3d Cir. 2005) .........................................................................21

*TSC Industries v. Northway*, 426 U.S. 438, 96 S. Ct 2126 (1976) ..........................................15, 16

*Turtur v. Rothschild Registry Int'l*, 26 F.3d 304 (2nd Cir. 1994) ...................................................22

*In re Xethanol Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 65935 (S.D.N.Y. Sept. 7, 2007) .........11

**State Cases**

*Brickell Partners v. Wise*, 794 A.2d 1 (Del. Ch. 2001) ...................................................................22

*Emerald Partners v. Berlin*, 726 A.2d 1215 (1999) ........................................................................20

*Greenspun v. Lindley*, 36 N.Y.2d 473, 369 N.Y.S.2d 123 (NY 1975) ............................................22

*Horn v. 440 East 57th Company*, 151 A.D.2d 112, 547 N.Y.S. 2d 1 (First Dept. 1989) .............23

*In re PNB Holdings Shareholder Litig.*,
    2006 Del. Ch LEXIS 158 (Del. Chancery Aug. 18, 2006) ........................................................20

*Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 738 N.Y.S.2d 658 (2001) .....................14

*Sonet v. Timbers Co.*, 722 A.2d 319 (Del. Ch. 1998) ....................................................................22

*Stone v. Ritter*, 911 A. 2d 362, 370 (Del. 2006) ...............................................................................4

*In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27 Del. 2006 ...........................................21

*West, Weir & Bartlet Inc. v. Mary Carter Paint Co.*,
    25 N.Y.2d, 535, 307 N.Y.S. 2d 449 (1969) .............................................................................14

**Federal Statutes**

15 U.S.C. § 78j(b) ..............................................................................................................................2

**Federal Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................................................8, 20

**State Statutes**

6 Del. Code §17-1101 .........................................................................................................................3

N.Y. Gen. Bus. Law § 352 .................................................................................................................22

Plaintiff, thorough his attorneys, submits his Memorandum of Law in Opposition to Defendants' Motion to dismiss the Complaint.[1] For the reasons below, the Motion should be denied.

## PRELIMINARY STATEMENT

This case involves a federal securities fraud and breach of fiduciary duty committed by defendants Goldin Restructuring Fund, L.P. ("the Fund"); Goldin Capital Partners, L.P., and Goldin Capital Management, L.P., which are respectively the Fund's general partner and its manager; Goldin Associates, L.P., a financial and strategic advice firm with which the Fund is closely associated; and individual defendants Harrison J. Goldin, David Pauker, and Lawrence J. Krule, who are the principals of the Fund's general partner ("Defendants").

The Fund was marketed as a diversified private investment designed to limit risk by investing in *multiple* distressed companies wherein only a small percentage of the Fund's equity would be invested in any one company. However, investors did not flock to invest; despite significant marketing efforts and an extended time period in which to raise funds, the Fund had great difficulty raising capital. By the time that Plaintiff was solicited in February 2005, the Fund had raised barely $40 million of the $200 million sought, an amount far less than it needed to fulfill its investment plan as outlined in the Confidential Offering Memorandum dated June 2004 (the "COM"). Desperate to obtain additional capital contributions for the Fund, and realizing that their efforts had stalled, Defendants were motivated to and did make material misrepresentations to Plaintiff, and failed to disclose information which they were legally required to disclose, to induce him to become a limited partner in the Fund and to commit to a capital contribution of $1,000,000.

---

[1]    For ease of reference, a copy of the Complaint is appended to this Memorandum.

Even after Plaintiff's investment, however, the Fund remained severely undercapitalized. Defendants, having already expended significant start-up capital, realized that they could not effectuate the investment plan outlined in the COM with the meager capital that was raised. Consequently, Defendants recklessly abandoned that investment plan, with its investor protections which required investment diversification, and invested 42 percent of the Fund's assets in one risky venture. Only a few short months later, this single reckless investment failed. Plaintiff suffered a loss of approximately $450,000 (his entire cash contribution) of his $1 million capital commitment to the Fund, and remains obligated for the additional capital contributions.

This action is brought pursuant to the anti-fraud provisions of the Securities Exchange Act of 1934, Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5. Plaintiff also asserts a common law claim for breach of fiduciary duty.

Defendants' Motion to Dismiss the federal securities claim should be denied since Plaintiff clearly alleged a *prima facie* case. Plaintiff alleged that he was induced to invest in the Fund in a face-to-face meeting in February 2005, with Defendants Goldin, Pauker and Krule, where, in effect, they concealed the truth behind a screen of lies. Defendants failed to disclose the central facts about the Fund, in particular that they had failed dismally to raise sufficient funds to effectuate the COM's business plan, especially its diversification feature, which was touted to Plaintiff. Instead, Defendants falsely represented that one investor alone had committed to a $40 million investment in the Fund, and pressured Plaintiff to rush his investment decision, giving plaintiff written documentation that falsely indicated that the Fund was closing soon. Not only has Plaintiff presented sufficient facts that Defendants made materially false representations, Plaintiff has adequately alleged scienter and loss causation.

Despite the numerous specific allegations of materially false and misleading statements in the Complaint, Defendants nonetheless argue that the Complaint did not plead a securities fraud. Defendants' argument that their false statements fail to raise a strong inference of scienter is simply without merit. Scienter is evident as Defendants' false and misleading statements clearly served the purpose of raising capital for a troubled, capital-short venture. Defendants further incorrectly argue that the risks of the venture were disclosed in the boiler-plate risk factors, and therefore Plaintiff could not rely on the claimed false statements. This argument is also baseless. While Plaintiff may have assumed the risk of economic failure based on the investment he *thought* he was acquiring, he did not accept the heightened risks of failure for the investment he did acquire, since those risks were not disclosed by Defendants. Thus, the boiler-plate cautionary language contained in the offering documents was not designed to warn Plaintiff about the risks to which Defendants' false statements exposed him. Nor are Defendants permitted to employ the "bespeaks caution" doctrine, since the statements made to Plaintiff were not forward-looking statements, but statements regarding present or historic facts.

Defendants' claim that Plaintiff has not alleged loss causation also fails. To the contrary, Plaintiff adequately alleged loss causation, in that his loss directly resulted from the false statements and the material omissions, which satisfies the pleading of loss causation in this Circuit.

Defendants are also not entitled to dismissal of Plaintiff's fiduciary duty claim. Defendants cannot establish their good faith on this motion, and accordingly, are not entitled to assert any limitation on their liability pursuant to 6 Del. Code §17-1101 of the Delaware Revised Uniform Limited Partnership Act ("DRUPLA") or §4.13 of the Limited Partnership Agreement (the "Partnership Agreement"). Both sections provide that Defendants must have acted in good faith, and statutes which limit liability are viewed as the assertion of an affirmative defense, which should not

be addressed on a Rule 12(b)(6) motion. Here, Plaintiff adequately alleged that Defendants acted in their own interest to the detriment of the limited partners.[2] Since breach of fiduciary duty claims are pled pursuant to Rule 8 of the Federal Rules, a short plain statement of the claim is sufficient. Beyond that, nothing more is required, and a determination of the claim should be left to the trier of the facts. Finally, Defendants' assertion that the New York Martin Act bars Plaintiff's claim is baseless, since as Defendants acknowledge, Delaware law properly determines the liability of the Fund—a Delaware limited partnership—and its related entities, and as shown below, the Martin Act is not otherwise applicable.

## THE ALLEGATIONS OF THE COMPLAINT

Plaintiff Lloyd J. Heller is a New York resident and the president of H. Heller & Co., Inc., a plastics raw materials manufacturing business. Heller is an investing neophyte whose past investing experience has been limited to bank accounts and a broker discretionary account satisfactorily managed for him by the same broker for the past 25 years. (Cplt ¶ 11)

The Defendant entities are all Delaware limited liability entities controlled and managed by three individuals. Defendant Harrison J. Goldin, the founding partner and senior managing director of Goldin Associates, was one of three principals of Goldin Capital Partners and the "Key Person" of the Fund. Defendants David Pauker and Lawrence J. Krule, both managing directors of Goldin Associates, were the other two principals of Goldin Capital Partners. Goldin, Pauker and Krule all participated in the meeting with Heller in which Defendants solicited Heller to invest in the Fund. (Cplt ¶¶ 12-18)

---

[2]    In *Stone v. Ritter,* 911 A. 2d 362, 370 (Del. 2006), the Delaware Supreme Court reiterated that lack of good faith on the part of defendant fiduciaries may in itself constitute a breach of the duty of loyalty. Here, Plaintiff alleges that, in effect, Defendants acted in their own interest to the

The Complaint alleges that Defendants induced Plaintiff to invest in the Fund by a combination of palpably false statements and omissions of material facts which they knew and had an obligation to disclose. Defendants Goldin, Pauker and Krule had a face-to-face meeting with Plaintiff in February 2005 for the express purpose of inducing him to invest in the Fund. (Cplt ¶¶ 29-32) Plaintiff was also given a set of documents describing the Fund, which included the COM, an unexecuted draft of the Partnership Agreement (the "Draft Partnership Agreement"), the Fund's subscription documents (the "Subscription Agreement"), and a presentation on the Fund in the form of printed slideshow (the "Presentation"). (Cplt ¶¶ 33-34) The COM and the Presentation clearly and repeatedly represented that limits were placed on the Fund's investment concentration as part of the Fund's basic investment objective (Cplt ¶¶ 35-39), and Goldin echoed these representations orally (Cplt ¶¶ 30-31).[3]

It is undisputed that, at that time, the Fund was having severe difficulty raising capital. Defendants knew but failed to disclose to Plaintiff that the Fund had obtained less than a fifth of its targeted capital commitments by the originally planned First Closing Date, July 31, 2004. For this reason, unbeknownst to Heller and contrary to the COM, Defendants chose to significantly delay commencing the Fund's operation, deferring the originally planned First Closing date by six months, until January 31, 2005, in order to extend the time for their fund-raising efforts. These additional months failed to raise any additional capital. By the time Heller's investment in the Fund was

detriment of the Fund's limited partners.

[3]    The COM, the Draft Partnership Agreement, the Subscription Agreement and the Final Partnership Agreement were provided as Exhibits A-D to Defendants' Memorandum of Law. The COM and Subscription Agreement attached by Defendants appear to be slightly later drafts of the documents than were provided to Heller, but the versions in Plaintiff's possession do not differ materially for present purposes. To ensure these documents form part of the record of these proceedings, they are again attached as Exhibits A-D of the accompanying declaration of John

solicited, the Fund's total committed capital still fell short of its $200 million target by approximately 80 percent, a fact that Defendants withheld from Heller. (Cplt ¶¶ 26-28, 40-41) Defendants also knew, but failed to disclose, that a capital shortfall of such magnitude crippled the Fund's ability to meet its declared investment objective, in particular its ability to diversify its investment portfolio. (Cplt. ¶¶ 27, 44-47)

As a result of this significant capital shortfall, Defendants were highly motivated to obtain a capital commitment from Heller and others. They did so not only by concealing the Fund's undercapitalization, but also by other material falsehoods and omissions. Thus, instead of disclosing the Fund's capital-raising failure, Goldin falsely represented to Heller that a sizeable portion (about $40 million) of the Fund's overall target had been committed by a single well-known investor, Leonard Stern. (Cplt ¶¶ 31, 42-43) Instead of disclosing that Defendants had delayed commencing the Fund's activities by six months in the vain hope of raising minimally adequate capital, Defendants falsely told him that the Fund remained open to prospective investors because Defendants had been waiting for suitable investment opportunities. (Cplt ¶¶ 32, 48-52) Similarly, instead of disclosing that the Fund would remain open for another 9-12 months, Defendants urged Heller to invest quickly, telling him that he was getting in at the tail end of the capital raising process and might lose the opportunity to invest *at all* if he did not commit immediately. (Cplt ¶ 53-55)[4]

---

Halebian (the "Halebian Declaration").

[4]     Plaintiff could not have known from the documents that he was furnished at the time that he made his investment that the Fund would remain open to further investment. Rather, the documents are consistent with a second closing being imminent since it had to occur no later than nine months after the First Closing, which the documents provided to him indicated had already occurred in 2004. Cplt ¶ 48 and 54; *also see* Halebian Decl., Ex. A (COM), p. 2 and 17, and Ex. B (Draft Partnership Agreement), title page and p. 1. Heller was not notified that the First Closing had occurred until *after* he made his investment: Plaintiff signed the Subscription Agreement on February 7, 2005, and Defendants accepted the commitment on February 14, 2005. *See* Halebian Decl., Ex. C (Subscription

Finally, Defendants made the experience and integrity of the Fund's "Key Person," Harrison J. Goldin, a former New York City Comptroller, a lynchpin of their solicitation to Plaintiff, emphasizing his major role in New York City's financial restructuring in the mid-1970s. (Cplt ¶¶ 56-58) Defendants failed to disclose, however, that an investigation report by the Securities and Exchange Commission said that Goldin, as New York City Comptroller in 1974-5, knowingly "misled public investors" about the risks of the City's municipal securities and engaged in "deceptive practices" to mask the City's poor financial condition in advance of its near-default in 1975—information that was clearly material to plaintiff's evaluation of Goldin's Fund. (Cplt ¶¶ 59-62)

Defendants knew (or recklessly failed to know) that the Fund's declared investment objective was unachievable with only 20 percent of targeted capital. Nevertheless, in June 2005, the Fund purchased Skin Nuvo International, L.L.C., a "medical spa" business, for $7 million in a bankruptcy auction. Operating the business as Lumity Medspa, the Fund quickly injected additional cash to fund the company's business plan, raising its investment to $15 million, and then invested a further $2 million in the company in October or early November, 2005. In making this $17 million investment in Lumity Medspa, defendants staked 42%, or almost half of the Fund's total capital commitments on a single venture. (Cplt ¶ 66-67)

In November, 2005 just after the Fund injected its second round of capital into the business, MedSpa's sales stalled badly. By December, 2005, it was clear that the business would require significantly *more* capital to turn around successfully, and, six months after buying it, the Fund decided to sell it. In March, 2006 the Fund sold the business for a sum of cash applied to

Agreement), p. 19, 20.

professional fees and wind-down expenses, an assumption of liabilities, and an equity stake in the purchaser valued at "zero to ten percent" of the original investment. (Cplt ¶¶ 69-71)

As a direct result of Defendants' fraud in inducing Plaintiff to invest in the Fund, and of their subsequent breaches of fiduciary duty in operating the Fund, Plaintiff lost his entire cash investment. (Cplt ¶¶ 72-73)

<strong>ARGUMENT</strong>

## I.    LEGAL STANDARDS

On a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), all allegations in a complaint are accepted as true, and all reasonable inferences are drawn in favor of Plaintiff. *See Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir. 2001); *Grandon v. Merrill Lynch & Co., Inc.,* 147 F.3d 184, 188 (2d Cir. 1998). The court's task is "'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *In re Refco Sec. Litig.,* 2007 WL 1280649, at *5 (S.D.N.Y. April 30, 2007) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir. 1985)). S*ee also Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

## II.    PLAINTIFF HAS PROPERLY PLED THE SECURITIES FRAUD CLAIM

### A.    The Complaint Demonstrates a Strong Inference of Scienter

Plaintiff may establish the requisite strong inference of scienter in one of two ways: "(a) by alleging facts to show that Defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

8

recklessness." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir. 2000), see also *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000); In re *Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 39 (2d Cir. 2000). "Although the inference of scienter must be reasonable and strong, it need not be irrefutable." *In re Regeneron Pharm., Inc. Sec. Litig.,* 2005 WL 225288, at * 24 (S.D.N.Y. Feb. 1, 2005). The Second Circuit has noted that a plaintiff is not required to plead scienter with "great specificity." *Ganino*, 228 F.3d at 169; accord *In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2000) ("we do not require the pleading of detailed evidentiary matter in securities litigation."); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 455 (S.D.N.Y. 2005); *In re Atlas Air Worldwide Holdings, Inc. Sec.* Litig., 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004).

Conscious misbehavior or recklessness is adequately pled by alleging that a defendant: (1) deliberately engaged in illegal behavior; (2) knew facts or had access to information suggesting that their statements were not accurate; or (3) failed to check information that they had a duty to monitor. *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir. 2000). To plead facts supporting a strong inference of scienter by demonstrating a defendant's motive and opportunity, a plaintiff may allege facts "showing concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged, and the means and likely prospect of achieving the concrete benefits by the means alleged." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 469 (S.D.N.Y. 2001) (quotations and citations omitted); accord *In re Scholastic Corp. Sec. Litig,* 252 F.3d 63, 74 (2d Cir. 2001) (motive focus is on "...a concrete benefit defendant would realize by his conduct.").

Plaintiff here satisfies both methods of demonstrating scienter. Here, Defendants told Plaintiff facts which were materially false including, among other things, that they intended to effectuate the Fund's business plan, when Defendants had *actual knowledge* at the time that the claims were false. Further, Defendants were motivated to misrepresent the material facts concerning

the Fund to Plaintiff, because Defendants *desperately needed* additional capital which was not otherwise forthcoming. The Complaint sets out detailed allegations demonstrating that Defendants knowingly and deliberately misrepresented material facts concerning the Fund to induce Plaintiff to invest. (*See*, *e.g.*, Cplt ¶¶ 39-62). Accordingly, the inference of scienter here is compelling.

The Supreme Court's recent decision in *Tellabs*, *Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct 2499, 2509 (2007) strongly favors upholding the Complaint. Plaintiff's scienter allegations clearly satisfy the *Tellabs* standard. Considering the question of what standard courts should apply in interpreting the "strong inference" requirement of the Private Securities Litigation Reform Act of 1995, the Court "establish[ed] the following prescriptions:"

> First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . . Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss. . . . Third, in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.

However, as the Supreme Court explained, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking gun' genre, or even the 'most plausible of competing inferences," but merely "at least as compelling as any opposing inference one could draw from the facts alleged.'" (holding that a plaintiff must "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference"). (127 S. Ct at 2510, 2512) Considering each of these factors, the Supreme Court adopted the following standard: "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." (127 S. Ct at 2505, 2513). Several recent cases in the Southern District have upheld securities complaints in reliance on *Tellabs. See In Re Xethanol Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 65935 at *11-12

(S.D.N.Y. Sept. 7, 2007) (Rejecting defendants' claim that plaintiffs failed to demonstrate scienter, since defendants offered no more compelling inference to warrant dismissal.); *Darquea v. Jarden Corp.*, 2007 U.S. Dist. LEXIS 65739 (S.D.N.Y. Sept. 5, 2007) (denying motion to reargue of dismissal based on *Tellabs*.); *Glidepath Holding, B.V. v. Spherion Corp.* 2007 U.S. Dist. LEXIS 54889 at *38-39 (S.D.N.Y. 2007 July 26, 2007) (Inferences of fraud were at least as strong as competing inferences.).

Defendants' claim that there is no cogent inference of scienter is without merit. First, it is clear that once Plaintiff signed the subscription agreement, and it was accepted by Defendants on February 14, 2005, (Subscription Agreement, Defendants' Exhibit C p. 20) he had made his investment and was contractually bound. Any claimed later disclosure of the undercapitalization is irrelevant. *Flickinger v. Brown,* 947 F.2d 595, 598 (2d Cir. 1991) (Defendants' fraud must be integral to the purchase of the security). Second, the fact that Defendants themselves had already made a capital contribution creates an additional strong inference of their scienter. Since they had their own money at risk, they were highly motivated to make material misrepresentations to new potential investors in order to get new investors to invest in the Fund and thereby attempt to make the Fund more viable and to save Defendants' own funds. Nor does the claim that Defendants could jeopardize further investments if they defrauded Plaintiff make any sense. The need for immediate capital certainly outweighed any other consideration, and an accurate revelation of the true state of the Fund would have driven new investors away. Absent the painting of a false rosy picture, there would likely have been no new investors. Here the Plaintiff's inferences of scienter are far more cogent and compelling than those of Defendants.

### B.    Plaintiff Properly Alleged Loss Causation

Defendants' assertion that the Complaint fails to allege loss causation is baseless. This is *not*

a case where the Defendants lied to Plaintiff and then the Plaintiff's loss resulted from some external cause, such as a flood, or a general decline in the value of limited partnerships generally. Rather, Plaintiff's loss was occasioned by the very risks which Defendants concealed from him. Specifically, the Fund's severe undercapitalization directly led to the failure of the Fund and of the value of Plaintiff's investment. In order to induce Plaintiff to invest, Defendants concealed these risks by hiding the Fund's undercapitalization and all related facts, such as the Defendants' prolonged but unsuccessful fund raising efforts.

In *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court adopted a pragmatic, common-law tort approach to loss causation in securities litigation. Expressly endorsing loss causation as it has been defined in the Second Circuit, the Supreme Court held that the element of loss causation requires a plaintiff to show that a misrepresentation "proximately caused the plaintiff's economic loss." 544 U.S. at 344-46. Among the decisions cited with approval by the Supreme Court in *Dura* was the Second Circuit's decision in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003). In *Emergent Capital*, the Second Circuit held that proximate cause in a securities case exists when "damages suffered by plaintiff [are] a foreseeable consequence of any misrepresentation or material omission." Id. at 197. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) ("a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 n.23 (S.D.N.Y. 2005) (Second Circuit's loss causation standard was "undisturbed by *Dura*.").[5]

---

[5]    In terms of Plaintiffs' pleading burden to allege loss causation in a securities fraud complaint, the Supreme Court in *Dura* "assumed" that plaintiffs would only be required, pursuant to Rule 8(a),

Here, Plaintiff alleged that Defendants induced him to invest in the Fund by concealing material risks of the investment. The investment was far more risky than represented because, unknown to Plaintiff, Defendants had raised so little capital that they would have to bet the future of the Fund as a whole on any one investment they chose to make. The Fund failed because it was undercapitalized and consequently wholly undiversified. Plaintiff's losses resulted from the very risk concealed by Defendants and thus, loss causation is clear.

### C.    Defendants' Misrepresentations and Omissions Are Actionable

Defendants inaccurately argue that Plaintiff agreed not to rely on Defendants' oral misrepresentations. Defendants' assertion is contrary to the provisions of the Subscription Agreement, at p. 2:

> The Investor has received, carefully read and understands the Partnership Agreement and the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risk and expenses of an investment in, the Partnership. The Investor acknowledges that it has made an independent decision to invest in the Partnership and that, in making its decision to subscribe for an Interest, the Investor has relied solely upon the Memorandum, the Partnership Agreement and *independent investigations made by the Investor*. The Investor is not relying on the Partnership or the General Partner, or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Investor's own advisers. The Investor's investment in the Interest is consistent with the investment purposes, objectives and cash flow requirements of the Investor and will not adversely affect the Investor's overall need for diversification and liquidity.
>
> ****
>
> *The Investor has been provided an opportunity to obtain any additional information concerning the offering, the Partnership and all other information to the extent the Partnership or the General Partner possesses such information or can acquire it without unreasonable effort or expense, and has been given the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the offering and other matters pertaining to this investment. (Emphasis added.)*

---

to plead "a short and plain statement of the claim." 544 U.S. at 346. As the Supreme Court recently reaffirmed, in *Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct 1955 (2007), there is no heightened pleading standard under Rule 8 of the Federal Rules.

Thus, the Subscription Agreement *required* that Plaintiff obtain additional information from the Defendants, and to use such information in making his independent decision whether to invest. Accordingly, Plaintiff was *not limited* to reliance on the Offering Memorandum and the Partnership Agreement, but was entitled to, and *expected to* rely upon what Defendants orally told him.

*Silva Run Worldwide Ltd. V. Gaming Lottery Corp.* 2001 WL 396521 (S.D.N.Y. April 19, 2001) is instructive. There, unlike here, the written documentation expressly excluded reliance on *any* oral representations. (slip at *6). Under those circumstances, plaintiff, a highly sophisticated investor, was precluded from claiming reliance on oral representations as a basis of a fraud suit. Here, Defendants, as authors of the documentation which Plaintiff executed, could have included the exact same language, but did not. Since Defendants, who drafted the agreement, *expressly permitted* Plaintiff to rely on oral discussions, they cannot now claim that the agreement said something else.[6]

Similarly, Defendants' claim that the alleged misrepresentations and omissions are contradicted by the written offering materials is simply wrong. Defendants misleadingly claim that the actual amount raised by the Fund was disclosed to Plaintiff in writing (See Defendants' Brief p. 22 n. 3), but this purported disclosure did not take place until May 19, 2005—long *after* Plaintiff invested in the Fund. Thus, Plaintiff never knew this negative material information when his decision to invest was made months earlier, in February 2005. *See Flickinger,* 947 F. 2d 595, 598, holding that Defendants' fraud must be integral to the purchase of a security. In addition, Defendants incorrectly argue that their misstatements pressuring Plaintiff to invest in the Fund quickly were

---

[6]    Defendants are bound by this language and cannot argue otherwise. Where a contract is clear on its face, the court will interpret it as a matter of law. *See West, Weir & Bartlet Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d, 535, 307 N.Y.S. 2d 449, 452 (1969); *See also Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195, 199 738 N.Y.S.2d 658, 661 (2001) (Court will not imply language which the parties have not included.)

contradicted by the COM, which purportedly made clear that the opportunity to invest would remain open until a subsequent Final Closing. To the contrary, the written materials that Defendants gave to Plaintiff were themselves misleading because they falsely indicated that the Fund already had its First Closing on or about July 31, 2004. Cplt ¶ 48; *also see* Halebian Decl., Ex. A (COM), p. 2 and 17, and Ex. B (Draft Partnership Agreement), title page and p. 1. On the basis of the written materials alone, Plaintiff was led to believe and could have reasonably assumed that the First Closing had occurred months earlier and that Final Closing was about to occur.[7] In their oral statements to Plaintiff, Defendants made every effort to reinforce rather than correct this misimpression. *See* Cplt ¶¶ 50, 53-54.

Further, Defendants failed to disclose information which was material to Plaintiff's decision to invest.[8] In face-to-face negotiations, reliance is *presumed* as to material information which was

---

[7]    Based on the offering materials, the second closing was to occur *no later* than 9 months after the First Closing. It could occur earlier. Cplt ¶ 54; *also see* Halebian Decl., Ex. A (COM), p. 2.

[8]    Whether a fact is material was explained in *TSC Industries v. Northway*, 426 U.S. 438, 449, 96 S. Ct 2126, 2132 (1976):

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Materiality is viewed as a mixed question of fact and law and not suitable for decision by the court, as the *Northway* Court held:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear

omitted. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S. Ct 1456, 1472 (1972); *DuPont*

*v. Brady*, 828 F.2d 75, 78 (2d Cir. 1987). Indeed, the failure to disclose that the Fund was having

severe trouble raising money, that the closing had been significantly delayed, and that it was highly

likely that additional funds would not be forthcoming, were all highly material as to whether

Plaintiff should invest in the Fund which was so severely undercapitalized that it could not

effectuate its stated business plan.

Defendants further argument that the doctrine of "bespeaks caution" insulates them is also

baseless. First, the bespeaks caution doctrine has *no application* to misstatements of present or

historic fact, but applies only to forward-looking statements. Since Plaintiff complained of

misstatements of current or historic fact, this doctrine has no application. As the court held in *Stolz*

*Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2004):

> Although it does not appear that this circuit has ruled specifically on this issue,
> other circuits have expressly limited the application of the "bespeaks caution"
> doctrine to forward-looking, prospective representations, but they have noted that
> the misrepresentation of present or historical facts cannot be cured by cautionary
> language. *See, e.g., EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 874 (3d
> Cir. 2000) ("By its terms, the 'bespeaks caution' doctrine . . . is directed only to for-
> ward-looking statements."). District courts within this circuit have recognized this
> limitation. *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340
> (S.D.N.Y. 2001) (noting that the "bespeaks caution" doc-trine applies "to forward-
> looking statements only, and not to material omissions or misstatements of
> historical fact.") (emphasis in original). This is a reasonable limitation on the
> "bespeaks caution" doctrine and we adopt it here. The cautionary language
> associated with the "be-speaks caution" doctrine is aimed at warning investors that
> bad things may come to pass-in dealing with the contingent or unforeseen future.
> Historical or present fact-knowledge within the grasp of the offeror is a different

---

> in mind that the underlying objective facts, which will often be free from dispute, are
> merely the starting point for the ultimate determination of materiality. The
> determination requires delicate assessments of the inferences a "reasonable
> shareholder" would draw from a given set of facts and the significance of those
> inferences to him, and these assessments are peculiarly ones for the trier of fact.

426 U.S. 438, 449, 96 S. Ct 2126, 2133.

matter. Such facts exist and are known; they are not unforeseen or contingent. It would be perverse in-deed if an offeror could knowingly misrepresent historical facts but at the same time disclaim those misrepresented facts with cautionary language.

Secondly, while it is true that Plaintiff undertook certain risks of the investment, he did not undertake the risks that the Fund was likely to fail due to the failure to raise enough capital, and the risk that Defendants could not effectuate the business plan. As *Halperin v. Ebanker USA.Com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002) makes clear, the bespeaks caution doctrine is really an inquiry into whether the alleged false statements are material in the light of the other disclosures.[9] Where, as here, defendants relied on blanket risk factors claiming that a plaintiff's reliance was not justified, the courts reject such contentions. In *Kline v. First Western Govt. Sec. Inc.* 24 F.3d 480, 489 (3rd Cir. 1994) the court, in rejecting the use of blanket disclaimers to support dismissal, held:

> Not just any cautionary language will trigger application of the doctrine. Instead, disclaimers must relate directly to that on which investors claim to have relied. As we noted in *Trump*,[ *In re Donald J. Trump Secs. Litig.,* 7 F.3d 357, 371-72 (3d Cir. 1993] "a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."

To the same effect is *Hunt v. Alliance North American Govt. Income Trust, Inc*, 159 F.3d 723, 729 (2d Cir. 1998) where the court reversed a dismissal and rejected the bespeaks caution

---

[9]    As the court held:

> Consequently, when cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered. *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2d Cir. 1990).

defense because disclosures warned against a different risk than that which plaintiff contended was
not disclosed. Holding that the cautionary language, must relate *directly* to that by which plaintiffs
claim to have been misled, the court stated:

> the central issue . . . is not whether the particular statements, taken separately, were
> literally true, but whether defendants' representations, taken together and in context,
> would have misled a reasonable investor about the nature of the [securities]." *Olkey
> v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996), cert. denied, 520 U.S.
> 1264, 138 L. Ed. 2d 194, 117 S. Ct. 2433 (1997), (finding no material
> misrepresentation where "the prospectuses when read in their entirety [were] not
> overly sanguine" and contained "extensive cautionary language") (quoting *McMahan
> & Co. v. Wherehouse Entertainment,* 900 F.2d 576, 579 (2d Cir. 1990)). The
> cautionary language, however, must relate directly to that by which plaintiffs claim
> to have been misled. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir.
> 1997); *Kline v. First Western Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir. 1994).

> The cautionary language contained in the prospectus does not necessarily foreclose
> liability because it warned investors of a different contingency than that which
> plaintiffs allege was misrepresented. The prospectuses warned that the Fund's
> hedging maneuvers might fail, not that the Fund would have no opportunity to use
> hedging maneuvers. Plaintiffs allege the prospectuses were misleading as to the
> latter. That the prospectuses disclosed the possible inefficacy of hedges does not
> shield the Fund from liability for misrepresenting the availability of hedging
> opportunities. According to plaintiffs' theory, investors who trusted the astuteness of
> the Fund's managers would be reassured as to their ability to reduce risk through
> hedging, notwithstanding the warning that their hedging efforts might be foiled,
> whereas in truth, according to the Amended Complaint, the Fund would have no
> opportunity to reduce the risk of currency fluctuation by hedging.

Clearly, here the boiler-plate risk factors did not address the risks of which Defendants knew
and Plaintiffs did not. While Defendants point to the disclosure that the Fund might "be unable to
find a sufficient number of attractive opportunities," this disclosure is clearly inapposite because it
concerns the possibility that the fund would find too few opportunities to invest, not that it would be
too undercapitalized to safely exploit those opportunities. Moreover, the resulting risk contemplated
by the disclosure would be a lack of return on capital, and not a loss of the capital itself. Second,
Defendants point to the boilerplate disclosure of investment concentration risk entitled "Risk of
Limited Number of Investments." This disclosure, however, (like the rest of the COM) takes for

granted that *a portfolio of multiple investments will exist*. The disclosure thus cautions that the Fund's composite ("total") return may be depressed if "even a single Portfolio Company" performs poorly, but provides no notice that Defendants would effectively commit the entire Fund to a single venture.

Accordingly, Defendants cannot claim that the boiler-plate risk factors absolve them from liability since the misstatements and omissions of present and historic fact made to Plaintiff clearly misled him to invest in the Fund and did not warn him of the particular risks to which he was subjected.

### III.    PLAINTIFF'S FIDUCIARY DUTY CLAIMS SHOULD BE UPHELD

#### A.    On This Motion, Defendants Are Not Entitled to Rely on the Limitations of Liability in the Partnership Agreement

Defendants are not entitled to summary dismissal of the fiduciary duty claim. Indeed, Defendants attempt to obtain it by selective quotation of the operative language of the documents to suggest that Plaintiff has no claim. When the language of Section 4.3 of the Partnership Agreement is examined in full, it is apparent that Defendants' Motion is baseless. Properly quoted, section 4.3 of the Partnership Agreement reads as follows:

> 4.3    Limitation on Liability. (a) The General Partner shall be subject to all of the liabilities of a general partner in a partnership without limited partners; provided however, that to the fullest extent permitted by law, none of the Manager, the General Partner, their Affiliates and their members, partners, officers, directors, shareholders, agents and employees (each, an "Indemnified Party"), shall be liable to the Partnership or to any Partner for (i) any act or omission taken or suffered by such Indemnified Party in connection with the conduct of the affairs of the Partnership or otherwise in connection with this Agreement or the matters contemplated herein, unless such act or omission resulted from fraud, willful misconduct, the commission of a felony, gross negligence or a material violation of applicable securities laws or (ii) any mistake, negligence, dishonesty or bad faith of any broker or other agent of the Partnership unless such Indemnified Party was responsible for the selection of such broker or agent and such Indemnified Party acted in such selection and monitoring capacity with gross negligence, in each case, which has a material adverse effect on the business of the Partnership or the ability of the General Partner

> to perform its duties under the Partnership Agreement; <u>provided</u> that in each of cases (i) and (ii), such Indemnified Party acted in good faith and, as to matters on behalf of the Partnership, in a manner reasonably believed to be in, the best interests of the Partnership.

Halebian Decl., Ex. D (Final Partnership Agreement), p.30-31.

Thus, section 4.3 states that the General Partner of the Fund is *liable* as a general partner in a general partnership, except its liability, and that of the other defendants is limited, *if (and only if)* such entities acted in good faith and in the best interests of the partnership. Here Plaintiff alleges that Defendants breached their fiduciary duty in committing the Fund to the investment in MedSpa, despite the fact that such action constituted a total repudiation of the defined investment strategy as set forth in the COM. Since Plaintiff has alleged sufficient facts demonstrating that Defendants did not act in good faith, the Court should not grant dismissal on a Rule 12(b)(6) motion. Rather, the good faith or the bad faith of Defendants should be tested after full discovery. Since Defendants' reliance on exculpatory language is generally viewed as an affirmative defense, the instant Motion is not a proper vehicle for decision.[10]

Nor should the Court be misled if Defendants, in their reply memorandum, cite pleading authority from Delaware, which sets a high bar to the maintenance of fiduciary duty claims, arguing that this Court should apply such heightened standard. Delaware requires very detailed pleading of a breach of fiduciary duty claim. While Delaware views this as notice pleading under Rule 8 of the Delaware Chancery Rules, which substantially tracks the Federal Rules, it does not at all resemble notice pleading in federal court. Thus, in federal court, a breach of fiduciary duty claim is alleged pursuant to Rule 8 of the Federal Rules. Federal Rule 8 requires a short plain statement of the claim

---

[10]    *See Emerald Partners v. Berlin,* 726 A.2d 1215, 1223 (1999); *In Re PNB Holdings c. Shareholder Litig.* 2006 Del. Ch LEXIS 158 at *84 n. 117 (Del Chancery Aug. 18, 2006) (Statutory limitation on liability is in the nature of an affirmative defense.)

demonstrating the plausibility of relief. *See Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct 1955, 1966 (2007). The heightened Delaware pleading standard has no place in federal court pleading.[11] Further, while Defendants claim to have acted in good faith, Plaintiff has put that question at issue, and, as set forth in *In re Walt Disney Co. Derivative Litigation*, 906 A.2d 27, 67 Del. 2006) , it is likely that Defendants will be found to have acted in bad faith.[12]

Here, Plaintiff alleged that Defendants abandoned the documented business plan for an untested reckless scheme. Such allegations, under Rule 8 of the Federal Rules, are more than sufficient to preclude dismissal. Pursuant to *Disney*, Defendants could be shown, after discovery, to have been indifferent to the best interests of the Fund, or evinced a conscious disregard for their duties. This showing should await trial and should not be decided on this motion.[13]

---

[11]    The Third Circuit held that the onerous Delaware Chancery Court pleading requirements for a fiduciary duty claim are not applicable to pleading in federal court. In *In re Tower Air Inc.*, 416 F.3d 229, 236 3rd Cir. 2005), the Third Circuit, when faced with the exact question of whether Delaware state court strict pleading standards governed the pleading of fiduciary duty claims in federal court, the court rejected any importation of the strict factual pleading standards into Rule 8 in federal court.

[12]    As the Court held in *Disney* on appeal after trial:

> A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. There may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

[13]    Defendants also contend that Plaintiff cannot challenge the MedSpa investment because it was authorized by the Partnership Agreement (Defendants' Brief p. 12.) First, this misconstrues Plaintiff's claim. Plaintiff does not specifically attack the Med Spa investment. Rather, plaintiff is challenging the Defendants' decision to make any single investment which constituted a 42 percent use of the Fund's capital. Such action was clearly *contrary* to the business plan set forth in the COM (*see, e.g.,* Halebian Decl., Ex. A (COM), p. 8), which is incorporated as a provision of the Partnership Agreement by § 4.1. (*See* Halebian Decl., Ex. D (Final Partnership Agreement), p.28). While it may be true that certain aspects of the MedSpa investment met some of the investment guidelines, overall, the investment was clearly *contrary* to the whole structure of the business plan. The cases cited by cited by Defendants (Defendants. Brief p. 22) *e. g.*, *Brickell Partners v.* Wise,

**B.**    **The Martin Act Preemption Is Inapplicable**

It is undisputed that the Section 11.7 of the Partnership Agreement (*see* Halebian Decl., Ex. D (Final Partnership Agreement), p. 62) provides that the agreement shall be governed and construed under Delaware Law, including that the rights and liabilities of the Partners shall be determined under Delaware law. The provision is broad enough for the Court to apply Delaware law, and consequently, the New York Martin Act has no application. *Finance One Public co. LTD. v. Lehman Bros. Special Fin. Inc.,* 414 F.3d 325, 335 (2d Cir. 2005); *Turtur v. Rothschild Registry Int'l* 26 F.3d 304, 310 (2nd Cir. 1994).[14] Defendants cannot have it both ways, i.e. the application of Deleware law on one issue and the application of New York law on a different issue.

Even if the Martin Act did apply, there is no pre-emption by the Martin Act, N.Y. Gen. Bus. Law § 352. The Martin Act permits the New York Attorney General, without alleging fraud, to seek a remedy on behalf of investors who were deceived "in connection with the purchase or sale of securities." *In re Marsh & McLennan Cos. Sec. Litig.,* 2006 U.S. Dist. LEXIS 49525, at *116-17 (S.D.N.Y. July 19, 2006). Plaintiff's breach of duty claim, however, concerns only Defendants' conduct *after* Plaintiff had already subscribed to the Fund, rather than the conduct that induced Plaintiff to make his subscription. Since Plaintiff does not claim that Defendants' misconduct as to the fiduciary duty claim in the Complaint caused him to buy, sell, or exchange any securities, the Martin Act does not apply here to pre-empt any claim.

---

794 A.2d 1 (Del. Ch. 2001) and *Sonet v. Timbers Co.*, 722 A.2d 319 (Del. Ch. 1998), for the proposition that Defendants are insulated by the Partnership Agreement have no application to these facts.

[14]    Additionally, since the breach of fiduciary duty claim involves the internal workings of a Delaware business entity, the internal affairs doctrine strongly suggests that substantive Delaware law should apply. *Greenspun v. Lindley*, 36 N.Y.2d 473, 478, 369 N.Y.S.2d 123, 126-27 (NY 1975)(Internal affairs doctrine mandated application of law of the state of incorporation.)

The cases cited by Defendants involve claims that the plaintiffs were deceived into purchasing or selling their securities. *See e,g., Castellano v. Young & Rubicam, Inc.* 257 F.3d 171, 190 (2d Cir. 2001)(breach of fiduciary duty relating to purchase of securities); *Horn v. 440 East 57th Company*, 151 A.D.2d 112, 547 N.Y.S. 2d 1 (First Dept. 1989) (fraud in purchase of residential units); *Bayou Hedge Fund Litig. v. Hennessee Group* LLC, 2007 WL 2319127 (S.D.N.Y. July 31, 2007) (Claimed breach of fiduciary duty was directly in connection with purchase of securities); *Nanopierce Techs. v. Southridge Capital Mgmt. LLC*, 2002 U.S. Dist. LEXIS 24049, at *3-7 (S.D.N.Y. Oct. 10, 2002) (Martin Act pre-empted common law claim that corporation was deceived by unscrupulous underwriter to sell its own shares); *Horn v. 440 East 57th Co.,* 151 A.D.2d 112, 547 N.YS.2d 1, 1-4 (1st Dep't 1989) (claim that deception by cooperative apartment sponsor induced plaintiff to purchase shares in complex).

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion should be denied in its entirety.

Dated: November 28, 2007

**LOVELL STEWART HALEBIAN LLP**

By:    s/ John Halebian
       John Halebian (JH-8005)
       Adam C. Mayes (AM-1101)
       500 Fifth Avenue
       New York, New York 10110
       Telephone (212) 981-6760
       Attorneys for Plaintiff Lloyd J. Heller
