**<u>APPENDIX</u>**
**<u>Complaint filed May 10, 2007 (docket #1)</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                :   Civil Action No.07-cv-3704 (RWS)

LLOYD J. HELLER,                   :

                       Plaintiff,    :   **COMPLAINT FOR FEDERAL**

     vs.                       :   **SECURITIES FRAUD AND**

                                   :   **BREACH OF FIDUCIARY DUTY**

GOLDIN RESTRUCTURING FUND, L.P.,  :

GOLDIN CAPITAL PARTNERS, L.P.,     :   **Jury Trial Demanded**

GOLDIN CAPITAL MANAGEMENT, L.P., :

GOLDIN ASSOCIATES, L.L.C.,        :   ECF Case

HARRISON J. GOLDIN, DAVID PAUKER, :

and LAWRENCE J. KRULE,         :

                                     :

                   Defendants.   :

-------------------------------------------------------------x

       Plaintiff, Lloyd J. Heller ("Heller" or "plaintiff"), by his attorneys, alleges upon personal knowledge as to his own acts, and as to all other matters, upon information and belief, based in part upon the investigation conducted by counsel, as follows:

## NATURE OF THE ACTION

      1.     Plaintiff brings this action against defendants Goldin Restructuring Fund, L.P. ("the Fund"); Goldin Capital Partners, L.P., and Goldin Capital Management, L.P., which are respectively the Fund's general partner and its manager; Goldin Associates, L.P., a financial and strategic advice firm with which the Fund is closely associated; and individual defendants Harrison J. Goldin, David Pauker, and Lawrence J. Krule, who are the principals of the Fund's general partner. Plaintiff was damaged by the defendants' knowing or reckless, material misstatements and omissions to plaintiff in connection with plaintiff's purchase of a limited partnership interest in the Fund. Plaintiff was also damaged by defendants' breach of their fiduciary duties to plaintiff when, after plaintiff purchased his interest in the Fund, defendants abandoned the Fund's stated investment objective as

1

well as any pretense of prudent investment diversification in order wrongfully to bet the Fund's

future on a single ill-considered venture. As a result of defendants' wrongful acts, in less than five

months after first providing cash funds to defendants, plaintiff suffered a total loss of approximately

$450,000 (i.e. his entire cash contribution) of his $1 million capital commitment to the Fund.

Plaintiff is suing the defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. §

240.10b-5, as well as for violation of defendants' common law fiduciary duties to plaintiff.

      2.     Defendants articulated the Fund's investment objective to Heller in oral

representations made to him by defendants Goldin, Krule and Pauker when they solicited his

participation in the Fund in February, 2005, and in written representations contained in an offering

memorandum and other written materials given to him at the same time. According to these

representations, the Fund was intended to pursue opportunities in distressed or underperforming

"middle market" companies by purchasing strategic pieces of their capital structures and exerting

significant influence or control over the restructuring process. The Fund intended to raise capital

commitments of $200 million, which it would use to make individual investments of up to a

maximum of 20% of committed capital each. Investment positions would typically be in the $15

million to $25 million range, a size calculated to allow the Fund to implement its investment strategy

by exercising influence or control in the targeted "middle market" range of companies. As a result,

the Fund would manage an expected portfolio of 8-12 investments, ensuring a measure of risk

diversification.

      3.     At the time defendants solicited Heller's investment in the Fund, they failed to

disclose that the Fund had less than $40 million in capital commitments—a shortfall of more than

*80%* relative to the targeted amount of $200 million and that they would be soliciting substantially more funds for the partnership for many more months. Instead, to the contrary, defendants pressured Heller to invest quickly because it was represented to him that he was getting in at the tail end of the capital raising process and might lose the opportunity to invest at all if he did not commit immediately. In fact, unknown to Heller, and contrary to those representations and documents provided to Heller at that time, the Fund was due to remain open to further investment for at least another 9-12 months after the First Closing, which did not occur in 2004 as the documents indicated. By investing early, Heller lost a valuable opportunity that would be available to potential subsequent investors, to evaluate more fully the Fund's initial investment results. The risk of foregoing this valuable opportunity and instead investing early in the fund-raising cycle was never disclosed to Heller. In fact, unbeknownst to Heller, the very viability of the Fund depended on its being able to raise substantial additional capital commitments—a multiple of existing commitments—*after* Heller invested.

4. Defendants also failed to disclose to Heller that they had delayed commencing the Fund's activities by six months beyond the date they had originally intended because they had been unable to raise minimally adequate capital commitments to commence operation. Instead, the defendants misrepresented to Heller that the opportunity to invest in the Fund remained open to him because they had been waiting for suitable investment opportunities. The lack of interest in the Fund shown by other potential investors was highly material to Heller's own investment decision, as was defendants' own concerns about capitalization that motivated them to extend their fund-raising efforts. Moreover, defendants failed to disclose to Heller the dire implications of operating the Fund with only 20% of target capital if, as seemed likely, no further investors were ever forthcoming.

3

5.      Heller was never warned, and the defendants never disclosed, that the Fund might commence operations so severely under-capitalized that it could not possibly meet its stated investment objective and prudently diversify its portfolio. This, however, was exactly what took place. In violation of their fiduciary duties to Heller, defendants not only commenced the Fund's activities with only 20% of targeted capital, but proceeded to bet the Fund on its first and only investment. In June, 2005, the Fund purchased Skin Nuvo International, L.L.C., a "medical spa" business, for $7 million in a bankruptcy auction. Operating the business as Lumity Medspa, the Fund quickly injected additional cash to fund the company's business plan, raising its investment to $15 million, and then invested a further $2 million in the company in October or early November, 2005. In making this $17 million investment in Lumity Medspa, defendants staked 42%, or almost half of the Fund's total capital commitments on a single venture.

6.      In November, 2005 (just a few months after Heller's initial cash investment), however, the same month the Fund injected its second round of capital into the business, Lumity Medspa's sales stalled badly. By December, 2005, it was clear that the business would require significantly *more* capital to turn around successfully, and, six months after buying it, the Fund decided to sell it. In March, 2006 the Fund sold the business for a sum of cash applied to professional fees and wind-down expenses, an assumption of liabilities, and an equity stake in the purchaser valued at "zero to ten percent" of the original investment. Heller's capital contribution to this failed venture was $443,769, or 44% of his $1 million capital commitment, lost in a single venture because of defendants' abandonment of the prudent diversification promised by the Fund's declared investment objective.

4

7.     Finally, defendants made the experience and integrity of the Fund's "Key Person,"
Harrison J. Goldin, the former New York City Comptroller, the lynchpin of their investment
solicitation to plaintiff, emphasizing his major role in New York City's financial restructuring in the
mid-1970s. Defendants failed to disclose, however, that an investigation report by the Securities and
Exchange Commission reportedly said that Goldin, as New York City Comptroller in 1974-5, had
knowingly "misled public investors" about the risks of the City's municipal securities and engaged in
"deceptive practices" to mask the City's poor financial condition in advance of its near-default in
1975—information that was clearly material to plaintiff's evaluation of Goldin's new investment
vehicle, the Fund.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
1331, federal question jurisdiction, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C.
§ 1367, supplemental jurisdiction of state law claims.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and § 1391(c), and
Section 27 of the Exchange Act, because several defendants reside, are headquartered, or conduct
business in this District, and under § 1391(b)(2) because a substantial part of the events or omissions
giving rise to the action occurred in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or
indirectly, used the mails and the means and instrumentalities of interstate commerce, including
telephonic communications.

5

## THE PARTIES

11.     Plaintiff Lloyd J. Heller is a New York resident and the president of H. Heller & Co., Inc., a plastics raw materials manufacturing business. Heller is an investing neophyte whose past investing experience has been limited to bank accounts and a broker discretionary account satisfactorily managed for him by the same broker for the past 25 years.

12.     Defendant Goldin Restructuring Fund, L.P. ("the Fund") is a Delaware limited partnership formed May 20, 2004, between Goldin Capital Partners, L.P., as General Partner, and Harrison J. Goldin as the Initial Limited Partner. The Fund commenced its activities on January 31, 2005, when it was restructured by an Amended and Restated Limited Partnership Agreement of that date ("the Final LP Agreement") to bring in additional outside investors, including Heller, as Limited Partners.

13.     Defendant Goldin Capital Partners, L.P. ("Goldin Capital Partners"), is a Delaware limited partnership formed May 20, 2004, to function as the Fund's general partner. As such, Goldin Capital Partners is responsible for making investment decisions for the Fund. Goldin Capital Partners is an affiliate of Goldin Associates, L.L.C.

14.     Defendant Goldin Capital Management, L.P. ("Goldin Capital Management"), is a Delaware limited partnership formed May 20, 2004, to function as the Fund's manager. Goldin Capital Management is an affiliate of Goldin Associates, and its staff are drawn principally or entirely from Goldin Associates' managers and analysts.

15.     Defendant Goldin Associates, L.L.C. ("Goldin Associates") is a Delaware limited liability company incorporated in 1995. Founded and led by Harrison J. Goldin, Goldin Associates provides financial and strategic advice to distressed or underperforming companies or their lenders,

creditors, equity holders or other parties-in-interest, and also provides interim management services for such companies.

16. Defendant Harrison J. Goldin ("Goldin") is a former Comptroller of The City of New York and the founding partner and senior managing director of Goldin Associates. Goldin is one of three principals of Goldin Capital Partners and the "Key Person" of the Fund. As noted above, the Fund's investment decisions are determined by Goldin Capital Partners; under the Fund's Final LP Agreement, such investment decisions are specifically made by a majority of Goldin Capital Partner's three principals, one of whom must be Goldin.

17. Defendant David Pauker ("Pauker") is a managing director of Goldin Associates, and one of the three principals of Goldin Capital Partners. Pauker was a senior aide to Goldin during the latter's tenure as New York City's comptroller. Pauker participated in the meeting with Heller in which defendants solicited Heller to invest in the Fund.

18. Defendant Lawrence J. Krule ("Krule") is also a managing director of Goldin Associates, and one of the three principals of Goldin Capital Partners. Krule also participated in the meeting with Heller in which defendants solicited Heller to invest in the Fund.

19. Defendants Goldin, Pauker and Krule are hereinafter collectively referred to as the "Individual Defendants."

### OTHER PERSONS AND ENTITIES

20. Skin Nuvo International, L.L.C. ("Skin Nuvo"), was the owner and operator of approximately 40 leased "medical spas" offering such services as laser hair removal, microdermabrasion and Botox injections in regional malls in the Pacific Northwest, California and Las Vegas.

7

21.     Goldin Capital Medspa Holdings, L.L.C. ("Medspa"), is a Delaware limited liability company incorporated on June 17, 2005, and wholly owned by the Fund.  Medspa was incorporated by the Fund to own and operate the assets purchased from Skin Nuvo.

## FACTUAL ALLEGATIONS

*The Fund's Investment Objective and Purported Advantages*

22.     The Goldin Restructuring Fund represented that it aimed to achieve a 15% internal rate of return annually by investing in a portfolio of distressed and underperforming companies which would be selected and managed by Goldin and his firm, Goldin Associates.  Essentially, the Fund's pitch to potential investors was that it would provide them an opportunity to participate in Goldin's business and take advantage of his and Goldin Associates' well-established network of contacts, experience, expertise and integrity.  The specific industry niche on which the Fund focused was "middle market" companies, meaning businesses with revenues in the $50 million to $500 million range.  Such a focus purportedly had the advantage of limiting direct competition, and the Fund would enjoy a competitive advantage because of its access to Goldin Associates' deal flow.  The Fund's Confidential Offering Memorandum ("the Offering Memo," discussed further below) explained:

> Goldin Associates has extensive contacts in the turnaround industry through its advisory business.  These contacts will be made available to the Fund through the General Partner [i.e. Goldin Capital Partners].  Goldin Associates believes these contacts will provide the Fund with a substantial source of investment ideas and investment opportunities.  The Fund has been formed to pursue such opportunities.

Offering Memo, 1.

23.     The network of contacts maintained by Goldin Associates and the Individual Defendants purportedly included connections to the restructuring departments of major law firms and

8

a "web of contacts" with major financial institutions. Fund investors were promised that any business opportunity brought to Goldin Associates would first be reviewed by the principals as a potential investment for the Fund (with the limited exception of opportunities specifically for advisory assignments).

24. The Fund aimed to purchase strategic pieces of the capital structures of selected distressed or underperforming companies, in order to exert significant influence or control over the restructuring or turnaround process. The Fund intended to raise capital commitments of $200 million, which it would use to make individual investments of up to a maximum of 20% of committed capital each. Investment positions would typically be in the $15 million to $25 million range, a size calculated to allow the Fund to implement its investment strategy by exercising influence or control in the targeted "middle market" range of companies. As a result, the Fund would manage an expected portfolio of 8-12 investments, ensuring a measure of risk diversification.

*The Fund's Undisclosed Prolonged and Unsuccessful Efforts to Raise Adequate Capital*

25. The Fund's general partner, Goldin Capital Partners, purportedly planned to raise the targeted $200 million in committed capital in a two-stage process. Goldin Capital Partners would initially seek capital commitments from investors before the Fund commenced operation. On the "First Closing Date," the Fund would close on these initial investors' capital commitments and commence its activities. After the First Closing Date, however, Goldin Capital Partners would continue to seek additional capital commitments from new investors (or additional commitments by existing investors), until the "Final Closing Date," when the Fund would close on these subsequent commitments and cease accepting any further capital commitments. Investors would be locked into their capital commitments from the time the Fund closed on a commitment until three years after the

9

Final Closing Date ("the Commitment Period"). During the Commitment Period, an investor would be required to make capital contributions out of his capital commitment from time to time, as called by the Fund to fund the investments it made and to pay fees and expenses.

26.     Unbeknownst to Heller and undisclosed by defendants, prospective investors greeted the Fund with a marked lack of enthusiasm. From its inception, the Fund experienced substantial difficulty in raising capital, obtaining less than a fifth of the Fund's targeted capital commitments by the originally planned First Closing Date, July 31, 2004. This substantial difficulty in raising capital also existed in January and February, 2005, when defendants solicited Heller to invest in the Fund.

27.     Unbeknownst to Heller and undisclosed by defendants, as discussed further below, defendants knew or recklessly failed to know that a total committed capital of less than 20% of targeted capital was not minimally adequate to support the Fund's declared investment objective. For this reason, Defendants chose to significantly delay commencing the Fund's operation, deferring the originally planned First Closing date by six months, until January 31, 2005, in order to extend the time for their fund-raising efforts.

28.     These additional months of fund-raising efforts failed to raise any additional capital. By the time Heller's investment in the Fund was solicited in January and February 2005, the Fund's total committed capital still fell short of its $200 million target by approximately 80%.

*Defendants' Oral Representations to Heller during their February 2005 meeting*

29.     Heller first met Goldin socially on a vacation trip in January, 2005, during which Goldin made oral representations to Heller regarding the Fund's investment objectives and its expertise in distressed companies. About a week after returning, on February 1, 2005, Heller met

10

Goldin, Krule and Pauker at the Goldin Associates' office to further discuss investing in the Fund ("the February 1 Meeting").

30.     In the February 1 Meeting, Goldin represented that the Fund intended to pursue opportunities in distressed or underperforming "middle market" companies by purchasing strategic pieces of their capital structures and exerting significant influence or control over their restructuring. Goldin and Krule stressed their expertise in distressed manufacturing companies, particularly small to mid-sized companies, and the synergy between the Fund and their regular work in that area with Goldin Associates, which would provide a stream of investment opportunities for the Fund.

31.     Goldin represented to Heller that the Fund had been raising money for about six months and expected to raise about $200 million in investor commitments, with a sizeable portion (about $40-50 million) committed by one major investor, Leonard Stern. He further represented that the Fund intended to make individual investments of up to a maximum of 20% of committed capital each, with investment positions typically in the $15 million to $25 million range.

32.     Goldin represented to Heller that the Fund had not made any investments during the prior six months because the Individual Defendants were very careful about selecting their investment opportunities and were waiting for the right investment. Goldin further represented that investors were complaining to him that the Fund had not made any investments yet, and told Heller that he was being given an opportunity to invest at the tail end, just before the Fund closed.

*Representations in Documents Provided to Heller during the February 1 Meeting*

33.     In addition to making various oral representations to Heller in the February 1 Meeting, the Individual Defendants gave Heller a set of documents describing the Fund ("the Solicitation Documents"). The Solicitation Documents included the Offering Memo, dated June

11

2004, an unexecuted draft of the Fund's Amended and Restated Limited Partnership Agreement, dated June 8, 2004 ("the Draft LP Agreement"), a printed presentation on the Fund in the form of slideshow, dated January 2005 ("the Presentation"), the Fund's Subscription Documents, and a package of promotional materials describing Goldin Associates and its principals ("the Firm Profile").

34.    The Offering Memo, Draft LP Agreement and Presentation appear to have been prepared by or on behalf of the Fund and its general partner, Goldin Capital Partners, of which the Individual Defendants are the principals. The Firm Profile appears to have been prepared by or on behalf of Goldin Associates.

35.    The Offering Memo represented that limits were placed on the Fund's investment concentration as part of the Fund's basic investment objective. The prominence the Offering Memo gives to these concentration limits clearly indicates the materiality to investors of risk diversification by the Fund. The very first paragraph of the Offering Memo describes the Fund in terms which immediately reference both its targeted $200 million capitalization and limited portfolio concentration:

### I. Executive Summary

Goldin Restructuring Fund, L.P. (the "Fund") has been formed by Goldin Capital Partners, L.P. (the "General Partner"). The Fund will be managed by Goldin Capital Associates, L.L.C. ("Goldin Associates"). The Fund will invest in distressed or underperforming companies and fund corporate turnarounds and reorganizations. *The Fund is seeking to raise capital commitments of $200 million, which will be used to make individual investments, each up to a maximum of 20% of committed capital.*

Offering Memo, 1. [emphasis added]

36.    A subsequent paragraph of the Offering Memo which sets out the Fund's investment objective in more detail again highlights the Fund's intended level of portfolio concentration:

## IV.  Investment Objective and Strategy

### A.    Investment Objective

The objective of the Fund is to achieve superior returns by investing in distressed and underperforming companies by purchasing debt, securities or other interests (including assets) of distressed or underperforming companies or funding corporate turnarounds and reorganizations.  This will be accomplished by making a limited number of investments in operationally and/or financially distressed middle market companies *("Portfolio Companies")*.  The Fund will purchase strategic pieces of capital structures on favorable terms and use the skills and expertise of the Principals to manage its positions actively, with the intention of exerting significant influence or control over the financial and operational restructuring process.  Investments will be made through the purchase of debt or other securities or interests at appropriate discounts or by providing the funding necessary for a corporate turnaround or reorganization.  Some investments will be made while companies are in bankruptcy or in contemplation of bankruptcy.  *The Fund intends to make individual investments from a minimum of $5 million to a maximum of 20% of committed capital.  Most investment positions are expected to be in the $15 million to $25 million range.  With that target, based on $200 million of capital commitments, the Fund can be expected to make 8 to 12 investments.*  The Fund will target an overall annualized net return in excess of 15% on capital provided by the Limited Partners.

*Id.* at 9. [emphasis added]

37.    Like the Offering Memo, the Presentation begins by stating the Fund's "Target $200M in invested capital" on its first slide, which is entitled "Goldin Restructuring Fund – Objectives." Presentation, 3. On a later slide entitled "Goldin Restructuring Fund – Summary of Principal Terms," the Presentation again notes "Target Capital Commitments: $200,000,000." *Id.* at 18.

38.    The Presentation addresses portfolio diversification as a component of the Fund's investment objective even more explicitly than the Offering Memo.  A slide entitled "Investment Objectives" reads:

Investment Objectives
- *Build a portfolio with specific limits on single-company and industry concentration*

13

- *Complete 8-12 transactions during a 3-year investment period, with an average investment of $15-25 million and a minimum investment of $5 million*
- Target distressed debt or corporate recapitalization investments with an expected hold period of 2 to 4 years
- Exceed 15% compounded annual returns, net of fees
- Return capital as investments are realized

*Id.* at 15. [emphasis added]

39.     The slide entitled "Summary of Principal Terms" similarly includes the bullet point, "Diversification: No single investment or series of investments will exceed 20% of capitalization; minimum investment position $5 million." *Id.* at 18.

*Failure to disclose the Fund's capital shortfall*

40.     In the February 1 Meeting, the Individual Defendants omitted to disclose to Heller the material fact that the Fund had been unable to raise more than a small fraction of its targeted $200 million in capital commitments.  The omission of this same fact from the Offering Memo and Presentation also made these documents materially false and misleading at the time they were given to Heller.

41.     The Fund's 80% capital shortfall was clearly material to Heller's investment decision.  Such severe difficulty raising capital signaled strong skepticism about the Fund's prospects among other potential investors, a consideration which was obviously material to Heller's own evaluation of the Fund as an investment opportunity.

42.     Rather than disclosing the capital shortfall, Goldin and the other Individual Defendants orally misrepresented to Heller that one well-known investor and businessman, Leonard Stern, the chairman of the Hartz Group of companies, had committed approximately $40 million.  This representation was inconsistent with the Fund's true capitalization as revealed by later

14

communications (discussed below), which showed that capital commitments by all investors barely exceeded $40 million.

43.     Goldin's affirmative misrepresentation that such a well-known investor had made a major commitment to the Fund was calculated to foster an impression of strong, positive investor interest in direct contradiction to the Fund's actual failure to raise even minimally adequate capital.

*Failure to disclose the Fund's prospective inability to diversify*

44.     In addition to reflecting a poor response by potential investors, a capital shortfall of such magnitude directly and fundamentally endangered the Fund's prospects. The Fund's stated investment objective was to make 8-12 investments, each averaging about $15-25 million out of a total, target capitalization of $200 million. With a total capitalization of only $40 million, however, the Fund would only ever be capable of making two investments of this size, fundamentally transforming the intended Fund portfolio and eliminating any prospect of prudent diversification. While the Fund could resort to making smaller investments, these would either be insufficient to exercise the "significant influence or control" over the targets envisioned by the Fund's investment strategy, or the companies targeted would themselves have to be significantly smaller, i.e. below the "middle market" tier to which that strategy was oriented.

45.     Thus, the Individual Defendants knew (or recklessly failed to know) that an 80% shortfall in targeted capital commitments placed the Fund in an impossible bind: with so little capital, the Fund could not possibly achieve its investment objective, including both its middle-market investment strategy and its diversification target. Nevertheless, in the February 1 Meeting, the Individual Defendants omitted to disclose to Heller the obviously material fact that undercapitalization would cause the Fund's investment objective to be unachievable. Instead,

15

Goldin orally misrepresented to Heller that the Fund maintained its diversification target of investments in 8-12 different companies.

46.     The omission of this same fact from the Offering Memo and Presentation also made these documents materially false and misleading at the time they were given to Heller.  Neither the Offering Memo nor the Presentation indicates that the Fund might abandon the investment objective otherwise set out therein and instead concentrate its entire capital in a wholly undiversified "portfolio" of only one or two "portfolio companies."  Neither document addresses the likelihood, at the time the documents were provided to Heller, that the Fund would be so severely under-capitalized that it could not *afford* to make more than one or two investments of size sufficient to control a middle market company, and would consequently be rendered incapable from the outset of achieving its stated investment objective.

47.     Nor does either document address the material change to the risk profile of investing in the Fund which would result from such a transformation of the Fund into, in effect, a single company buy-out vehicle.  To the contrary, both documents refer throughout to the Fund making plural "investments" in plural "portfolio companies."

### *Failure to disclose the Fund's prolonged fund-raising efforts*

48.     The Draft LP Agreement that the Individual Defendants gave Heller in the February 1 Meeting misrepresents in its preamble that it is "made as of July [___], 2004." Draft LP Agreement, 1 [ellipsis in original] (same information also on title page). The Offering Memo similarly misrepresents that the Fund's First Closing Date and entry into operation was expected "on or about July 31, 2004." Offering Memo, 2 and 16.

16

49.     These statements were materially false and misleading at the time the documents were given to Heller. The execution date of the Fund's LP Agreement is significant because it constitutes the Fund's "First Closing Date," on which the Fund closed on the capital commitments of its initial investors and commences its operations.  In fact, the Fund ultimately had its First Closing Date on January 31, 2005, shortly before Heller invested.  The Fund's First Closing was thus delayed six months beyond the date embodied in the documents given to Heller.  In light of the Fund's capital shortfall, it is clear that defendants put off their originally intended First Closing to extend their originally planned period of capital-raising in the vain hope of remedying the Fund's egregious undercapitalization before commencing its activities.

50.     In the February 1 Meeting, the Individual Defendants also omitted to inform Heller orally that they had delayed the Fund's originally anticipated First Closing for six months in a failed effort to raise more capital.  To the contrary, Goldin orally misrepresented to Heller that the Fund had not made any investments during the prior six months because they were very careful about investing and were waiting for the right investment.

51.     A full and accurate account of the Fund's delayed First Closing would have been highly material to Heller's investment decision.  First, defendants' failure to achieve minimally adequate capitalization even after six additional months of fundraising further underlined how little interest other investors had shown in the opportunity Heller was being offered, a consideration which was obviously material to Heller's evaluation of the investment opportunity for himself.  Second, defendants' decision to put off their originally intended First Closing Date clearly demonstrated that they themselves regarded the capital shortfall as a serious and material issue.

17

52. Furthermore, the Individual Defendants knew or recklessly failed to know that the poor results achieved despite the prolonged fund-raising period strongly suggested that few or no additional investors were likely to enter after Heller. This fact was also highly material to Heller. For the reasons discussed above, the Fund would not be able to meet its investment objective unless it raised significant, additional capital commitments—a multiple of existing commitments—*after* and on top of Heller's investment. Heller should have been informed that, in light of the prolonged failure of defendants' fund-raising efforts, there was no reasonable likelihood that the Fund would be rescued by additional investors after Heller. Nevertheless, the Individual Defendants also omitted to inform Heller of this fact. The omission of this fact from the Offering Memo and Presentation similarly made these documents knowingly or materially false and misleading at the time they were given to Heller.

*The Individual Defendants' misrepresentations concerning Heller's time to invest in the Fund*

53. Rather than disclosing the Fund's capital-raising failure to Heller—which might have dissuaded him from investing—Goldin orally misrepresented to Heller in the February 1 Meeting that Heller might lose the opportunity to invest in the Fund if he did not do so immediately. Goldin told Heller that investors were complaining to Goldin that the Fund had not made any investments yet, and misrepresented to Heller that he was being given an opportunity to invest just before the Fund closed.

54. The Individual Defendants omitted to disclose or materially misrepresented to Heller that the Fund would in fact remain open to new capital commitments for at least another 9-12 months. As discussed above, following its First Closing Date, the Fund would continue to raise

18

capital until a subsequent Final Closing Date. The Draft LP Agreement that defendants gave Heller in the February 1 Meeting defined the Final Closing Date as "tak[ing] place no later than the ninth month anniversary of the First Closing Date." The Final LP Agreement (but not the Draft LP Agreement given Heller) also provided for a discretionary further extension of the Final Closing Date for up to three months. Thus, given that the Fund ultimately had its First Closing on January 31, 2005, the possibility of investing in the Fund in fact remained open for 9-12 more months thereafter, until sometime between October 31, 2005, and January 31, 2006.

55.     This misrepresentation was material because delaying his investment in the Fund would have yielded significant potential advantages to Heller. Such a delay would have given Heller a window in which to evaluate both the Fund's capital-raising success and its initial investment results before investing. A chance to evaluate the Fund's capital-raising would have been particularly important, given the Fund's inability to meet its investment objective without multiplying the capital commitments it had when defendants' solicited Heller's investment.

*Failure to disclose the SEC's prior investigation of Goldin*

56.     The Solicitation Documents given to Heller in the February 1 Meeting dwell on the experience and integrity of the Individual Defendants and of Goldin in particular. The Offering Memo notes:

> **Harrison J. Goldin**, 68, the founding partner of Goldin Associates, was for 16 years the elected Comptroller of The City of New York.... As chief financial officer of New York City, Mr. Goldin managed its $40 billion pension fund and directed its financial and investigative audit units. He also supervised its large issuances of debt, oversaw the work of its underwriters and financial advisors (for whose selection he was responsible) and represented it to the credit rating agencies. He was voted the best comptroller in the United States by a panel of more than 100 experts selected by Crain's Publications.

19

Mr. Goldin played a major role in New York City's financial restructurings in the mid-1970s which resulted in the City's successful return to the public credit markets, its achievement of investment grade ratings and the restoration of its full borrowing capacity.

Offering Memo, 5-6 [emphasis in original].

57.　　The same language also appears in the Firm Profile given to Heller in the February 1 Meeting. Firm Profile, 38.

58.　　In the Presentation, a slide entitled "Goldin's Strengths" includes the bullet point, "Recognized Integrity." Presentation, 4. A subsequent slide entitled "Recognized Integrity" begins with the bullet point:

- In the current investment environment, investors, lenders and transaction partners place a premium on doing business with firms that have a *reputation that is beyond reproach.*

*Id.* at 9. (Emphasis added.)

59.　　These representations contained in the Offering Memo, Presentation and Firm Profile were knowingly materially false and misleading because they failed to disclose the material facts that an SEC investigation reportedly concluded that Goldin knowingly misled investors during his tenure as comptroller of New York City. According to contemporaneous news reports, the SEC issued an investigation report on August 26, 1977, in which it said that the City's then-mayor, Abraham Beame, and its comptroller, Goldin, "had knowledge of the facts" and "misled public investors in the offer, sale and distribution of billions of dollars of the city's municipal securities from October 1975 through at least March 1975." "No Fraud Is Alleged – Inquiry Finds Officials Made Reassuring Statements Before Fiscal Collapse," NEW YORK TIMES, August 27, 1977, p. 1.

60.　　In an 800-page report, published after 19 months of investigation, the SEC reportedly stated that Goldin and Mayor Beame engaged in "deceptive practices masking the city's true and

disastrous financial condition," and that "[o]n a number of occasions, the key participants [in the financial transactions] had a clear opportunity to prevent further serious damage to public investors. However, they did not do so. As the city's financial condition deteriorated, additional steps were taken to sell its notes to individual investors, thus unfairly and improperly shifting the inherent risks." *Id.*

61.    A subsequent news report stated that the allegations against Goldin and others contained in the SEC report "might have been the foundation for criminal or civil action had it involved private transactions. But Federal securities laws are ambiguous about municipal notes, and, although this may not have been the reason, the report did not charge any fraud." "The Reckoning – S.E.C. Report Does Not Spare Banks or Beame," NEW YORK TIMES, August 28, 1977, p. 144.

62.    Furthermore, the Individual Defendants knew (or, in the case of Pauker and Krule, recklessly failed to know) this material fact, but omitted to disclose it in the February 1 Meeting with Heller. Pauker himself was a senior aide to Goldin when the latter was New York City comptroller.

*Defendants' breaches of fiduciary duty in operating the Fund and Heller's losses*

63.    Unbeknownst to Heller, defendants executed their Final LP Agreement and commenced the Fund's operation on January 31, 2005, which became the Fund's First Closing Date.

64.    Relying on the truth and completeness of the representations, discussed above, contained in the Solicitation Documents and made orally by the Individual Defendants, Heller purchased a limited partnership interest in the Fund with a capital commitment of $1 million shortly after the February 1 Meeting.

65.    Defendants' first communication with Heller after executing his capital commitment to the Fund and the Fund's First Closing was a February 22, 2005, letter from Goldin discussing the

21

Fund's start-up activities and initial investment prospects. The Fund did not ultimately undertake any of the particular, prospective investments that the letter discussed, and Goldin still did not disclose the extent to which the Fund's capital commitments had fallen short of its target.

66.     By June, 2005, approximately five months after the Fund's First Closing, defendants, apparently, had been unable to raise any additional capital commitments and the Fund remained stalled at approximately 20% of its targeted capitalization. After at least eleven months of unsuccessful fund-raising efforts, defendants should by this time have been left in no further doubt that the Fund's under-capitalization was irremediable. As a result, defendants knew or recklessly failed to know that the Fund's declared investment objective was unachievable. Nevertheless, defendants breached their fiduciary duty to their investors by going forward with the Fund's first and only investment.

67.     In June, 2005, the Fund purchased in bankruptcy all the assets of Skin Nuvo, a Western U.S. chain of leased mall-based skin treatment spas, and continued operating the business as "Lumity Medspa." Including the $7 million purchase price plus an injection of working capital, the Fund initially invested $15 million in Medspa, or approximately 37% of its total capital commitments. In November, 2005, the Fund injected $2 million more into Medspa, raising its investment to $17 million or approximately 42% of its capital. The resulting, single-company exposure was more than double the originally intended 20% concentration limit. Moreover, the Medspa investment left the Fund with less than $24 million of uncommitted capital—enough for, at most, one additional investment of strategic size, provided of course that the Medspa investment itself required no further draw on capital. Defendants thus breached their fiduciary duty to investors

22

by abandoning diversification and betting the Fund's future on a single investment, with disastrous results.

68.     Only after this investment was already made did defendants reveal the Fund's undercapitalization to Heller. In a letter and accompanying financial statements dated August 15, 2005, Goldin disclosed to Heller for the first time that the Fund had been operating during the first quarter of 2005 with capital commitments (including Heller's own investment) totaling only $40,750,000—barely 20% of the Fund's $200 million target.

69.     Under the Fund's management, Medspa's sales growth for several months seemed, to the Fund, slower than expected, but still acceptable. Sales stalled in November, however, and the Fund belatedly came to worry about its investment concentration. As Goldin later explained in an April 21, 2006, letter to Heller:

> With our cash burn $1.0 - $1.5 million a month, it became clear by mid-December that the business would continue to operate at a loss for a longer period than we had anticipated and would require significantly more capital. One of my concerns, in that regard, was the Fund's investment concentration limitations. At the same time, I was increasingly concerned as to whether, in the end, the limited additional investment we could make would be sufficient to turn the company around within an acceptable timeframe. Accordingly, we determined to pursue an appropriate exit from the investment.

70.     In December, 2005, within a few days of sending an additional $21,265 to the Fund, Heller spoke with Goldin on the telephone regarding the status of the Medspa investment. Goldin advised Heller that the investment was not going as well as expected and that he anticipated that it would be necessary to liquidate the investment, in what in all likelihood would be a total loss.

71.     On March 24, 2006, only nine months after the original purchase which totaled approximately $17 million, the Fund sold Medspa to another investor in exchange for $800,000 cash to be applied to professional fees and wind-up expenses, an assumption of Medspa's liabilities, and a

15% stake in the acquiring entity. Thus, the Fund's entire Medspa investment was lost apart from a residual equity stake in the acquirer, about which Goldin explained in the same letter, "[p]rudence dictates that we ascribe a very low current value—say, zero to ten percent." It is doubtful that the Fund itself remains viable after this loss, which has reduced its capitalization to less than 12% of its original target size.

72.      Subsequent to the Fund's First Closing Date, Heller subscribed a $1 million capital commitment to the Fund. As of June 30, 2005, Heller had made a capital contribution of $385,632 as his share of the Fund's initial $15 million investment in Medspa. After a further capital contribution of $58,137 in September, 2005, toward the Fund's second ($2 million) tranche of investment in Medspa, Heller's total capital contribution as of September 30, 2005 was $443,769. Heller made a further capital contribution of $21,265 for management fees and expenses in December, 2005, but the Fund refunded this contribution in January, 2006.

73.      Heller's loss of $443,769 on his $1 million capital commitment reflects the Fund's crippling loss of approximately 42% of its total capital in Medspa. Notwithstanding that the Fund itself is probably no longer operationally viable, Heller purportedly remains obligated to the Fund for the remainder ($556,231) of his original capital commitment, from which the Fund has offered to release him in exchange for giving up his rights to any future benefit from the Fund's residual equity stake in Medspa's acquirer.

### FIRST CLAIM FOR RELIEF

### COMMON LAW BREACH OF FIDUCIARY DUTY
**(Against Defendants For Breach of Fiduciary Duty)**

74.      Plaintiff repeats and realleges each and every allegation set forth above.

75.     Defendants owed to plaintiff, as a limited partner and investor in the Fund, a fiduciary duty in managing the Fund, including the duty to manage the Fund with the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use in like circumstances; the duty prudently to diversify the Fund's investments so as to minimize the risk of large losses; and the duty to manage the Fund in accord with its stated investment objective.

76.     Defendants have violated their fiduciary duty owed to plaintiff as a limited partner and investor in the Fund. Defendants failed to manage the Fund prudently, failed prudently to diversify the Fund's investments, and failed to manage the Fund according to its stated investment objective, by investing in a venture with capital requirements which they knew or recklessly failed to know were incompatible with the achievement of that objective in the circumstances, by investing an imprudent proportion of the Fund's total capital commitments in a single venture, and by subsequently raising their investment stake in that venture to an even more imprudent proportion of the Fund's total capital commitments.

77.     As a result of defendants' breaches of their fiduciary obligations, plaintiff has suffered monetary damages in the amount of $443,769.

78.     Defendants should be held personally liable for the damages sustained by plaintiff, plus interest, costs and attorney's fees.

79.     In addition, plaintiff is entitled to a declaration and order releasing him from any further obligations as a limited partner of the Fund, including the obligation to make any further capital contributions to the Fund.

25

## SECOND CLAIM FOR RELIEF

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 OF THE SECURITIES AND EXCHANGE COMMISSION
### (Against Defendants for Fraud)

80.     Plaintiff repeats and realleges each and every allegation set forth above.

81.     Defendants had a duty to disclose all material facts in connection with their offering to plaintiff of a limited partnership interest in the Fund.

82.     Defendants knew of the omitted material facts alleged above, and knew of the falsity of the material misrepresentations alleged above, when defendants made the oral and written misrepresentations and omissions to plaintiff alleged above, including:

    i.   The Individual Defendants' omission in the February 1 Meeting to disclose the material fact of the Fund's capital-raising shortfall;

    ii.   The representations concerning the Fund's investment objective contained in the Offering Memo, which were false and misleading due to the omission of the material fact of the Fund's capital-raising shortfall;

    iii.   The representations concerning the Fund's investment objective contained in the Presentation, which were false and misleading due to the omission of the material fact of the Fund's capital-raising shortfall;

    iv.   Goldin's material misrepresentations in the February 1 Meeting that a single, well-known investor and businessman had committed $40-50 million to the Fund;

    v.   The Individual Defendants' omission in the February 1 Meeting to disclose the material fact that undercapitalization would likely render the Fund's investment objective unachievable;

26

vi. Goldin's material misrepresentation in the February 1 Meeting that the Fund maintained its diversification target of investment in 8-12 different companies;

vii. The representations concerning the Fund's investment objective contained in the Offering Memo, which were false and misleading due to the omission of the material fact that undercapitalization would likely render the Fund's investment objective unachievable;

viii. The representations concerning the Fund's investment objective contained in the Presentation, which were false and misleading due to the omission of the material fact that undercapitalization would likely render the Fund's investment objective unachievable;

ix. The Draft LP Agreement's false and misleading statement that it is "made as of July [__], 2004;"

x. The Offering Memo's false and misleading statement that the Fund's First Closing Date was expected "on or about July 31, 2004;"

xi. The Individual Defendants' omission in the February 1 Meeting to disclose the material fact that they had delayed the Fund's originally anticipated First Closing for six months in a failed effort to raise more capital;

xii. Goldin's material misrepresentation in the February 1 Meeting that the Fund had not made any investments during the prior six months because the Fund was waiting for the right investment;

27

xiii.  The Individual Defendants' omission in the February 1 Meeting to disclose the material fact that there was no reasonable likelihood of additional investors joining in the Fund after plaintiff;

xiv.  The representations concerning the Fund's investment objective contained in the Offering Memo, which were false and misleading due to the omission of the material fact that there was no reasonable likelihood of additional investors joining in the Fund after plaintiff;

xv.  The representations concerning the Fund's investment objective contained in the Presentation, which were false and misleading due to the omission of the material fact that there was no reasonable likelihood of additional investors joining in the Fund after plaintiff;

xvi.  Goldin's material misrepresentation in the February 1 Meeting that plaintiff might lose the opportunity to invest in the Fund if he did not do so immediately;

xvii.  The Individual Defendants' omission in the February 1 Meeting to disclose the material fact that the Fund would remain open to new capital commitments for at least another 9-12 months;

xviii.  The representations concerning Goldin's experience as New York City's comptroller contained in the Offering Memo, which were false and misleading due to the omission of the material fact that an SEC investigation reportedly concluded that Goldin knowingly misled investors as comptroller;

xix.  The representations concerning Goldin's experience as New York City's comptroller contained in the Firm Profile, which were false and misleading due to

28

the omission of the material fact that an SEC investigation reportedly concluded that Goldin knowingly misled investors as comptroller;

xx. The representations concerning Goldin's integrity contained in the Presentation, which were false and misleading due to the omission of the material fact that an SEC investigation reportedly concluded that Goldin knowingly misled investors as comptroller; and

xxi. The Individual Defendants' omission in the February 1 Meeting to disclose the material fact that an SEC investigation reportedly concluded that Goldin knowingly misled investors during his tenure as New York City's comptroller.

83. Defendants purposely concealed and misrepresented the omitted material facts in order to induce plaintiff to purchase a limited partnership interest in the Fund.

84. Alternatively, defendants recklessly misled plaintiff. If defendants did not have actual knowledge of the misrepresentations and omissions of material facts alleged, then they were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether statements made to plaintiff were true.

85. As the foreseeable and intended result of defendants' material misstatements and omissions of the previously alleged facts upon which Heller relied, Heller purchased an interest in the Fund. In doing so, plaintiff reasonably relied on defendants' material misstatements and omissions of the previously alleged facts.

86. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. As a direct and proximate result of said violation,

plaintiff suffered damages in connection with the purchase of his limited partnership interest in the Fund.

WHEREFORE, plaintiff demands judgment in plaintiff's favor against all defendants as follows:

A.  awarding plaintiff compensatory damages against defendants, jointly and severally, together with interest, attorneys' fees and costs;

B.  declaring that plaintiff has no further obligations to the Fund, including no further obligation to make any capital contributions to the Fund;

C.  granting such other or further relief as may be just and proper under the circumstances.

Dated: May 9, 2007

LOVELL STEWART HALEBIAN LLP

By: _____

John Halebian (JH-8005)
Adam C. Mayes (AM-1101)
500 Fifth Avenue
New York, New York 10110
Telephone (212) 981-6760
Telecopier: (212) 208-6806
jhalebian@lshllp.com

Attorneys for Lloyd J. Heller, Plaintiff

30