## EXHIBIT A

## Confidential Offering Memorandum, Dated June 2004

# GOLDIN RESTRUCTURING FUND, L.P.

# $200,000,000

# CONFIDENTIAL OFFERING MEMORANDUM

June, 2004

## TABLE OF CONTENTS

**Page**

I.    Executive Summary.................................................................................1

II.   Summary Of Key Terms.........................................................................2

III.  Goldin Associates, L.L.C., the General Partner and the Principals....................................4

IV.   Investment Objective and Strategy.........................................................10

V.    Summary of Terms...............................................................................17

VI.   Risk Factors.........................................................................................28

VII.  Potential Conflicts of Interest..............................................................34

VIII. Regulatory, Tax Aspects and ERISA Considerations ...............................36

BY RECEIPT OF THIS CONFIDENTIAL OFFERING MEMORANDUM, PROSPECTIVE INVESTORS AGREE NOT TO DUPLICATE OR TO FURNISH COPIES HEREOF, IN WHOLE OR IN PART, TO PERSONS OTHER THAN THEIR INVESTMENT AND TAX ADVISORS, ACCOUNTANTS OR LEGAL COUNSEL (WHO, IN TURN, MAY USE THE INFORMATION CONTAINED HEREIN ONLY FOR PURPOSES RELATED TO THE PROSPECTIVE INVESTORS' INVESTMENT OR POSSIBLE FUTURE INVESTMENT IN THE FUND). PROSPECTIVE INVESTORS AGREE TO RETURN THIS CONFIDENTIAL OFFERING MEMORANDUM (AND ANY COPIES FURNISHED TO OTHERS AS PERMITTED ABOVE) PROMPTLY AFTER SUCH TIME AS THE PROSPECTIVE INVESTOR IS NO LONGER CONSIDERING AN INVESTMENT IN THE FUND. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE OFFEREE (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH OFFEREE) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF (I) THE FUND AND (II) ANY OF ITS TRANSACTIONS, AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE OFFEREE RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE.

MARKET RISKS ARE INHERENT IN ALL SECURITIES TRANSACTIONS TO VARYING DEGREES. THE FUND'S INVESTMENT PROGRAM IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK, AND NO ASSURANCE CAN BE GIVEN THAT THE FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE OF INTERMEDIATE TERM CAPITAL APPRECIATION. THE INTERESTS OFFERED PURSUANT TO THIS CONFIDENTIAL OFFERING MEMORANDUM ARE SUITABLE ONLY FOR SOPHISTICATED INVESTORS FOR WHOM AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS THAT ARE INVOLVED IN THE FUND'S SPECIALIZED INVESTMENT STRATEGIES. A PROSPECTIVE INVESTOR SHOULD CAREFULLY READ THIS CONFIDENTIAL OFFERING MEMORANDUM AND THE EXHIBITS HERETO IN ORDER TO EVALUATE THE SUITABILITY OF THIS INVESTMENT IN LIGHT OF HIS/HER INVESTMENT OBJECTIVE AND FINANCIAL RESOURCES.

THESE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR THE TERM OF THE FUND.

PROSPECTIVE PURCHASERS OF INTERESTS ARE NOT TO CONSTRUE THE CONTENTS OF THIS CONFIDENTIAL OFFERING MEMORANDUM AS LEGAL OR TAX ADVICE. EACH PROSPECTIVE PURCHASER SHOULD CONSULT WITH PROFESSIONAL ADVISORS AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE FUND.

THE RIGHTS AND DUTIES OF PARTNERS IN THE FUND WILL BE GOVERNED BY THE LIMITED PARTNERSHIP AGREEMENT, A COPY OF WHICH WILL BE PROVIDED TO YOU (THE "PARTNERSHIP AGREEMENT"). CAPITALIZED TERMS USED IN THIS CONFIDENTIAL OFFERING MEMORANDUM BUT NOT DEFINED SHALL HAVE THE MEANING ASSIGNED TO THEM IN THE PARTNERSHIP AGREEMENT.

**THIS CONFIDENTIAL OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT LAWFUL, OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO.**

# GOLDIN RESTRUCTURING FUND, L.P.

## I.    Executive Summary

Goldin Restructuring Fund, L.P. (the "Fund") has been formed by Goldin Capital Partners, L.P. (the "General Partner").    The Fund will be managed by Goldin Capital Management, L.P. (the "Manager"). Both the General Partner and the Manager are affiliates of Goldin Associates, L.L.C. ("Goldin Associates").    The Fund will invest in distressed or underperforming companies and fund corporate turnarounds and reorganizations.  The Fund is seeking to raise capital commitments of $200 million, which will be used to make individual investments, each up to a maximum of 20% of committed capital.

The objective of the Fund is to increase the value of its investments in middle market companies by exercising significant influence or control over a restructuring and/or turnaround.  The Fund will seek to achieve this goal through the purchase of debt, securities, assets or other interests in underperforming companies.  Alternatively, the Fund may provide debt or equity financing necessary for a turnaround or corporate reorganization.

Goldin Associates is a financial advisory and turnaround management firm founded in 1990, specializing in providing financial and strategic advice to distressed or underperforming companies or their lenders, creditors, equity holders or other parties-in-interest. Goldin Associates also provides interim management services for such companies.  Harrison J. Goldin is the firm's founder and Senior Managing Director.  In each of the last five years Goldin Associates has been named one of the outstanding turnaround managers in the United States by *Turnarounds and Workouts,* a professional publication that covers the turnaround management industry, and was named one of the top ten bankruptcy advisory firms for 2003 by *The Deal,* another industry publication.

The principals of the General Partner are Harrison J. Goldin, David Pauker and Lawrence J. Krule (the "Principals"), all of whom have been actively involved in the business of Goldin Associates, in addition to having other experience in advising in connection with troubled companies.  Goldin Associates has extensive contacts in the turnaround industry through its advisory business.  These contacts will be made available to the Fund through the General Partner.  Goldin Associates believes these contacts will provide the Fund with a substantial source of investment ideas and investment opportunities.  The Fund has been formed to pursue such opportunities.

## II.    Summary Of Key Terms

The following executive summary of the Fund's principal terms is qualified in its entirety by the provisions of the Fund's Limited Partnership Agreement.

| | |
|---|---|
| **The Fund:** | Goldin Restructuring Fund, L.P., a Delaware limited partnership. |
| **General Partner:** | Goldin Capital Partners, L.P., a Delaware limited partnership. |
| **Manager:** | Goldin Capital Management, L.P., a Delaware limited partnership. |
| **Investment Objective:** | Achieve superior returns by investing in distressed and underperforming companies, either by purchasing debt, securities, assets or other interests or by funding corporate turnarounds and reorganizations. |
| **Offering Size:** | Capital commitments of up to $200 million. |
| **Minimum Capital Commitment:** | $1 million. |
| **General Partner Capital Commitment:** | The General Partner and its Principals and affiliates will commit at least 1.5% of the total capital commitments to the Fund. |
| **Commitment Period:** | Ending on the third anniversary of the Final Closing Date, unless terminated earlier by the General Partner. |
| **Term:** | The seventh anniversary of the Final Closing Date, subject to extension by the General Partner for up to one year, and a further extension for a second year with the approval of a majority of the members of the Investors Committee. |
| **Closings:** | The first closing of the Fund is expected to occur on or about July 31, 2004. The final closing will occur not later than the nine-month anniversary of the first closing. |
| **Preferred Return:** | 8%, compounded annually, on all amounts invested in the Fund. |
| **Distributions:** | 100% to all Limited Partners pro rata according to their respective funded commitments, until the Limited Partners have received the return of all amounts invested in the Fund (including fees and expenses) plus a preferred return of 8%, compounded annually, on all amounts invested in the Fund as and from the date invested, |

then 100% to the General Partner until it has received an amount equal to 20% of the gains distributed to Limited Partners,

then 80% to the Limited Partners and 20% to the General Partner.

**Clawback:**                Yes.

**Management Fees:**        During the Commitment Period, 1.5% annually (payable quarterly) of each Limited Partner's capital commitment. After the Commitment Period, 1.5% of each Limited Partner's invested capital, reduced by the cost basis or written-down amount of any Fund investment which has been disposed of completely or written down by the Fund.

**Ancillary Fees:**         If the Manager receives any organization fees, transaction fees, advisory fees, success fees, monitoring fees, break-up fees or directors fees from any Portfolio Company, 50% of the amount of such fees will be applied ratably to reduce the management fee otherwise payable by the Limited Partners.

**Reinvestments:**          During the commitment period, any amounts received by the Fund as a return of capital with respect to Stake-Out Investments (other than Stake-Out Investments in which the Fund was involved in a restructuring) may, at the option of the General Partner, either be returned to Limited Partners and added back to their unfunded commitments or retained for subsequent investment. Stake-Out Investment means an investment which is held on a temporary basis (not exceeding one year) to facilitate a Fund investment.

**Organizational and Offering Expenses:**    The Fund will pay up to $900,000 of organizational and offering expenses.

## III.    Goldin Associates, L.L.C., the General Partner and the Principals

Goldin Associates, L.L.C. ("Goldin Associates") is a financial advisor and turnaround manager that specializes in underperforming and distressed situations, including turnarounds, workouts, restructurings and bankruptcies. The firm provides financial and strategic advice to distressed or underperforming companies or their lenders, creditors, equity holders or other parties-in-interest. Goldin Associates also provides interim management services for such companies. Goldin Associates has been led since its founding in 1990 by Harrison J. Goldin.

Goldin Associates has been recognized consistently as one of the top firms in the turnaround industry. In each of the last five years it has been named one of the outstanding turnaround managers in the United States by *Turnarounds and Workouts*, a professional publication in the turnaround management industry. Goldin Associates was named one of the top ten bankruptcy advisory firms for 2003 by *The Deal*, another industry publication. Goldin Associates' major assignments include involvements in the bankruptcies or restructurings of such companies as Bucyrus-Erie, Coram Healthcare, Crystal Brands, Drexel Burnham Lambert, Enron North America, Grand Court Lifestyles, MCI/WorldCom, Monarch Capital Corp., Northwestern, PSI Net Consulting Solutions, Rockefeller Center Properties, Trump Taj Mahal, United Merchants and Manufacturers, Vlasic Foods International and WCI Group.

As a restructuring advisor, Goldin Associates provides hands-on assistance throughout the restructuring process, whether in advising a company or its lenders, creditors, board or shareholders. In that connection, Goldin Associates investigates and critically reviews a company's operations, competitive position, financial results and business plans, evaluating its opportunities, viability, vulnerability and strategic options. Goldin Associates also advises on the financial aspects of the restructuring, which includes performing valuations, designing capital structures and negotiating debt-for-equity exchanges. The services Goldin Associates performs for its advisory clients include:

- Reviewing and stress-testing a company's proposed business plan after analyzing current and historical operations and financial results;

- Analyzing strategic alternatives, including right-sizing, consolidation and asset disposition, to focus the company on core competencies;

- Working to optimize cash flow and improve working capital efficiency;

- Performing business valuation and providing advice on the value of a company as a going concern, as well as its discrete lines of business and/or major assets;

- Assessing the appropriateness and adequacy of the company's capital structure;

- Providing strategic advice on the disposition or acquisition of major assets or lines of business;

- Advising in connection with a financing or sale transaction;

- Negotiating out-of-court restructurings, whether in the context of a forbearance agreement, modification of loan terms, debt restructuring or debt-for-equity exchange; and

- Assessing the value of consideration offered in a workout, restructuring or bankruptcy plan.

Goldin Associates has extensive contacts in the turnaround industry through its advisory business; these contacts are expected to provide the Fund with a substantial source of investment ideas and investment opportunities. Goldin Associates will continue to provide financial advisory, turnaround management and litigation support services while the Fund pursues investment opportunities. Many of the services Goldin Associates provides for its advisory clients are similar to the services the General Partner and Manager will provide to the Fund in determining whether to make an investment for the Fund and how to increase the value of an investment. Potential conflicts of interest between the Goldin Associates advisory business and the activities of the Fund are addressed in Section VII of this Memorandum.

**Management of the Fund**

The General Partner will make investment decisions for the Fund. The Principals of the General Partner are Harrison J. Goldin, David Pauker and Lawrence J. Krule (the "Principals"). Investment decisions will require approval of a majority of the Principals, one of whom must be Mr. Goldin. Each of the Principals is currently employed by Goldin Associates and will, along with Mr. Goldin, devote varying amounts of his professional time to the Fund. The Principals have backgrounds in the areas in which the Fund will seek investment opportunities, including negotiating the terms of corporate restructurings, influencing portfolio companies' strategic direction, enhancing operating performance and maximizing the value of investments.

Mr. Krule will devote substantially all of his professional time to managing the Fund during the Commitment Period. Mr. Goldin and Mr. Pauker will devote a significant amount of their professional time to the Fund, while remaining actively involved in the business of Goldin Associates. In addition, several seasoned Goldin Associates managers and analysts will become employees of the Manager and devote their full professional time to identifying opportunities, developing the investment portfolio and managing and monitoring investments for the Fund. The Manager will also utilize, at its or the General Partner's expense, other Goldin Associates professionals as it deems appropriate in support of its investment activities.

**Biographies of the Principals and Team Members**

**Harrison J. Goldin**, 68, the founding partner of Goldin Associates, was for 16 years the elected Comptroller of The City of New York and is now Chairman Emeritus of the Council of Institutional Investors. As chief financial officer of New York City, Mr. Goldin managed its $40 billion pension fund and directed its financial and investigative audit units. He also supervised its large issuances of debt, oversaw the work of its underwriters and financial advisors (for whose selection he was responsible) and represented it to the credit rating agencies.

He was voted the best comptroller in the United States by a panel of more than 100 experts selected by Crain's Publications.

Mr. Goldin played a major role in New York City's financial restructuring in the mid-1970s which resulted in the City's successful return to the public credit markets, its achievement of investment grade ratings and the restoration of its full borrowing capacity. At Goldin Associates he has worked on many of the major financial restructurings of the past fifteen years and has acted as chief executive officer, senior officer or trustee of Monarch Capital Corporation (insurance and real estate), First Interregional Advisors Corp. (leasing company), MCorp Trust (former bank holding company), Rockefeller Center Properties (real estate), Tuttle Papock (convenience stores), Gaston & Snow (defunct law firm), District 65 Trust (underfunded pension fund) and other entities. He has served as examiner, special master, mediator or receiver in numerous litigations and bankruptcies, including Enron North America, Bruno's and Cityscape.

Mr. Goldin was for many years an Adjunct Professor of Accounting at the Stern Graduate School of Business at New York University. He also taught finance at Columbia Law School and as an Adjunct Professor of Law at Cardozo and New York Law Schools. He was an attorney for the United States Department of Justice and at the New York law firm of Davis Polk & Wardwell.

Mr. Goldin received an A.B. summa cum laude from Princeton University (Phi Beta Kappa) and an LL.B. from Yale Law School, where he was articles editor of the Yale Law Journal and was elected to the Order of the Coif. He was also a Woodrow Wilson Fellow at the Harvard Graduate School.

**David Pauker**, 45, is an experienced restructuring advisor who has been chief executive officer of Vlasic Foods International, a major food company with $900 million in annual sales under the Vlasic, Swanson, Open Pit, Freshbake and SonA brands. He was previously chief executive officer of Pharmacy Fund, a financial services and information processing company operating in the healthcare industry. He served as chief operating officer or chief restructuring officer during the bankruptcies of Grand Court Lifestyles (fifth largest U.S. operator of independent and assisted living senior housing), Monarch Capital Corporation (holding company with interests in insurance, real estate and investment management), Tuttle Papock (convenience stores), First Interregional Advisors Corp. (leasing company), MCorp Trust (former bank holding company), Gaston & Snow (defunct law firm) and District 65 Trust (underfunded pension plan).

Mr. Pauker has been responsible for many of Goldin Associates' financial advisory engagements, including serving as financial advisor to the official committees of unsecured creditors of Drexel Burnham Lambert Trading Corporation and Crystal Brands and, among others, to the unofficial committee of bondholders in the First Capital Holdings bankruptcy and to a major bank lender to Trump Taj Mahal and the Penn Yards project in New York City. He has advised such firm clients as Amalgamated Life Insurance Company, GAF Corporation, Balfour Investors, Pegasus Investors, Nissho Iwai Corporation and CNA Insurance Corporation.

Mr. Pauker was named one of the top ten bankruptcy professionals for 2003 by *The Deal* and was previously named one of eight outstanding young turnaround managers in the United States by *Turnarounds and Workouts*. He has served as a director of WorldInvest Ltd. and Associated Capital Investors, Inc., investment firms with over $3 billion and $1 billion under management, respectively, and of Hudson Valley Financial Services, a direct marketer of financial services. He was also responsible for the restructuring and sale of those companies (to management, Berkeley-Govette Corp. and Chemical Bank, respectively).

Before joining Goldin, Mr. Pauker was a senior aide to Mr. Goldin, then Comptroller of The City of New York. He was formerly Executive Vice President of Barclay Knitwear Company, Inc., a New York-based company with interests in soft goods, manufacturing and importing, retailing and real estate. He is a graduate of Cornell University and the Columbia University School of Law.

**Lawrence J. Krule**, 48, was, prior to joining Goldin Associates, a senior-level troubled company analyst with Oscar Gruss & Son. Before that he was a senior analyst with the Third Avenue Funds and also Director of Research and a bank debt trader for M.J. Whitman Inc. He was co-founder and President of Distressdebt.com, a web-based business providing restructuring and special situation analysis to the investment community.

Mr. Krule was formerly part of the restructuring advisory practices of Osnos & Company, Coopers & Lybrand and Deloitte & Touché, where he assisted troubled companies or their lenders and other creditors as both financial advisor and turnaround consultant. He was CEO/CRO during the bankruptcy of Equitable Bag Co., Inc. and has acted as chief restructuring officer for companies in the manufacturing and soft goods industries, among others. Mr. Krule was previously Treasurer and Vice President for Finance for the E.F. Hutton Group and a Vice President-Capital Markets for Sumitomo Trust.

Mr. Krule has been a guest lecturer at Columbia University Graduate School of Business, Bernard Baruch Business School and Denver University Graduate School of Business. He is a past President of the Turnaround Management Association – New York Chapter. Mr. Krule has a B.A. in Finance from Roosevelt University and an M.B.A. from the University of Chicago.

**John C. Bambach**, 61, is a financial professional with diverse restructuring experience. His work at Goldin Associates has included assignments as restructuring/financial advisor to air carrier Tower Air, the shareholders of mining equipment manufacturer Harnischfeger Industries, counsel to a large luxury retailer, the independent Board members of Coram Healthcare, counsel to the major equity holder in a fiber optic telecom provider, a private producer of dietary supplements and its equity sponsor, a private holder of cellular and personal communication service providers, a privately-held manufacturer of metal buildings and Trustee for a bankrupt investment fund. Mr. Bambach has extensive experience in loan workouts, as an advisor on financial transactions and as an interim manager, including as interim CFO of a cellular telephone operating company. In addition to several telecommunications companies, he has advised firms in the insurance, hotel and gaming, outdoor advertising, data storage and management and consumer products businesses.

As Senior Consultant to National Westminster Bank, Mr. Bambach was responsible for the negotiation and administration of complex, syndicated loan workouts involving The Trump Organization, Orion Pictures Corp., Fairmont Communications Inc., Leaseway Transportation Corporation and many others. Previously, he held various positions as senior investment officer at Chrysler Capital, Citicorp Industrial Credit and The CIT Group, where he was responsible for LBO investments and equipment and project financings. Mr. Bambach has structured, negotiated and placed a wide variety of private debt and equity financing transactions, both as a consultant to many clients and/or as interim chief financial officer.

Mr. Bambach is a graduate of Fairleigh Dickinson University with MBA-Finance and Bachelor of Science degrees, cum laude. Mr. Bambach has been an instructor in areas of finance at Fairleigh Dickinson University, Marymount Manhattan College and, among others, The Practicing Law Institute, The American Bankers Association and The New York Institute of Finance.

**Erik M. Graber**, 35, has worked at Goldin Associates as financial advisor to a distressed private equity fund and as restructuring advisor to a senior housing and assisted living company in a loan restructuring. Mr. Graber has extensive experience structuring and executing public and private placements of equity and unsecured debt, as well as strategic dispositions and management-led buyouts.

Prior to joining Goldin Associates, Mr. Graber was a Vice President at Mercury Partners, a merchant banking group focusing on real estate and healthcare companies and at Pharus Advisors, a mergers and acquisitions boutique serving venture-backed technology companies. Previously, he held positions as an investment banker at UBS Warburg and PaineWebber Incorporated in their Real Estate Investment Banking Groups.

Mr. Graber earned a B.A. and a B.S. from the University of Pennsylvania and an M.B.A. from the University of Chicago Graduate School of Business.

**Bhrijesh "B.J." Patel** is a restructuring and corporate finance professional with significant experience preparing and analyzing corporate valuations, business plans, financial forecasts and restructuring scenarios. He has advised Goldin clients in the mortgage, manufacturing and refining industries and helped manage the workout and disposition of diverse LBO, mezzanine and venture capital investments of a failed investment fund. Mr. Patel previously worked for Nightingale & Associates, a turnaround management and financial advisory firm where, among other responsibilities, he helped develop strategic turnaround plans, negotiate loan restructurings, forecast cash flows and direct day-to-day treasury functions for clients in the information technology, real estate, media & entertainment, forest products, retail and business services industries. He has held management positions at various companies going through both operational and financial restructurings. Mr. Patel was previously an associate at SG Cowen Securities, an investment bank focused on high growth companies, and an analyst at Jones Lang Wootton, a leading real estate advisory firm. Mr. Patel holds a B.S. in finance and international business, cum laude, from New York University's Stern School of Business and an M.B.A. from U.C. Berkeley's Haas School of Business.

**David W. Prager**, 26, was a key member of Goldin Associates' Enron North America advisory team, where he investigated and valued highly complex and varied assets and played a key role in formulating proposals for Enron's reorganization. Mr. Prager was formerly employed at McManus & Miles, an investment bank specializing in the power generation industry. Before that, he was a financial analyst for Guardsmark, one of the largest firms in the corporate security industry. He has a B.S. from the Wharton School at the University of Pennsylvania.

## IV.    Investment Objective and Strategy

### A.    Investment Objective

The objective of the Fund is to achieve superior returns by investing in distressed and underperforming companies by purchasing debt, securities or other interests (including assets) of distressed or underperforming companies or funding corporate turnarounds and reorganizations. This will be accomplished by making a limited number of investments in operationally and/or financially distressed middle market companies ("Portfolio Companies"). The Fund will purchase strategic pieces of capital structures on favorable terms and use the skills and expertise of the Principals to manage its positions actively, with the intention of exerting significant influence or control over the financial or operational restructuring process. Investments will be made through the purchase of debt or other securities or interests at appropriate discounts or by providing the funding necessary for a corporate turnaround or reorganization. Some investments will be made while companies are in bankruptcy or in contemplation of bankruptcy. The Fund intends to make individual investments from a minimum of $5 million to a maximum of 20% of committed capital. Most investment positions are expected to be in the $15 million to $25 million range. With that target, based on $200 million of capital commitments, the Fund can be expected to make 8 to 12 investments. The Fund will target an overall annualized net return in excess of 15% on capital provided by the Limited Partners.

### B.    Investment Strategy

Opportunities in the distressed arena are wide-ranging, including lower risk/lower return investments, such as mortgages or other secured debt, and higher risk/higher return investments, such as unsecured or subordinated debt or equity in troubled companies. The Fund will focus on the higher risk/higher return segment. Sellers of distressed debt typically are high yield bond funds, banks, finance companies, insurance companies, major trade creditors, CLO funds and mezzanine funds. Investment opportunities often arise in the context of out-of-court reorganizations, workouts and exchange offers and Federal bankruptcy proceedings.

The Fund's objective in its purchase of some or all of a company's debt or other securities will be to exert significant influence over the restructuring or turnaround process. The Fund will focus on middle market companies, which it generally considers to be businesses with revenues of $50 to $500 million. From time to time, the Fund may co-invest with other investors with similar objectives, affording greater influence or control over Portfolio Companies or providing the opportunity to invest in a larger company. The Fund will generally invest with an intermediate-term horizon, anticipating a holding period of two to four years, during which time financial, structural and operational changes will be implemented at Portfolio Companies.

The Fund will generally invest where (1) analysis establishes that the underlying value of a security or interest or assets to be purchased exceeds its purchase price, (2) the timing for the realization of the higher value allows targeted returns to be met and (3) the investment will afford the opportunity to exert significant influence on or control over a company's turnaround, reorganization or restructuring, including such matters as capital structure, management and strategic direction. The Fund will look for companies with the ability to

generate sustainable cash flow or that have assets (including claims that may be asserted by or on behalf of the company) that can be sold or liquidated profitably, in either case to generate a targeted return.

The Fund will pursue an active and participatory role in realizing on its investments, whether an investment involves the purchase of distressed debt or other securities or interests or the acquisition of debt, securities, assets or other interests in a corporate recapitalization or reorganization. The investment process will include valuing a target Portfolio Company and its securities, negotiating the purchase price and terms, advising and supplementing management, hiring and directing professional advisors, shaping strategic direction through active oversight of operations, negotiating with creditors and attempting to maximize the Fund's return through a timely exit. For example, the Fund's purchases of distressed debt at discounts will often afford an opportunity to exercise a value-added investment strategy of converting such debt to equity through a restructuring event. As a variation, the Fund might purchase new securities distributed to former holders at the effective date of a bankruptcy. This opportunity would enable former creditors to liquidate for cash and the Fund to own equity in the reorganized business. The Fund may also make additional investments in a Portfolio Company for complementary or add-on acquisitions for product extension, market extension or a strategic fit.

While the Fund will not operate as a trading vehicle, the General Partner may build its positions in potential target companies through purchases in the public securities markets of, debt securities and, possibly, equity securities. Therefore, prior to actually obtaining significant influence or control over a target company, the Fund may hold a smaller "Stake-Out" position in a Portfolio Company. Due to the competitive and uncertain nature of the bankruptcy and turnaround process, a Stake-Out position may not develop into a permanent investment for the Fund because a controlling or substantially influential position may not turn out to be available or feasible for the Fund or because circumstances warrant that the Fund reconsider its strategy. In such cases, the Fund expects that the Stake-Out position will be sold within a relatively short period of time. Capital returned from Stake-Out positions will be available for reinvestment, or, at the option of the General Partner, be returned to the Limited Partners subject to being re-drawn.

C.    **Investment Policy and Portfolio Management**

In pursuing the Fund's investment objective and executing its investment strategy, the General Partner will follow portfolio management practices generally applicable to managers of private equity funds, with its policies and practices adapted for dealing in turnarounds, workouts and restructurings. These cover four broad categories:

- Sourcing: the origination of investment opportunities;

- Valuation: analysis of the opportunities to determine if they meet investment objectives and criteria and are priced right;

- Restructuring: Overseeing the investment's progress and subsequently influencing the investment's strategic direction; and

- Harvesting: Determining the timing and manner in which to realize gains.

*1.     Originating Investment Opportunities.*  The Principals have a broad network of contacts that is expected to provide a significant flow of investment opportunities. Sources include commercial loan and workout bankers, investment bankers, managers of collateralized debt pools, lawyers, accountants, insurance and other institutional investors, private mezzanine and equity investors and financial advisory firms similar to Goldin Associates. Initial screening of prospects will be done by one of the Principals.  If a transaction is considered potentially attractive, the Principal will give the other Principals a preliminary report on the prospect's historical and projected financial statements and related performance benchmarks and assumptions, as well as an assessment of the industry, the prospect's management, the company's valuation and the anticipated return.  Majority approval of the Principals will be required for further pursuit of any prospective investment.

Fund investments will be restricted by several concentration limits.  No single investment (or affiliated investments) may exceed 20% of the Fund's committed capital. Moreover, no more than 30% of the Fund's committed capital will be employed in any single industry.  These limitations will be determined by reference to targeted Capital Commitments of $200 million or, following the Final Closing Date, actual Capital Commitments.  In addition, prior to the Final Closing Date, the total investment by the Fund in any single Portfolio Company (or affiliated investments) may not exceed the greater of (a) 20% of actual Capital Commitments or (b) $20 million.  The Fund may make investments in excess of such limits with the approval of the Investors Committee.

*2.     Analyzing Opportunities and Investing at the Right Price.*  Investments will be selected on the basis of a perceived potential for ultimate realizable value to generate an attractive return (and in a timely manner), weighted against the risk of loss in a "worst case" valuation or liquidation. The Fund will seek to invest in the part of a company's capital structure that it believes is most likely to generate an attractive return commensurate with appropriate downside protection.  Downside protection is a function of (a) price relative to "worst case" value and (b) risk associated with the valuation and performance of the underlying business or investment.  As the risk of correctly valuing the business increases, a distress investor may seek to reduce risk by investing higher in the capital structure or, in the alternative, requiring a lower price and corresponding greater return.  Among the considerations that are relevant to assessing underlying business risk are:

| *Lower Business Risk* | *Higher Business Risk* |
| --- | --- |
| Market share leaders | Small market share players |
| Solid sales Growth | Sales decline |
| Barriers to entry | No barriers to entry |
| High margins | Low margins |
| Less foreign competition | Foreign (low cost) competition |
| Diversified customer base | Customer concentration |
| Low product obsolescence | Rapid technological change |
| Non-cyclical | Cyclical |
| Non-seasonal | Seasonal |

Strong management                    Weak management

Investment analysis and due diligence will focus on fundamental financial, operating, industry and legal analyses. Fundamental financial analysis incorporates a review and examination of financial statements, business plans, bankruptcy court records (where applicable), market and industry research reports and comparative company valuations. Financial due diligence may include the assistance of an outside accounting firm and discussions with the prospect's attorneys and financial advisors. Operating due diligence may include management interviews, on-site visits and discussions with employees, former employees, customers, suppliers, competitors and environmental analysts about products, the quality of service, competitive issues, market status and related matters. The General Partner may engage an industry expert who can assist in analyzing how a company operates and its competitive position. An important consideration is the company's performance in recessionary times, especially its ability to sustain operating profit margins. Any applicable legal issues — both pro and con — also need to be considered and translated into financial terms. A projected cash flow model, incorporating sensitivities to adverse as well as positive conditions, will generally be developed. Particular emphasis will be placed on analyzing the "worst case" scenario, which assumes a liquidation of the underlying investment.

In considering investments and potential returns, the Principals will employ their expertise in the complexities of the bankruptcy and reorganization process, including out-of-court restructurings. This includes knowledge about other parties' rights, remedies and motivations and an understanding of how enterprise value may need to be reallocated among competing constituencies based on security interests, legal rights and other factors. A company in Chapter 11 must report to the court on its operations regularly and is typically subject to the scrutiny of an organized creditor group. The filing of a plan of reorganization and approval of the plan and the setting of confirmation and effective dates are important steps in a company's emergence from bankruptcy. The plan of reorganization, for example, generally specifies the allocation of new securities in exchange for each class of old securities of the bankrupt company. The Fund may choose to purchase the old securities in anticipation of a plan's becoming effective. As an alternative, the Fund might buy the company's assets through a so-called "Section 363 sale." These options afford the Fund an opportunity to invest in the part of a debtor's capital structure or to buy assets at a price that is most likely to generate an attractive return commensurate with appropriate downside protection. The goal will be similar for reorganizations outside of court supervision.

In limited circumstances, the Fund may invest with the intention of liquidating a company's assets, including claims the company may have against third parties. Each investment opportunity will require rigorous analyses; the Principals anticipate that only a fraction of the investment opportunities considered for the Fund will, in fact, be pursued and consummated.

Final approval of each investment will require approval of a majority of the Principals, one of whom must be Mr. Goldin.

3.    *Providing Oversight and Subsequent Influence on Strategic Direction.* One strategy of the Fund will be to identify "good" companies with bad capital structures. Such companies have sound underlying business fundamentals, but are stressed, often severely, from

an over-levered financial structure. Ideally, an investment will be made only after adverse events precipitate a financial crisis of a kind that further reduces downside risk. Companies with troubled loans often suffer from multiple disabilities — deteriorating performance, unreliable financial information, operating losses, stretched working capital, low morale, weak leadership. Among these corporate challenges, in the Principals' experience, the most important is lack of leadership. Therefore, a critical component of the Fund's analysis will be determining the strength of management and the extent to which the Fund can help formulate and refine strategic plans and buttress management. This will include assessing the likelihood that problems have been identified fully and are being addressed and can be corrected, as well as the extent to which the Fund can influence the strategic direction of the company. Also important will be the Fund's ability to identify distressed situations that, nonetheless, retain strong brand names, defensible market shares and/or quality franchise positions.

In the Principals' experience, realizing an attractive return from a troubled financial situation is not usually feasible simply by increasing a company's revenues, at least not in the short run. Downsizing is often a better strategy. That can include separating quality product lines and operations from weak lines, shedding unprofitable customers, products and locations, reducing or eliminating costs, improving management systems, managing working capital better and selling non-core assets and lines of business. The key to achieving the desired result is an appropriate level of influence on a management team that will take direction from the Manager on core operating issues and on formulating and refining strategic plans. Also important are the existence of a recurring revenue base, achievement of market leadership in a niche industry, the reasonable expectation of sustained, predictable and improving cash flow and/or the presence of other profitable companies within the industry. This last factor serves both as assurance that an entire industry is not in peril and as an indicator that there is the prospect of an exit through the sale of the business to a competitor.

The Manager will continually and closely monitor each investment, both to assess progress and to affirm the optimal timing for disposition. In the case of a distressed debt investment, the Manager will participate actively in the company's restructuring process, both to protect and improve the Fund's position. In all circumstances, the Manager will monitor and assess actively financial and operating performance. The Manager will continuously seek to evaluate and influence management, core operating competencies, strategic plans, financing options, and acquisition and merger opportunities. This may be done through board representation, creditor committee participation, exercise of creditor or shareholder voting rights, enforcement of covenants, controls or other provisions of loan agreements, withholding or providing of consents, enforcement of legal remedies or in numerous other ways. The Manager will not manage a company's day-to-day operations, but will seek to ensure that the company is run by skilled industry-aware operating professionals who are responsive to the Fund.

    *4.    Realizing Gains.* Before it makes an investment, the Fund will consider how and when it may be able to exit. The General Partner will consider the likely buyers in the marketplace and the multiples paid by purchasers of comparable companies. Exit alternatives include: (i) sale of the entire company to strategic or financial buyers; (ii) sale of securities into the secondary market; (iii) repayment of debts through a refinancing or from cash flow; (iv) sale of a position back to the issuing company; or (v) exchange of debt for equity, with a subsequent sale of those securities after an appreciation of the enterprise value of the business. Given the

nature and size of its investments, the Fund will not ordinarily rely on public offerings for its exit.

## D.     Distressed Investing Market and Competition

According to Dr. Edward I. Altman of New York University's Stern Graduate School of Business, the estimated market value of outstanding defaulted and distressed debt was approximately $370 billion at year-end 2003.[1]  By contrast, Dr. Altman has also estimated that the total capital allocated to distressed investment opportunities is just $70 billion.

There are many distressed loan buyers and private equity and mezzanine funds. Many are substantially larger than the Fund and have greater financial and marketing resources. However, many of these large funds favor investments in companies that are considerably larger than those targeted by the Fund.  The Principals believe that the Fund's middle market niche, with emphasis on investing at the lower end (both in percentage of par and in transaction size) of the distressed investment marketplace and in situations in which the Fund can exercise significant influence or control, limits the universe of direct competitors.

*Inefficient Market.*  While loans and other credit instruments of financially troubled companies, often undervalued and relatively illiquid, frequently present an attractive opportunity for appreciation, information is generally limited, with the timing of the resolution of open issues uncertain.  Prices can be volatile, particularly on the downside; patient purchasers can benefit from ill-informed or non-economic sellers.  These inefficiencies — often driven by fear of bankruptcy, inability to manage workouts effectively and a willingness to sell nonperforming loans — create investment opportunities.  Moreover, the markets for distressed investments remain considerably underserved by market makers and providers of investment research.  To the extent there is distressed investment coverage, it is principally focused on larger companies, resulting in a more efficient market (and reduced investment opportunity) for those credits.  For these reasons, opportunities for enhanced returns are considerably greater in the middle market.

*Access to Investment Opportunities.*  Information and sources of investment opportunities in distressed and undercapitalized companies tend to be concentrated.  Bank and finance company loan officers, loan workout officers, corporate and bankruptcy attorneys, investment fund managers and CPAs regularly become aware of distressed and undercapitalized companies.  This awareness of potential opportunities often arises from their knowledge of non-performing loans held by financial institutions, LBO failures, bankruptcy filings and reorganizations.  The Principals have substantial, well-developed and longstanding relationships and established reputations in this relatively close community and, therefore, expect to be able to source investment opportunities advantageously.

*Complex Financial Analysis.*  A troubled company is typically considerably more difficult to analyze than a financially stable company; standard financial and operating ratios are often meaningless. Determining the value of distressed companies, particularly those near or in

---

[1]     Defaults and Returns in the High Yield Bond Market: The Year 2003 in Review and Market Outlook, Dr. Edward I. Altman, NYU Salomon Center, February, 2004.

bankruptcy, is a highly specialized skill. Moreover, many investors, including distress investors, lack the expertise to manage distressed or underperforming assets actively, which often requires reorganization and bankruptcy knowledge and skills. The scarcity of such skills limits the universe of distressed investors and places a premium on the skills available to the Funds through the General Partner.

*Continuing Supply of Distressed Investment Opportunities.* A continuing supply of distressed and underperforming investment opportunities can be expected, regardless of the economy's overall performance. High yield bond issuances since 1998 have substantially exceeded historical levels. Standard & Poor's has calculated that, historically, 20% of high yield debt is in default within five years of issuance. This is indicative of a "structural" business failure rate within the economy that is particularly true for smaller and middle market companies.

Internal guidelines, regulatory pressure and/or fiduciary requirements encourage institutions such as banks, insurance companies, CLO funds and mutual funds to sell holdings in financially troubled companies. Such institutional investors are increasingly inclined to sell, rather than hold, non-performing positions into the secondary marketplace.

Moreover, as a result of such factors as an inability to hit performance targets, acrimonious negotiations or contentious litigation, some segment of the owners of distressed securities tend to sell their positions because of frustration and fatigue, rather than on the basis of a fundamental analysis of the underlying business and its value. In addition, some investors feel compelled to dispose of distressed assets because they do not have the expertise required to manage them.

## V.    Summary of Terms

The following summary of the Fund's principal terms is qualified in its entirety by the provisions of the Fund's Limited Partnership Agreement.

| | |
|---|---|
| **The Fund:** | Goldin Restructuring Fund, L.P., a Delaware limited partnership. |
| **General Partner:** | Goldin Capital Partners, L.P., a Delaware limited partnership (the "General Partner"). The principals of the General Partner are Harrison J. Goldin, David Pauker and Lawrence J. Krule (collectively, the "Principals"). The General Partner is responsible for making investment decisions for the Fund. |
| **Manager:** | Goldin Capital Management, L.P., a Delaware limited partnership (the "Manager") is responsible for various administrative functions relating to the Fund. |
| **Investment Objective:** | Achieve superior returns by investing in distressed and underperforming companies, either by purchasing distressed debt, securities, assets or other interests or by funding corporate turnarounds and reorganizations with debt or equity capital. This will be accomplished by making a limited number of investments in operationally and/or financially distressed middle-market companies ("Portfolio Companies"). The Fund will seek to purchase strategic segments of capital structures, buy assets or invest capital on favorable terms and use the skills and expertise of the Principals to manage its positions actively, exercising significant influence or control over the restructuring process. |
| **Offering Size:** | The Fund is seeking capital commitments ("Capital Commitments") of up to $200 million. |
| **Minimum Capital Commitment:** | The minimum Capital Commitment will be $1 million. The General Partner reserves the right to waive this requirement. |
| **General Partner Capital Commitment:** | On the First Closing Date (as defined below), the General Partner and its Principals and affiliates will commit at least 1.5% of aggregate Capital Commitments to the Fund as, or on the same terms as, the Fund's limited partners' (the "Limited Partners" and, together with the General Partner, the "Partners") Capital Commitments, except that the General Partner and its Principals and affiliates will not pay management fees or carried interest. |
| **Closings:** | The first closing of the Fund is expected to occur on or about July 31, 2004 (the "First Closing Date"). The final closing (the "Final Closing Date") will occur not later than the ninth month anniversary of the first closing. |
| | The General Partner may accept new Capital Commitments and may permit existing Limited Partners to increase their Capital Commitments during the nine-month period following the First |

Closing Date. Investors admitted to the Fund or which increase their Capital Commitments after the First Closing Date of the Fund will be required to fund their pro rata share of the cost of any Fund investments already made (and not previously realized) and expenses already incurred (including organizational expenses), together with interest on such amounts calculated at an annual rate of prime plus 2%, which amounts will be distributed to existing Partners. In addition, such investors will be subject to Management Fees (defined below) as if they had invested on the First Closing Date (plus interest at an annual rate of prime plus 2%), which amounts will be paid to the Manager.

**Commitment Period:** The Fund's commitment period (the "Commitment Period") will end on the third anniversary of the Final Closing Date, unless terminated earlier by the General Partner. During the Commitment Period, investors will be required to make capital contributions ("Capital Contributions") to fund investments and to pay fees and expenses.

After the termination of the Commitment Period, investors will be required to make Capital Contributions only to (i) fund then-existing commitments to invest in Portfolio Companies; (ii) fund investments under active consideration by the Fund prior to the end of the Commitment Period; (iii) fund follow-on investments in Portfolio Companies for the purpose of protecting or enhancing such investments; provided that the total amount of all follow-on investments will not exceed 20% of aggregate Capital Commitments; (iv) fund investments in securities in connection with the exercise, exchange or conversion of options, warrants or convertible securities owned by the Fund; and (v) pay, or set aside for anticipated, Fund expenses (including, without limitation, Management Fees).

**Term:** The Fund's term will end on the seventh anniversary of the Final Closing Date, subject to extension by the General Partner for up to one year, and to further extension for a second year with the approval of a majority of the members of the Investors Committee.

**Drawdowns:** Capital Contributions to the Fund will generally be made pro rata, based on Capital Commitments, on an "as needed" basis for the purpose of making Fund investments, paying Fund expenses and establishing reserves. The General Partner will give Limited Partners at least 10 business days' prior written notice of any drawdown obligation.

**Reinvestment:**

During the Commitment Period, any amounts received by the Fund as a return of capital with respect to any Stake-Out Investments may, in the discretion of the General Partner, be retained by the Fund without reducing the Partners' unfunded commitments, for the purpose of making Fund investments and paying Fund expenses, or may be returned to the Partners, thereby increasing their unfunded commitments (but not above their total Capital Commitments to the Fund). "Stake-Out Investment" means an investment which is held on a temporary basis (not exceeding one year) to facilitate a Fund investment.

**Distributions:**

Current income from dividends and interest (net of expenses), as well as from net proceeds attributable to the sale, exchange, refinancing or other disposition of Fund investments (including Stake-Out Investments), will be distributed to the Partners, in the following order of priority:

a) First, to the Partners *pro rata* based on Capital Contributions, in proportion with their Capital Contributions, until each Partner has received an amount equal to its Capital Contributions (including fees and expenses);

b) Second, to the Partners *pro rata* based on Capital Contributions, until each Partner has received a preferred return of 8% per annum, compounded annually, on its unreturned Capital Contributions ("Preferred Return");

c) Third, to the General Partner until the General Partner has received 20% of the sum of all distributions made under clause (b) and this clause (c); and

d) Thereafter, (i) 20% to the General Partner and (ii) 80% to all the Partners *pro rata* based on Capital Contributions.

The Fund will distribute the net proceeds received in cash from dispositions of investments as soon as reasonably practicable after they are received, but in any event no more than 30 days following such disposition. Any distributions shall be subject to the availability of cash after paying Fund expenses and setting aside appropriate reserves for liabilities and obligations of the Fund, including future management fees and withholding taxes or other amounts owed by a Limited Partner.

Notwithstanding the foregoing, the General Partner may cause the Fund to retain (and not to distribute to the Limited Partners) amounts permitted to be reinvested by the Fund, as described above in "Reinvestment." In addition, if the Fund receives any securities or other non-cash assets in connection with any investment, such securities or other assets may be retained by the Fund until such time as they are converted into cash.

Prior to the termination of the Fund, all assets of the Fund will be distributed, with distributions expected to be in cash or securities, whether marketable or restricted.

**Tax Distributions:**  Within 90 days of the end of each fiscal year or whenever a tax liability may arise, the Fund expects (but is not required) to distribute to the General Partner an amount equal to the General Partner's deemed tax liability for such fiscal year or for such other relevant period with respect to income allocated to the General Partner by the Fund, less any other amounts already distributed to the General Partner with respect to that fiscal year or other relevant period. Each General Partner's deemed tax liability will be computed on the assumption that the income allocated to the General Partner is taxed at the applicable combined U.S. Federal and State and local income tax rates applicable to an individual residing in New York City (taking into account the character of the income and after giving effect to the Federal income tax deduction for such State and local income taxes and disregarding the effects of Code Sections 67 and 68). The Fund may make tax distributions to the General Partner with respect to a fiscal year during a taxable year on an estimated basis, subject to adjustments at the end of the fiscal year. Tax distributions shall be deemed advances of (and shall reduce) the amounts otherwise distributable to the General Partner and may thus affect the general distribution scheme described above.

**Clawback:**  If the General Partner receives cumulative distributions on account of its carried interest which are, upon termination of the Fund, in excess of its carried interest, the General Partner will be required to restore such excess funds to the Fund, but in no event will such requirement aggregate more than 100% of the cumulative distributions previously received by the General Partner on account of its carried interest (net of deemed taxes paid thereon by the members of the General Partner).

**Management Fees:**  During the Commitment Period, the Fund will pay the Manager, on account of each Limited Partner, an annual management fee (the "Management Fee"), payable quarterly in advance, equal to 1.5% of such Limited Partner's Capital Commitment.

After the Commitment Period, the annual Management Fee, payable quarterly in advance, on account of each Limited Partner, will be equal to 1.5% of each Limited Partner's invested capital, reduced by the Limited Partner's share of the cost basis of any investment which has been disposed of completely or written down by the Fund.

| | |
|---|---|
| **Allocations of Profit and Loss:** | Net profits and losses of the Fund will generally be allocated to the Partners in a manner consistent with the distribution provisions described above. |
| **Limited Partner Giveback:** | Subject to certain limitations, during the term of the Fund, the General Partner may require a Limited Partner (including any former Limited Partner) to return distributions made to such Limited Partner for the purpose of meeting such Limited Partner's pro rata share of the Fund's indemnity or other obligations in an amount up to, but in no event in excess of its unpaid Capital Commitment plus up to 50% of the aggregate amount of distributions actually received by such Partner of such Limited Partner's Capital Commitments. No Limited Partner will be required to return a distribution more than three years after the date of dissolution of the Fund. |
| **Default:** | Upon the failure of a Limited Partner to fund all or any portion of a required Capital Contribution, the Limited Partner will be in default. Unless the General Partner determines otherwise, the amount of such default (the "Default Amount") will accrue interest commencing on the date such Capital Contribution was due at the lesser of (i) an annual rate equal to the prime rate plus 8% and (ii) the maximum rate permitted by applicable law. In addition, the General Partner may exercise a number of remedies, including, without limitation (i) causing the defaulting Limited Partner to forfeit all or any portion of future distributions; (ii) causing the Limited Partner to forfeit a portion of its capital account; (iii) causing the defaulting Limited Partner to be excluded from participating in future Fund investments; and (iv) causing a forced sale of the defaulting Limited Partner's interest in the Fund. Unless the General Partner elects to terminate a defaulting Limited Partner's unused Capital Commitment, the defaulting Limited Partner will continue to remain obligated to make Capital Contributions to the Fund, as required by the General Partner. |
| | The General Partner will have the right to cover shortfalls arising from the default of a Limited Partner in any manner the General Partner deems appropriate, including by requiring additional Capital Contributions from non-defaulting Partners. |
| **Excuse and Exclusion:** | Any Limited Partner may be excused or excluded from making all or any part of its Capital Commitment respecting a particular investment if the General Partner receives an opinion of counsel acceptable to it that such investment is reasonably likely to cause that Limited Partner to be in material violation of any applicable law or regulation. The General Partner may exclude a Limited Partner from participation in a particular investment if the |

General Partner determines in good faith that such Limited Partner's participation in such investment will likely result in substandard returns due to tax rules or other circumstances, a significant delay in making an investment, extraordinary expense or a materially adverse effect on the Fund, any of its affiliates, any Portfolio Company or future investments. In the event of any excuse or exclusion, the General Partner may correspondingly increase the interest of each other Limited Partner in such investment, subject to the restrictions described under "Investment Limits" below, and only to the extent of a Limited Partner's unpaid commitment. The excused or excluded Limited Partner's unpaid commitment will not be reduced as a result of any excuse or exclusion.

**Expenses:**

The General Partner will be responsible for its overhead expenses, including, but not limited to, compensation of employees, rent, utilities and other similar items, and organizational and offering expenses in excess of the cap noted below.

The Fund will be responsible for all other expenses, including organizational and offering expenses up to $900,000; all out-of-pocket expenses incurred in connection with the making, holding, management, sale or proposed sale of any Fund investment (including travel), including any expenses associated with proposed investments that are ultimately not made by the Fund; routine expenses of the Fund that are not reimbursed by Portfolio Companies, including research and brokerage commissions, consultants' and other experts' fees, premiums for errors and omission insurance (or similar coverage) for the General Partner, the Manager and their respective members, directors, officers, employees and agents, legal, auditing and financing fees and expenses associated with preparing the Fund's financial statements and tax returns, as well as other administrative expenses of the Fund; and all litigation-related and indemnification expenses.

**Ancillary Fees:**

If the Manager receives any organization fees, transaction fees, advisory fees, success fees, monitoring fees, break-up fees or directors fees from any Portfolio Company, 50% of the amount of such fees will be applied ratably to reduce the Management Fee otherwise payable by the Limited Partners.

**Investment Participation:**

In general, a given investment opportunity will either be held directly by the Fund or indirectly through one or more investment vehicles in which all Limited Partners participate ratably. The General Partner will have the flexibility to cause certain investors to participate through a separate investment vehicle or structure to the extent necessary or desirable to address legal, tax or regulatory issues. In addition, the General Partner may, in its sole

discretion, offer strategic investors the opportunity to co-invest with the Fund, with or without offering Partners the opportunity to co-invest; provided that the General Partner determines in good faith that it would be inappropriate for the Fund to take the entire investment opportunity or that the Fund's returns or investment opportunities will be enhanced by the co-investment. Co-investment opportunities provided to any investor will be on such terms and conditions as the General Partner, in its sole discretion, may determine.

**Borrowings:**

The General Partner anticipates that borrowings will be used only (i) in advance of drawdowns of capital, (ii) in connection with the exercise, exchange or conversion of options and (iii) to cover a defaulting Limited Partner's Default Amount and that such borrowings will be repaid within 365 days after the date of the related drawdown notice to the investors or the date on which it needs to cover a defaulting Limited Partner's Default Amount. Such borrowings may be secured by the assets purchased with the borrowed amount or by the assets of the Fund generally, including the Fund's right to require Capital Contributions from the Partners pursuant to their Capital Commitments to the Fund. In connection therewith, Partners may be required to execute documents requested by a lender acknowledging such Partners' obligations to the Fund in respect of their Capital Commitments.

**Investment Limits:**

Total investment by the Fund (at cost) in Portfolio Companies within any single industry sector may not exceed 30% of Capital Commitments (at the date of investments). The total investment by the Fund in any single Portfolio Company (or series of related Portfolio Companies) may not exceed 20% of Capital Commitments (at the date of investment). These limitations shall be determined by reference to targeted Capital Commitments of $200 million or, following the Final Closing Date, actual Capital Commitments. In addition, prior to the Final Closing Date, the total investment by the Fund in any single Portfolio Company (or series of related Portfolio Companies) may not exceed the greater of (i) 20% of actual Capital Commitments or (ii) $20 million. The Fund may make investments in excess of such limits with the approval of the Investors Committee, defined below.

**Successor Funds:**

Until the earlier of (i) the end of the Commitment Period or (ii) such time as 75% of aggregate Capital Commitments have been invested or committed to investment, neither the General Partner nor any affiliate of the General Partner will operate and advise a new closed-end pooled investment vehicle with investment objectives that are substantially similar to those of the Fund.

**Investors Committee:**    The General Partner will appoint an investors committee (the "Investors Committee") of representatives of at least three Limited Partners to provide such advice and approval as may be requested by the General Partner in connection with potential conflicts of interest (including any principal trades), making investments in excess of the Fund's investment limits, changing the time commitments of the Principals, the engagement of Goldin Associates by a Portfolio Company and other matters described in the Partnership Agreement. Investors Committee approval with respect to any investment or transaction for which the General Partner has sought such approval will be binding on all of the Partners. In its discretion, the General Partner may remove any member of the Investors Committee. An appointment to the Investors Committee is not transferable without the consent of the General Partner, which consent may be given or withheld in the sole discretion of the General Partner.

**Confidentiality:**    Limited Partners must keep confidential all matters relating to the Fund and its affairs (including any and all communications from the General Partner) both during and after this offering of limited partnership interests, except as otherwise required by law. In addition, a Limited Partner may instruct the General Partner not to disclose to such Limited Partner material non-public information concerning situations in which the Fund has invested so as to prevent the Limited Partner from becoming an insider with respect to the companies involved.

**Dissolution:**    The Fund will be dissolved and its affairs wound up upon the earliest of (i) the expiration of the term described above; (ii) the determination of the General Partner in good faith that changes in applicable law or regulation would have a material adverse effect on the continuation of the Fund or that such action is necessary or desirable in order for the Fund to comply with certain laws; and (iii) an event of withdrawal of the General Partner under Delaware law, unless certain conditions are met as set forth in the Partnership Agreement. Upon dissolution, the General Partner will liquidate the Fund in an orderly manner. The General Partner will not be required to complete such liquidation within any specified period of time.

**Key Person Event:**    If Mr. Goldin is no longer actively involved in the business of the Fund for a period of 45 consecutive business days, the General Partner shall notify the Limited Partners of such event and the Suspension Period (defined below) will commence upon such notification.

During the 120-day period after the occurrence of a Key Person Event (the "Suspension Period"), the General Partner may propose a candidate to replace Mr. Goldin as the Key Person and

the Principal whose consent is required for any investment. During the Suspension Period, two-thirds of the Limited Partners entitled to vote under the Partnership Agreement may consent to the replacement of Mr. Goldin proposed by the General Partner and/or terminate the Suspension Period. If the Limited Partners do not terminate the Suspension Period within 120 days, the Commitment Period will be deemed to have terminated.

If the Suspension Period occurs during the Commitment Period, the Limited Partners shall not be obligated to make Capital Contributions, other than to pay management fees, fund follow-on investments or investments the Fund committed to make prior to the commencement of the Suspension Period.

**Indemnification:**

The Fund will indemnify the General Partner, its affiliates and their respective members, officers, employees and agents and any Investors Committee members for any loss or damage incurred by such indemnified person in connection with the Fund or the Fund's activities, except for losses or damages that result from an act or failure to act by an indemnified person that resulted from fraud, gross negligence, willful misconduct, the commission of a felony or a material violation of applicable securities laws which has a material adverse effect on the business of the Fund or the ability of the General Partner to perform its duties under the Partnership Agreement.

The foregoing right to indemnification could require a Limited Partner to fund at any time an aggregate amount up to its unused Capital Commitment at such time, plus up to 50% of the aggregate distributions received by such Limited Partner from the Fund. Such right to indemnification will survive for a period of three years from the date of dissolution of the Fund, subject to extension with respect to certain claims under certain circumstances.

**Transferability:**

Interests in the Fund may not be directly or indirectly sold, transferred or assigned, in whole or in part, without the written consent of the General Partner. The General Partner may, without the consent of the Limited Partners, assign its general partner interest to an affiliate or entity with substantially similar ownership to that of the General Partner.

**Investor Meetings:**

The General Partner may hold meetings, which may be telephonic, with the Limited Partners on an annual basis.

| | |
|---|---|
| **Reports:** | Limited Partners will receive annual audited financial statements for the Fund, generally within 120 days after the end of each fiscal year and such other information as may be reasonably necessary for Limited Partners' preparation of tax returns. Limited Partners will receive unaudited quarterly reports, generally within 45 days after the end of each of the first three quarters of each fiscal year. |
| **Non-U.S. Investors:** | The General Partner may form an offshore feeder fund in order to facilitate investment in the Fund by non-U.S. persons and U.S. tax-exempt investors. |
| **Taxation:** | Counsel to the Fund will render an opinion that the Fund will be classified as a partnership and not as an association taxable as a corporation for Federal income tax purposes. Counsel to the Fund also will render its opinion that the Fund will not be treated as a "publicly traded partnership" taxable as a corporation. Accordingly, the Fund should not be subject to Federal income tax; hence, each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Fund's taxable income or loss. (See "Tax Aspects.") |
| **UBTI:** | Subject to the following sentence, the General Partner will generally use commercially reasonable efforts to operate the Fund in a manner that the General Partner reasonably believes will minimize the likelihood of the realization of UBTI by any tax-exempt Limited Partner that does not incur indebtedness with respect to its investment in the Fund. Notwithstanding the foregoing, the following will not be deemed a violation of the foregoing undertaking: (i) borrowings or guarantees of indebtedness by the Fund for the purpose of (a) covering Fund expenses or (b) providing interim financing to the extent necessary to consummate the purchase of portfolio investments prior to the receipt of Capital Contributions; (ii) reduction of the Management Fee by certain Ancillary Fees received by the General Partner; or (iii) investments in one or more partnerships engaged in a trade or business, as a result of or in connection with a restructuring. |
| **ERISA Considerations:** | Entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), may purchase Interests in the Fund. Trustees or administrators of such entities are urged to review carefully the matters discussed in this Confidential Offering Memorandum. Investment in the Fund by entities subject to ERISA requires special consideration. In particular, the Fund may utilize leverage in connection with its investment activities, which could give rise to "unrelated business taxable income." The Fund does not intend to permit investments by "benefit plan investors" (as defined in U.S. Department of Labor Plan Asset Regulation, 29 CFR 2510.3-101) to equal or exceed |

26

25% of the total Capital Commitments. (See "Certain Risk Factors," "Tax Aspects" and "ERISA Considerations.")

**Auditors:** _____.

**Counsel:** Schulte Roth & Zabel LLP assisted in the preparation of this Memorandum. Schulte Roth & Zabel LLP acts as counsel to the Fund and to the General Partner with respect to its responsibilities as the general partner of the Fund. Schulte Roth & Zabel LLP also represents the Manager. Schulte Roth & Zabel LLP may act as counsel to the General Partner, the Manager and/or the Fund in connection with the Fund's transactions and may represent Goldin Associates in unrelated matters. No independent counsel has been retained to represent the Limited Partners of the Fund.

## VI.    Risk Factors

Potential investors should be aware that an investment in the Fund involves a high degree of risk. Potential investors should evaluate the following considerations carefully before making an investment in the Fund.

**Risks Associated With Investments in Distressed Companies.**  Whether the Fund invests in a Portfolio Company's debt or other securities or interests in a corporate reorganization, turnaround or recapitalization, such Portfolio Companies are generally experiencing significant financial or business difficulties. The Fund's investments will be in middle-market companies, which tend to be more vulnerable than larger firms to competitors' actions, industry and market conditions and general economic downturns. While the Fund believes that the Principals' experience and knowledge in advising and managing undercapitalized situations will provide the Fund with advantages in selecting and realizing on its investments, there can be no assurance that the positions in which the Fund invests will perform as anticipated. Although such investments may result in significant returns to the Fund, they involve a substantial degree of risk. Any one or all of the issuers of the securities in which the Fund invests may be unsuccessful or not show any return for a considerable period of time. There is no assurance that the Principals will correctly evaluate the nature and magnitude of the various factors that could affect the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Fund invests, the Fund may lose its entire investment or may be required to accept cash or securities with a value less than the Fund's original investment. Under such circumstances, the returns generated from the Fund's investments may not compensate the Limited Partners adequately for the risks assumed.

**Below Investment Grade Debt, Securities and Trade Claims.**  The Fund will purchase financial instruments of, and may make direct loans to or equity investments in, companies that are not investment grade. The Fund will purchase loans that may be in default or are from issuers in financial distress or bankruptcy proceedings. The Fund may also purchase trade or other claims against credit-impaired companies, which generally represent money owed by the company to a supplier of goods and services. Loans or claims purchased by the Fund may not have any maturity. As with other types of debt instruments, loans and trade claims involve the risk of loss in case of the default or insolvency of the borrower. In addition, trade claims may be subject to such other defenses as warranty claims or failure to provide the product or services. Such loans are also less liquid than are the debt instruments of publicly-traded companies.

The types of investments to be made by the Fund may bear the additional risks associated with lower positions in the capital structure. Such investments may include equity, convertible preferred equity, and convertible debt securities, including private investments in public companies (also known as "PIPES").

**Risks Associated With Bankruptcy Proceedings.**  Many of the events within a bankruptcy proceeding are adversarial and often beyond the control of the creditors. While creditors are generally afforded an opportunity to object to significant actions, there can be no

assurance that a bankruptcy court would not approve actions that may be contrary to the interests of the Fund. Furthermore, there are instances where creditors and equity holders lose their ranking and priority, such when they take over management and functional operating control of a debtor. In those cases where the Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Fund.

Generally, the duration of a bankruptcy proceeding can be only estimated roughly. Therefore, unless the General Partner, on behalf of the Fund as a creditor in such a proceeding, negotiates for or is otherwise entitled to receive interest on its pre-bankruptcy petition claim, the Fund's return on investment can be adversely affected by the passage of time, during which the plan of reorganization of the debtor is being negotiated, approved by the creditors and confirmed by the bankruptcy court before it ultimately becomes effective. The risk of delay is particularly acute when a creditor holds unsecured debt or when the collateral value underlying secured debt does not equal the amount of the secured claim. It should be noted, too, that reorganizations outside of bankruptcy are also subject to unpredictable and potentially lengthy delays.

Bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purposes of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in the class.

The administrative costs in connection with a bankruptcy proceeding are frequently high and paid out of the debtor's estate prior to any return to creditors and equity holders. In addition, certain claims that have priority by law (for example, claims for taxes) may be quite high and may reduce the amount available for distribution to other creditors or security holders.

The Fund may seek representation on creditors committees, equity holders committees or other groups to ensure preservation or enhancement of its position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated. If the General Partner concludes that its obligations owed to other parties as a committee or group member conflict with its duties owed to Limited Partners under general fiduciary principles or any specific laws or regulations applicable to it, it will resign from that committee or group, and the Fund may not realize the benefits, if any, of participation on the committee or group. In addition, if the Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of its investments in such company while it continues to be represented on such committee or group.

The Fund may purchase creditor claims subsequent to the commencement of a bankruptcy proceeding. Under judicial decisions, it is possible that such a purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture.

**Default and Recovery Rates of Loans and High-Yield Securities.** There are varying sources of statistical default and recovery rate data for loans and high-yield securities and numerous methods for measuring default and recovery rates. The historical performance of the high-yield market or the leveraged loan market is not necessarily indicative of its future performance.

**Interest Rate Risk.** The value of any fixed-rate securities in which the Fund may invest generally will have an inverse relationship to interest rates. Accordingly, if interest rates rise, the value of such securities may decline. In addition, to the extent the trade claims or loans are prepayable, the value of such holdings may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

**Risks Associated With Investments in Securities.** Any investment in securities carries certain market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Fund's investments and the strategies to be employed. An investment in the Fund should not itself be considered a balanced investment program but, rather, is intended to provide diversification in a more complete investment portfolio. Investors must be able to withstand the loss of their entire investment.

**Nature of Investment; Risk of Limited Number of Investments.** Investment in the Fund requires a long-term commitment, with no certainty of return. There most likely will be little or no near-term cash flow available to the Limited Partners. Many of the Fund's investments will be highly illiquid and there can be no assurance that the Fund will be able to realize on such investments in a timely manner. Consequently, dispositions of such investments may require a lengthy time period or may result in distributions in kind to the Limited Partners. Additionally, the Fund will likely acquire securities that cannot be sold except pursuant to a registration statement filed under the 1933 Act or in a private placement or other transaction exempt from registration under the 1933 Act. In addition, in some cases the Fund may be prohibited by contract from selling certain securities for a period of time. Since the Fund may make only a limited number of investments and since the Fund's investments generally will involve a high degree of risk, poor performance by even a single Portfolio Company could severely affect the total returns to Limited Partners.

**Difficulty of Locating Suitable Investments.** The Fund may be unable to find a sufficient number of attractive opportunities to meet its investment objectives or fully invest its committed capital.

**Restrictions on Transfer and Withdrawal; No Market for Interests.** The Limited Partnership interests offered hereby have not been registered under the 1933 Act or any other securities laws and, therefore, cannot be resold unless they are subsequently registered under the 1933 Act and other applicable securities laws or an exemption from registration is available. It is not contemplated that registration of the interests under the 1933 Act or other securities laws will ever be effected. There is no public market for the limited partnership interests offered hereby and none is expected to develop. In addition, the Limited Partnership interests offered hereby are not assignable or transferable except with the General Partner's consent, which may be withheld in its sole discretion. In addition, Limited Partners may not withdraw capital from the Fund. Consequently, investors may not be able to liquidate their

investments prior to the end of the Fund's term and must be prepared to bear the risks of owning Limited Partnership interests for an extended period of time. Further, there are substantial penalties that may result if a Limited Partner fails to fulfill a Capital Commitment.

**Dilution from Subsequent Closings.** Limited Partners subscribing for limited partnership interests after the First Closing Date of the Fund will participate in the existing investments of the Fund, thereby diluting the interest of existing Limited Partners. Although such subsequent Limited Partners will contribute their pro rata share of prior Capital Contributions (plus certain additional amounts), there can be no assurance that this contribution will reflect the fair value of the Fund's existing investments at the time that such additional Limited Partners subscribe for interests.

**Investments with Terms Longer than the Fund.** The Fund may invest in investments that cannot be realized in an orderly fashion until after the date on which the Fund is scheduled to terminate. Although it is the expectation of the General Partner that all Fund investments will be disposed of prior to the end of the Fund's term, the Fund may have to sell or otherwise dispose of investments on disadvantageous terms as a result of the Fund's termination, or distribute such investments in kind.

**Failure to Make Capital Contributions.** The consequences of defaulting on a required Capital Contribution are material and adverse to the defaulting Limited Partner. In addition, if a Limited Partner fails to pay a required Capital Contribution when due and the Capital Contributions made by non-defaulting Partners and borrowings by the Fund are inadequate to cover the defaulted Capital Contribution, the Fund may be unable to pay its obligations when due. As a result, the Fund may be subject to significant penalties that could materially adversely affect the returns to the non-defaulting Partners.

**Contingent Liabilities on Disposition of Investments.** In connection with the disposition of an investment in a Portfolio Company, the Fund may be required to make representations about the business and financial affairs of such Portfolio Company. The Fund may also be required to indemnify the purchasers of such an investment regarding certain matters, including the accuracy of any such representations. These arrangements may result in the incurrence of contingent liabilities for which the Fund may establish reserves or escrow accounts. In addition, Limited Partners may be required to return amounts distributed to them to fund indemnity obligations.

**Legal, Tax and Regulatory Risks.** Legal, tax and regulatory changes could adversely affect the Fund. For example, from time to time the market for private equity transactions has been adversely affected by a decrease in the availability of senior and subordinated financing for transactions, in part in response to regulatory pressures on providers of financing to reduce or eliminate their exposure to such transactions.

**Non-Controlling Investments.** The Fund may hold a non-controlling interest in certain Portfolio Companies and, therefore, may have a limited ability to protect its position in such Portfolio Companies, although in making an investment in a Portfolio Company the Fund will seek the ability to exercise significant influence over the company or its restructuring.

**Risks Associated With In-Kind Distributions.** Although the General Partner anticipates that all the Fund's investments will be liquidated prior to the termination of the Fund and that only cash will be distributed to the Limited Partners, there can be no assurance that the Fund will meet this objective. At the discretion of the General Partner, the Limited Partners may receive in-kind distributions of securities held by the Fund. Such securities may not be readily marketable or saleable and may have to be held by the Limited Partners for an indefinite period of time (which, under tax law rules relating to in-kind distributions by Funds, could postpone a Limited Partner's recognition of any capital loss and certain capital gains realized by a Limited Partner on the distribution).

**Carried Interest; Distributions in Kind.** The existence of the General Partner's carried interest may create an incentive for the General Partner to make riskier or more speculative investments on behalf of the Fund than would be the case in the absence of this arrangement. Under certain limited circumstances set forth in the Partnership Agreement, distributions may be made in kind of investments for which market quotations are not readily available. The valuation of such investments will be determined in accordance with procedures set forth in the Partnership Agreement which will be the basis for the calculation of the carried interest.

**Diverse Limited Partner Group.** The Limited Partners may have conflicting investment, tax and other interests with respect to their investments in the Fund. The conflicting interests of individual Limited Partners may relate to or arise from, among other things, the nature of investments made by the Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a consequence, conflicts of interest may arise in connection with decisions made by the General Partner, including with respect to the nature or structuring of investments that may be more beneficial for one Limited Partner than for another Limited Partner, especially with respect to any Limited Partner's individual tax situations. In selecting and structuring investments appropriate for the Fund, the General Partner will consider the investment and tax objectives of the Fund and its Partners as a whole, not the investment, tax or other objectives of any Limited Partner individually.

**Risks Associated With Lack of Liquidity.** Because of the nature of the Fund's investment strategies, certain investments may have to be held for a substantial period of time before they can be liquidated to the Fund's greatest advantage or, in some cases, at all. In addition, the Fund may hold a significant number of investments for which no market exists and which have restricted transferability under Federal or state securities laws and may be able to dispose of these securities only at substantial discounts or losses.

**Risks Associated With Restrictions on Transferability.** Successful implementation of the Fund's investment objectives requires that certain investments be maintained for significant periods of time to realize anticipated profits and, thus, depends on the maintenance of a stable pool of capital. The Limited Partnership interests offered hereby are, therefore, subject to restrictive redemption, assignment and transfer provisions. Prospective investors should determine whether restricted liquidity is consistent with the objectives of their portfolios before investing in the Fund.

**Risks Associated With Fund Status.**  Were the Fund to be classified as an association taxable as a corporation, or treated as a publicly traded partnership taxable as a corporation, the Fund itself would be taxed on its income at corporate income tax rates, there would be no flow through of Fund income, gains, losses and deductions to the Limited Partners and Fund distributions generally would be taxable as dividends.  (See "Income Tax Aspects.")

**Lack of Protection Under Investment Company Act.**  The Fund is not registered as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), in reliance upon the exclusion from the definition of "investment company" provided by Section 3(c)(1) of the 1940 Act.  Accordingly, the provisions of the 1940 Act which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of a fund's activities and contractual relationships, and prohibit a fund from engaging in certain transactions with its affiliates, is not applicable.

**Passive Investment in Interests; Reliance on Personnel.**  The success of the Fund depends in substantial part upon the skill and expertise of the Principals.  Limited Partners will be relying entirely on such individuals to conduct and manage the affairs of the Fund.  The Partnership Agreement will not permit the Limited Partners to engage in the active management and affairs of the Fund.  Because specific investments of the Fund have not yet been identified, the Limited Partners must rely on the ability of the Principals to make appropriate investments for the Fund and to manage and dispose of such investments.  None of the Fund, the General Partner, the Manager or the Principals have any operating or investment history upon which investors can evaluate the anticipated performance of the Fund.  Moreover, there can be no assurance that the key investment professionals will continue their present association with the General Partner and the Manager throughout the life of the Fund.

## VII.  Potential Conflicts of Interest

Certain conflicts of interest may occur as a result of certain of the Principals' roles with respect to Goldin Associates' advisory business, on the one hand, and the activities of the Fund on the other hand. This section discusses those potential conflicts and the manner in which the General Partner intends to resolve them.

Goldin Associates is a financial advisory and turnaround management firm that specializes in underperforming and distressed situations. Goldin Associates provides financial and strategic advice to financially distressed companies or to lenders, creditors, equity holders or other parties-in-interest, such as boards of directors, and also provides hands-on management services for troubled companies. As described above, Goldin Associates has a broad network of contacts that is expected to provide a significant flow of investment opportunities to the Fund. Goldin Associates will continue to serve advisory clients during the term of the Fund and certain of the Principals will continue to be engaged in activities of the advisory business. Specifically, Harrison J. Goldin and David Pauker will continue to spend time on the advisory business, although they will be required to devote a significant amount of their business time to the Fund's activities. A large part of their time will be spent maintaining and developing contacts that are expected to generate investment opportunities for the Fund. The Fund will not be entitled to profits from the advisory activities of Goldin Associates.

From time to time, the Principals may learn of a restructuring that presents either a potential investment opportunity for the Fund or an advisory opportunity for Goldin Associates. In the event a referral source contacts Goldin Associates specifically to solicit its interest in an advisory assignment, Goldin Associates will evaluate and pursue the potential for the advisory assignment before the Fund considers it as an investment opportunity. In all other cases, the Principals will first review such opportunity as a potential investment for the Fund. If the Principals determine in good faith that the opportunity would not be appropriate for, or in the best interest of, the Fund, Goldin Associates may pursue the opportunity as an advisory assignment. In making such a determination, the decision will be made Mr. Goldin. Goldin Associates will not pursue advisory engagements in connection with any potential investment under active consideration by the Fund. Investors should bear in mind that many of Goldin Associates' assignments involve situations that would not be appropriate investments for the Fund, either because they involve companies that are not middle market companies or for other reasons.

The Fund will generally not seek to invest in situations in which Goldin Associates is engaged as an advisor. However, there may be cases in which a client or potential client asks the Fund to consider making an investment. In such a case, the prospective investment must be reviewed and approved by the Investors Committee in order for the Fund to make the investment. The Fund will not invest in any situation in which Goldin Associates is engaged in a bankruptcy case as an advisor to a company, a creditors committee or another official committee.

It is not generally contemplated that Goldin Associates will be hired as an interim manager or full-time consultant in connection with a Portfolio Company. Any such arrangement would require the approval of the Investors Committee. Any fees paid to Goldin Associates in that regard would be retained by Goldin Associates.

Other conflicts of interest may arise from the Fund's and Goldin Associates' activities. Prospective investors are invited to discuss the potential for conflicts of interest with the Principals. As a condition to being admitted as a Limited Partner, each investor will be required to acknowledge and consent to the foregoing in its subscription agreement.

## VIII. Regulatory, Tax Aspects and ERISA Considerations

### CERTAIN REGULATORY MATTERS

**Investment Company Act of 1940.** The Fund will not be subject to the provisions of the Investment Company Act of 1940, as amended (the "Investment Company Act"), in reliance on Section 3(c)(1) thereof which excludes from the definition of "investment company" any issuer whose outstanding securities are beneficially owned by not more than 100 persons (as defined in Section 3(c)(1)) and which meets the other conditions contained therein. Limited Partner subscription agreements and the Partnership Agreement will contain representations and restrictions on transfer designed to assure that the foregoing conditions will be met.

**General Partners Act of 1940.** The General Partner and the Manager are not presently registered as investment advisers under the Investment Advisers Act of 1940, as amended (the "Advisers Act"), in reliance upon the exemption from the registration requirements of the Advisers Act contained in Section 203(b)(3) thereof, which exempts from registration any investment adviser who during the course of the preceding 12 months has had fewer than 15 clients and who meets certain other requirements. By virtue of being exempt from registration, the General Partner is not subject to the performance fee restrictions and certain other restrictions contained in the Advisers Act. However, the General Partner or the Manager may register as investment advisers under the Advisers Act in the future, and in the event that the General Partner will have the right to amend the formula for the calculation of the carried interest to conform to the requirements of Rule 205-3 under the Advisers Act.

**Securities Act of 1933.** The offer and sale of the limited partnership interests will not be registered under the 1933 Act in reliance upon the exemption from registration provided by Section 4(2) thereof and Regulation D promulgated thereunder. Each purchaser must be an "accredited investor" (as defined in Regulation D) and will be required to represent, among other customary private placement representations, that it is acquiring its limited partnership for its own account for investment purposes only and not with a view to resale or distribution.

## TAX ASPECTS

The following is a summary of certain aspects of the income taxation of the Fund and its Limited Partners that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Internal Revenue Service (the "Service") or any other federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has it obtained an opinion of counsel with respect to any tax issues.

This summary of certain aspects of the federal income tax treatment of the Fund is based upon the Internal Revenue Code of 1986, as amended (the "Code"), judicial decisions, Treasury Regulations (the "Regulations") and rulings in existence on the date hereof, all of which are subject to change. This summary does not discuss the impact of all of the various proposals to amend the Code that could change certain of the tax consequences of an investment in the Fund. This summary also does not discuss all of the tax consequences that may be relevant to a particular investor or to certain investors subject to special treatment under the federal income tax laws, such as insurance companies and non-United States persons.

EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT WITH ITS OWN TAX ADVISER IN ORDER FULLY TO UNDERSTAND THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

In addition to the particular matters set forth in this section, tax-exempt organizations should review carefully those sections of the Memorandum regarding liquidity and other financial matters to ascertain whether the investment objectives of the Fund are consistent with their overall investment plans. Each prospective tax-exempt Limited Partner is urged to consult its own counsel regarding the acquisition of interests.

Tax Treatment of Fund Operations

Classification of the Fund. The Fund will receive an opinion of Schulte Roth & Zabel LLP, counsel to the Fund, that under the provisions of the Code and the Regulations as in effect on the date of the opinion, and based upon certain representations of the General Partner, the Fund will be classified as a partnership for Federal income tax purposes and not as an association or a publicly traded partnership taxable as a corporation.

As a partnership, the Fund is not itself subject to federal income tax. The Fund files an annual partnership information return with the Service that reports the results of operations. Each Partner is required to report separately on its income tax return its distributive share of the Fund's items of income, gain, loss deduction and expense for the taxable year regardless of whether it has received or will receive a distribution from the Fund.

Allocation of Profits and Losses. Under the Partnership Agreement, the Fund's items of income, gain, loss, or deduction actually recognized by the Fund for income tax purposes for each fiscal year generally are to be allocated for income tax purposes among the Partners and to their capital accounts in a manner consistent with the distribution of cash proceeds described above. For federal income tax purposes, a Partner's allocable share of the Fund's items of income, gain, loss, deduction and expense will be determined by the Partnership

Agreement if such allocations have "substantial economic effect" or are determined to be in accordance with the Partners' interests in the Fund.

　　　　Tax Elections; Returns; Tax Audits. The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Fund to make such an election. Any such election, once made, cannot be revoked without the Service's consent. The General Partner presently does not intend to make such election.

　　　　The General Partner decides how to report the partnership items on the Fund's tax returns, and all Partners are required under the Code to treat the items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported. In the event the income tax returns of the Fund are audited by the Service, the tax treatment of the Fund's income and deductions generally is determined at the Fund level in a single proceeding rather than by individual audits of the Partners. The General Partner, designated as the "Tax Matters Partner", has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Fund items.

Tax Consequences of Distributions

　　　　A Limited Partner receiving a cash liquidating distribution from the Fund, in connection with the dissolution of the Fund, generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such Limited Partner and such Limited Partner's adjusted tax basis in its partnership interest. Such capital gain or loss will be short-term, long-term, or some combination of both, depending upon the timing of the Limited Partner's contributions to the Fund. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Limited Partner's allocable share of the Fund's "unrealized receivables" exceeds the Limited Partner's basis in such unrealized receivables (as determined pursuant to the Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Limited Partner would recognize ordinary income. A Limited Partner receiving a cash nonliquidating distribution will recognize income in a similar manner only to the extent that the amount of the distribution exceeds such Limited Partner's adjusted tax basis in its partnership interest.

　　　　Distributions of Property. A partner's receipt of a distribution of property from a partnership is generally not taxable. However, under Section 731 of the Code, a distribution consisting of marketable securities generally is treated as a distribution of cash (rather than property) unless the distributing partnership is an "investment partnership" within the meaning of Section 731(c)(3)(C)(i) and the recipient is an "eligible partner" within the meaning of Section 731(c)(3)(C)(iii). The Fund will determine at the appropriate time whether it qualifies as

an "investment partnership."   Assuming it so qualifies, if a Limited Partner is an "eligible partner", which term should include a Limited Partner whose contributions to the Fund consisted solely of cash, the recharacterization rule described above would not apply.

<u>Tax Treatment of Fund Investments</u>

   <u>In General</u>.  The Fund expects to act as an investor, and not as a dealer, with respect to its securities transactions.  An investor is a person who buys and sells securities for its own account.  A dealer, on the other hand, is a person who purchases securities for resale to customers rather than for investment or speculation.

   The Fund expects that its gains and losses from its securities transactions generally will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.  Property held for more than one year generally will be eligible for long-term capital gain or loss treatment.  The maximum ordinary income tax rate for individuals is 35% and, in general, the maximum individual income tax rate for "Qualified Dividends" and long-term capital gains is 15% (unless the taxpayer elects to be taxed at ordinary rates - see "Limitation on Deductibility of Interest and Short Sale Expenses" below), although in all cases the actual rates may be higher due to the phase out of certain tax deductions, exemptions and credits.  For corporate taxpayers, the maximum income tax rate is 35%.  Capital losses of both individual and corporate taxpayers are subject to limitations on deductibility.

   The Fund may realize ordinary income from dividends and accruals of interest on securities.  The Fund may hold debt obligations with "original issue discount."  In such case, the Fund would be required to include amounts in taxable income on a current basis even though receipt of such amounts may occur in a subsequent year.  The Fund will also acquire debt obligations with "market discount."  Upon disposition of such an obligation, the Fund generally would be required to treat gain realized as interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund.  The Fund may realize ordinary income or loss with respect to its investments in partnerships engaged in a trade or business, or in certain private claims, or in certain fundings of reorganization plans.

   There are a number of uncertainties in the federal income tax law relating to debt restructuring.  In general, a "significant modification" of a debt obligation acquired by the Fund at a discount is treated as a taxable event to the Fund, with the resulting gain or loss measured by the difference between the principal amount of the debt after the modification and the Fund's tax basis in such debt before the modification.  However, other than for certain "safe harbor" modifications specified in Treasury Regulations, the determination of whether a modification is "significant" is based on all of the facts and circumstances.  Therefore, it is possible that the Service could take the position that the restructuring of a debt obligation acquired by the Fund at a discount amounts to a "significant modification" that should be treated as a taxable event even if the Fund did not so treat the restructuring on its tax return.

   <u>Currency Fluctuations - "Section 988" Gains or Losses</u>.  To the extent that its investments are denominated in a foreign currency, gain or loss realized by the Fund frequently

will be affected by the fluctuations in the value of such foreign currency relative to the value of the dollar. Generally, gains or losses with respect to the Fund's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the disposition of such stock. However, under Section 988 of the Code, gains and losses of the Fund from the acquisition and disposition of foreign currency (e.g., the purchase of foreign currency and subsequent use of the currency to acquire stock) will be treated as ordinary income or loss. Moreover, under Section 988, gains or losses on disposition of debt securities denominated in a foreign currency to the extent attributable to fluctuations in the value of the foreign currency between the date of acquisition of the debt securities and the date of disposition will be treated as ordinary income or loss. Similarly, gains or losses attributable to fluctuations in exchange rates that occur between the time the Fund accrues interest or other receivables or accrues expenses or other liabilities denominated in a foreign currency and the time the Fund actually collects such receivables or pays such liabilities may be treated as ordinary income or ordinary loss.

In addition, the Fund may acquire foreign currency forward contracts and acquire put and call options on foreign currencies. Generally, foreign currency option contracts that qualify as "Section 1256 Contracts" (see "Section 1256 Contracts" below) will not be subject to ordinary income or loss treatment under Section 988. However, if the Fund acquires currency option contracts that are not Section 1256 Contracts, or any currency forward contracts, any gain or loss realized by the Fund with respect to such instruments will be ordinary, unless (i) the contract is a capital asset in the hands of the Fund and is not a part of a straddle transaction, and (ii) the Fund makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

Section 1256 Contracts.   In the case of Section 1256 Contracts, the Code generally applies a "mark-to-market" system of taxing unrealized gains and losses on such contracts and otherwise provides for special rules of taxation. A Section 1256 Contract includes, in pertinent part, certain foreign currency forward contracts, and certain options contracts. Under these rules, Section 1256 Contracts held by the Fund at the end of each taxable year will be treated for Federal income tax purposes as if they were sold by the Fund for their fair market value on the last business day of such taxable year. The net gain or loss, if any, resulting from such deemed sales (known as "marking-to-market"), together with any gain or loss resulting from actual sales of Section 1256 Contracts, must be taken into account by the Fund in computing its taxable income for such year. If a Section 1256 Contract held by the Fund at the end of a taxable year is sold in the following year, the amount of any gain or loss realized on such sale will be adjusted to reflect the gain or loss previously taken into account under the "mark-to-market" rules.

Capital gains and losses from such Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof. Such gains and losses will be taxed under the general rules described above. Gains and losses from certain foreign currency transactions will be treated as ordinary income and losses. (See "Currency Fluctuations – 'Section 988' Gains or Losses.") If an individual taxpayer incurs a net capital loss for a year, the portion thereof, if any, which consists of a net loss on Section 1256 Contracts may, at the election of the taxpayer, be carried back three years. Losses so carried back may be deducted only against net capital gain to the extent that such gain includes gains on Section 1256 Contracts.

<u>Limitation on Deductibility of Interest and Short Sale Expenses</u>.    For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest and short sale expenses for "indebtedness properly allocable to property held for investment").   Investment interest is not deductible in the current year to the extent that it exceeds the taxpayer's "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses).   For this purpose, "qualified dividends" and long-term capital gain are excluded from net investment income unless the taxpayer elects to pay tax on such amounts at ordinary income tax rates.

For purposes of this provision, the Fund's activities will be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a noncorporate Limited Partner's share of the interest expense attributable to the Fund's operation.   In such case, a noncorporate Limited Partner would be denied a deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to interest expense unless it had sufficient investment income from all sources including the Fund.   A Limited Partner that could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation.  The investment interest limitation would also apply to interest paid by a noncorporate Limited Partner on money borrowed to finance its investment in the Fund.

For each taxable year, Section 1277 of the Code limits the deduction of the portion of any interest expense on indebtedness incurred by a taxpayer to purchase or carry a security with market discount which exceeds the amount of interest (including original issue discount) includible in the taxpayer's gross income for such taxable year with respect to such security ("Net Interest Expense").   In any taxable year in which the taxpayer has Net Interest Expense with respect to a particular security, such Net Interest Expense is not deductible except to the extent that it exceeds the amount of market discount that accrued on the security during the portion of the taxable year during which the taxpayer held the security.   Net Interest Expense which cannot be deducted in a particular taxable year under the rules described above can be carried forward and deducted in the year in which the taxpayer disposes of the security.   Alternatively, at the taxpayer's election, such Net Interest Expense can be carried forward and deducted in a year prior to the disposition of the security, if any, in which the taxpayer has net interest income from the security.

Section 1277 would apply to a Limited Partner's share of the Fund's Net Interest Expense attributable to a security held by the Fund with market discount.   In such case, a Limited Partner would be denied a current deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to such Net Interest Expense and such losses would be carried forward to future years, in each case as described above.  Although no guidance has been issued regarding the manner in which an election to deduct previously disallowed Net Interest Expense in a year prior to the year in which a bond is disposed of should be made, it appears that such an election would be made by the Fund rather than by the Limited Partner.  Section 1277 would also apply to the portion of interest paid by a Limited Partner on money borrowed to finance its investment in the Fund to the extent such interest was allocable to securities held by the Fund with market discount.

Deductibility of Fund Investment Expenditures and Certain Other Expenditures.
Investment expenses (e.g., investment advisory fees) of an individual, trust or estate are
deductible only to the extent they exceed 2% of adjusted gross income. In addition, the Code
further restricts the ability of an individual with an adjusted gross income in excess of a specified
amount (for 2004, $142,700 or $71,350 for a married person filing a separate return) to deduct
such investment expenses. Under such provision, investment expenses in excess of 2% of
adjusted gross income may only be deducted to the extent such excess expenses (along with
certain other itemized deductions) exceed the lesser of (i) 3% of the excess of the individual's
adjusted gross income over the specified amount or (ii) 80% of the amount of certain itemized
deductions otherwise allowable for the taxable year. Moreover, such investment expenses are
miscellaneous itemized deductions that are not deductible by a noncorporate taxpayer in
calculating its alternative minimum tax liability.

Pursuant to Regulations issued by the Treasury Department, these limitations on
deductibility will apply to a noncorporate Limited Partner's share of the expenses of the Fund,
including the Management Fee. The consequences of these limitations will vary depending upon
the particular tax situation of each taxpayer. Accordingly, noncorporate Limited Partners should
consult their tax advisers with respect to the application of these limitations.

A Limited Partner will not be allowed to deduct syndication expenses, including
placement fees, paid by such Limited Partner or the Fund. Any such amounts will be included in
the Limited Partner's adjusted tax basis for its interest.

Application of Rules for Income and Losses from Passive Activities. The Code
restricts the deductibility of losses from a "passive activity" against certain income that is not
derived from a passive activity. This restriction applies to individuals, personal service
corporations and certain closely held corporations. Pursuant to Regulations issued by the
Treasury Department, income or loss from the Fund's securities investment and trading activity
generally will not constitute income or loss from a passive activity. Therefore, passive losses
from other sources generally could not be deducted against a Limited Partner's share of such
income and gain from the Fund. Income or loss attributable to the Fund's investments in
partnerships engaged in certain trades or businesses, certain private claims or certain fundings of
reorganization plans may constitute passive activity income or loss.

Application of Basis and "At Risk" Limitations on Deductions. The amount of
any loss of the Fund that a Limited Partner is entitled to include in its income tax return is
limited to its adjusted tax basis in its interest as of the end of the Fund's taxable year in which
such loss occurred. Generally, a Limited Partner's adjusted tax basis for its interest is equal to
the amount paid for such interest, increased by the sum of (i) its share of the Fund's liabilities, as
determined for federal income tax purposes, and (ii) its distributive share of the Fund's realized
income and gains, and decreased (but not below zero) by the sum of (i) distributions (including
decreases in its share of Fund liabilities) made by the Fund to such Limited Partner and (ii) such
Limited Partner's distributive share of the Fund's realized losses and expenses.

Similarly, a Limited Partner that is subject to the "at risk" limitations (generally,
non-corporate taxpayers and closely held corporations) may not deduct losses of the Fund to the
extent that they exceed the amount such Limited Partner has "at risk" with respect to its interest

at the end of the year. The amount that a Limited Partner has "at risk" will generally be the same as its adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of the Fund or any amount borrowed by the Limited Partner on a non-recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

"Phantom Income" From Fund Investments. Pursuant to various "anti-deferral" provisions of the Code (the "Subpart F," "passive foreign investment company" and "foreign personal holding company" provisions), investments (if any) by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

Foreign Taxes

It is possible that certain dividends and interest received by the Fund from sources within foreign countries will be subject to withholding taxes imposed by such countries. In addition, the Fund may also be subject to capital gains taxes in some of the foreign countries where it purchases and sells securities. Tax treaties between certain countries and the United States may reduce or eliminate such taxes. It is impossible to predict in advance the rate of foreign tax the Fund will pay since the amount of the Fund's assets to be invested in various countries is not known.

The Limited Partners will be informed by the Fund as to their proportionate share of the foreign taxes paid by the Fund, which they will be required to include in their income. The Limited Partners generally will be entitled to claim either a credit (subject, however, to various limitations on foreign tax credits) or, if they itemize their deductions, a deduction (subject to the limitations generally applicable to deductions) for their share of such foreign taxes in computing their federal income taxes. A Limited Partner that is tax-exempt will not ordinarily benefit from such credit or deduction.

Unrelated Business Taxable Income

Generally, an exempt organization is exempt from federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the organization directly or indirectly through a partnership in which it is a partner.

This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of an exempt organization. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived (either directly or through partnerships) from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the organization's exempt purpose or function. UBTI also includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year, and

(ii) gains derived by an exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of such disposition. With respect to its investments in partnerships engaged in a trade or business, in certain private claims or in certain fundings of reorganization plans, the Fund's income (or loss) from these investments may constitute UBTI.

Subject to the following sentence, the General Partner will generally use commercially reasonable efforts to operate the Fund in manner that the General Partner reasonably believes will minimize the likelihood of the realization of UBTI by any tax-exempt Limited Partner that does not incur indebtedness with respect to its investment in the Fund. Notwithstanding the foregoing, the following will not be deemed a violation of the foregoing undertaking: (i) borrowings or guarantees of indebtedness by the Fund for the purpose of (a) covering Fund expenses or (b) providing interim financing to the extent necessary to consummate the purchase of portfolio investments prior to the receipt of capital contributions; (ii) reducing the Management Fee by certain Ancillary Fees received by the General Partner; or (iii) investing in one or more partnerships engaged in a trade or business, as a result of or in connection with a restructuring. Additionally, in certain circumstances, the Fund may borrow for short-term financing purposes, in which case it is possible that the Fund may incur "acquisition indebtedness" with respect to certain of its transactions. To the extent the Fund recognizes income (i.e., dividends and interest) from securities with respect to which there is "acquisition indebtedness" during a taxable year, the percentage of such income which will be treated as UBTI generally will be based on the percentage which the "average acquisition indebtedness" incurred with respect to such securities is of the "average amount of the adjusted basis" of such securities during the taxable year.

To the extent the Fund recognizes gain from securities with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of their disposition, the percentage of such gain which will be treated as UBTI will be based on the percentage which the highest amount of such "acquisition indebtedness" is of the "average amount of the adjusted basis" of such securities during the taxable year. In determining the unrelated debt-financed income of the Fund, an allocable portion of deductions directly connected with the Fund's debt-financed property is taken into account. Thus, for instance, a percentage of losses from debt-financed securities (based on the debt/basis percentage calculation described above) would offset gains treated as UBTI.

As described above, the General Partner may realize Ancillary Fees in connection with the Fund's activities, and all of such Ancillary Fees will be applied to reduce the Management Fees paid by Limited Partners. As a result of the application of these provisions, the Service could assert that a tax-exempt investor realized such Ancillary Fees, and that such Ancillary Fees give rise to UBTI.

To the extent that the Fund generates UBTI, the applicable federal tax rate for such tax-exempt Limited Partner generally would be either the corporate or trust tax rate depending upon the nature of the particular exempt organization. An exempt organization may be required to support, to the satisfaction of the Service, the method used to calculate its UBTI. The Fund will be required to report to a Partner that is an exempt organization information as to

the portion, if any, of its income and gains from the Fund for each year which will be treated as UBTI. The calculation of such amount with respect to transactions entered into by the Fund is highly complex, and there is no assurance that the Fund's calculation of UBTI will be accepted by the Service.

In general, if UBTI is allocated to an exempt organization such as a qualified retirement plan or a private foundation, the portion of the Fund's income and gains which is not treated as UBTI will continue to be exempt from tax, as will the organization's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in the Fund generally should not affect the tax-exempt status of such an exempt organization. However, a charitable remainder trust will not be exempt from federal income tax under Section 664(c) of the Code for any year in which it has UBTI. A title-holding company will not be exempt from tax if it has certain types of UBTI. Moreover, the charitable contribution deduction for a trust under Section 642(c) of the Code may be limited for any year in which the trust has UBTI. A prospective investor should consult its tax adviser with respect to the tax consequences of receiving UBTI from the Fund. (See "ERISA Considerations.")

Certain Issues Pertaining to Specific Exempt Organizations. Special considerations apply to investors in the Fund that are private foundations, qualified retirement plans and endowment funds. Such entities should consult their own counsel concerning the tax and other issues that may arise if they want to invest in the Fund.

Tax Shelter Reporting Requirements

Under recently issued Regulations, the activities of the Fund may include one or more "reportable transactions," requiring the Fund and, in certain circumstances, a Limited Partner to file information returns as described below. In addition, the General Partner and other material advisors to the Fund may each be required to maintain for a specified period of time a list containing certain information regarding the "reportable transactions" and the Fund's investors, and the Service could inspect such lists upon request.

A "reportable transaction" of a partnership includes, among others, a transaction that results in a loss claimed under Section 165 of the Code (computed without taking into account offsetting income or gain items, and without regard to limitations on its deductibility) generally of at least $2 million in any one taxable year or an aggregate of at least $4 million over a period of six taxable years (beginning with the taxable year in which the transaction is entered into), unless the transaction has been exempted from reporting by the Service. Subject to certain significant exemptions described below, a partner will be treated as participating in a partnership's "loss transaction," and thus be required to report the transaction, if (i) the partner's allocable share of such a partnership's loss exceeds certain thresholds, or (ii) the partner is an individual or a trust which is allocated in any one taxable year a loss of at least $50,000 from a Section 988 transaction.

The Service has published guidance exempting many of the Fund's transactions from the reporting requirements, provided that the Fund has a "qualifying basis" in the assets underlying the transaction. Assets with a "qualifying basis" include, among others, certain assets purchased by the Fund for cash. However, even if the Fund has a "qualifying basis" in the asset

generating the loss, each of the following transactions is still subject to the reporting requirements unless it is marked to market under the Code (e.g., a Section 1256 Contract): (i) a transaction involving an asset that is, or was, part of a straddle (other than a mixed straddle), (ii) a transaction involving certain "stripped" instruments, (iii) the disposition of an interest in a pass-through entity, and (iv) certain foreign currency transactions which generate an ordinary loss.

The Regulations require the Fund to complete and file Form 8886 ("Reportable Transaction Disclosure Statement") with its tax return for each taxable year in which the Fund participates in a "reportable transaction." Additionally, each Partner treated as participating in a reportable transaction of the Fund is required to file Form 8886 with its tax return. The Fund and any such Partner, respectively, must also submit a copy of the completed form with the Service's Office of Tax Shelter Analysis. The Fund intends to notify the Partners that it believes (based on information available to the Fund) are required to report a transaction of the Fund, and intends to provide such Limited Partners with any available information needed to complete and submit Form 8886 with respect to the Fund's transactions.

Under the above rules, a Partner's recognition of a loss upon its disposition of an interest in the Fund could also constitute a "reportable transaction" for such Partner. Investors should consult with their own advisors concerning the application of these reporting obligations to their specific situations.

Legislative Proposals

This foregoing summary of certain aspects of the Federal income tax treatment of the Fund is based upon the Code, judicial decisions, Regulations and rulings in existence on the date hereof, all of which are subject to change. Legislation has recently been proposed to amend the Code, which could change certain of the tax consequences of an investment in the Fund. In particular, the Senate has recently passed a bill that, if enacted, would require that the Fund operate as if it had a Section 754 election in effect (see "Tax Elections; Returns; Tax Audits"). The Fund would be required to adjust its tax basis in its assets in certain situations, including when a Partner recognizes gain or loss from a Fund distribution or takes a basis in distributed property that is different from the Fund's basis in the property immediately prior to the distribution. If such bill is enacted, the Fund will request a Partner who receives a distribution from the Fund, including in connection with a withdrawal in whole or in part, to provide the Fund with such Partner's adjusted basis in its Interest. The same bill would also change from 60 months to 180 months the period of time over which the Fund may elect to amortize organizational expenses, if such expenses are incurred or paid by the Fund after the bill's effective date. It is not possible to predict the extent to which any of these or other provisions will be enacted and, if enacted, what their final form and effective dates will be. Any of the current proposals that are enacted could change the tax consequences described herein of an investment in the Fund. Prospective investors should consult their own tax advisors regarding the status of these proposed changes and the effect, if any, on their investment in the Fund.

<u>State and Local Taxation</u>

In addition to the federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident. A partnership in which the Fund acquires an interest may conduct business in a jurisdiction that will subject to tax a Partner's share of the partnership's income from that business and may cause Partners to file tax returns in those jurisdictions. Prospective investors should consult their tax advisers with respect to the availability of a credit for such tax in the jurisdiction in which that Partner is a resident.

The Fund should not be subject to the New York City unincorporated business tax, which is not imposed on a partnership which purchases and sells securities for its "own account." (This exemption may not be applicable to the extent a partnership in which the Fund invests conducts a business in New York City.) By reason of a similar "own account" exemption, it is also expected that a nonresident individual Partner should not be subject to New York State personal income tax with respect to his share of income or gain realized directly by the Fund.

Individual Limited Partners who are residents of New York State and New York City should be aware that the New York State and New York City personal income tax laws limit the deductibility of itemized deductions and interest expense for individual taxpayers at certain income levels. These limitations would likely apply to a Limited Partner's share of some or all of the Fund's expenses. Prospective Limited Partners are urged to consult their tax advisers with respect to the impact of these provisions and the federal limitations on the deductibility of certain itemized deductions and investment expenses on their New York State and New York City tax liability.

For purposes of the New York State corporate franchise tax and the New York City general corporation tax, a corporation generally is treated as doing business in New York State and New York City, respectively, and is subject to such corporate taxes as a result of the ownership of a partnership interest in a partnership which does business in New York State and New York City, respectively. Each of the New York State and New York City corporate taxes are imposed, in part, on the corporation's taxable income or capital allocable to the relevant jurisdiction by application of the appropriate allocation percentages. Moreover, a non-New York corporation that does business in New York State may be subject to a New York State license fee.

Regulations under both the New York State corporate franchise tax and the New York City general corporation tax, however, provide an exception to this general rule in the case of a "portfolio investment partnership", which is defined, generally, as a partnership which meets the gross income requirements of Section 851(b)(2) of the Code. The Fund's qualification as such a portfolio investment partnership must be determined on an annual basis and, with respect to a taxable year, the Fund may not qualify as a portfolio investment partnership.

New York State has recently enacted legislation that imposes a quarterly withholding obligation on certain partnerships with respect to partners that are individual non-New York residents or corporations (other than "S" corporations). Accordingly, the Fund may be required to withhold on the distributive shares of New York source partnership income allocable to such partners to the extent such income is not derived from trading in securities for the Fund's own account.

A trust or other unincorporated organization that by reason of its purposes or activities is exempt from federal income tax is also exempt from New York State and New York City personal income tax. A nonstock corporation that is exempt from federal income tax is generally presumed to be exempt from New York State corporate franchise tax and New York City general corporation tax. New York State imposes a tax with respect to such exempt entities on UBTI (including unrelated debt-financed income) at a rate that is currently equal to the New York State corporate franchise tax rate (plus the corporate surtax). There is no New York City tax on the UBTI of an otherwise exempt entity.

Each prospective corporate Partner should consult its tax adviser with regard to the New York State and New York City tax consequences of an investment in the Fund.

## ERISA CONSIDERATIONS

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF ERISA IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO THE PARTNERSHIP, OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING THE PARTNERSHIP AND THE INVESTOR.

**General**

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "ERISA Plan"), an individual retirement account or a Keogh plan subject solely to the provisions of the Code[2] (an "Individual Retirement Fund") should consider, among other things, the matters described below before determining whether to invest in the Partnership.

ERISA imposes certain general and specific responsibilities on persons who are fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("DOL") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, including the fact that the returns may be subject to federal tax as unrelated business taxable income, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to redeem all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in the Fund, a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in the Fund might be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

---

[2]    References hereinafter made to ERISA include parallel references to the Code.

**Plan Assets Regulations**

The DOL has published a regulation (the "Regulation") describing when the underlying assets of an entity in which certain benefit plan investors ("Benefit Plan Investors") invest constitute "plan assets" for purposes of ERISA. Benefit Plan Investors include employee benefit plans as defined in Section 3(3) of ERISA, whether or not subject to Title I of ERISA, plans described in Section 4975(e)(1) of the Code, government plans, church plans, non–U.S. employee benefit plans, certain insurance company general and separate accounts, and entities the underlying assets of which include plan assets by reason of investment therein by Benefit Plan Investors. The effect of the Regulation is to treat certain entities as pooled funds for the collective investment of plan assets.

The Regulation provides that, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security;" nor (b) a security issued by an investment fund registered under the Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established that:

(i)      the entity is an "operating company;" or

(ii)     the equity participation in the entity by Benefit Plan Investors is not "significant."

Equity participation in an entity by Benefit Plan Investors is considered "significant" if 25% or more of the value of any class of equity interests in the entity is held by such Benefit Plan Investors. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether equity participation by Benefit Plan Investors is significant.

**Limitation on Investments by Benefit Plan Investors**

It is the current intent of the General Partner to monitor the investments in the Fund to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the capital commitments to the Fund so that equity participation by Benefit Plan Investors in the Fund will not be considered "significant" under the Regulation and, as a result, the underlying assets of the Fund will not be deemed "plan assets" for purposes of the Regulation. Capital commitments of the General Partner and its affiliates are not considered for purposes of determining whether equity participation by Benefit Plan Investors is significant. If the assets of the Fund were regarded as "plan assets" of a Benefit Plan Investor that is an ERISA Plan or an Individual Retirement Fund, the General Partner would be a "fiduciary" (as defined in ERISA and the Code) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. In such circumstances, the Fund would be subject to various other requirements of ERISA and the Code. In particular, the Fund

would be subject to rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries which might result in a violation of ERISA and the Code unless the Fund obtained appropriate exemptions from the DOL allowing the Fund to conduct its operations as described herein. As described above, under "Outline of the Partnership Agreement" – "Excuse and Exclusion", the General Partner reserves the right to redeem all or a part of the Interests held by any Limited Partner, subject to the aforesaid, including, without limitation, to ensure compliance with the above percentage limitation. In addition, the General Partner reserves the right, however, to waive the 25% limitation and thereafter to comply with ERISA.

## Representations by Plans

An ERISA Plan proposing to invest in the Fund will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand the Fund's investment objective, policies and strategies, and that the decision to invest plan assets in the Fund was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

WHETHER OR NOT THE UNDERLYING ASSETS OF THE FUND ARE DEEMED PLAN ASSETS UNDER THE REGULATION, AN INVESTMENT IN THE FUND BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE FUND.

## ERISA Plans and Individual Retirement Funds Having Prior Relationships with the General Partner or its Affiliates

Certain prospective ERISA Plan and Individual Retirement Funds investors may currently maintain relationships with the General Partner or other entities that are affiliated with the General Partner. Each of such entities may be deemed to be a party in interest to and/or a fiduciary of any ERISA Plan or Individual Retirement Fund to which any of the General Partner or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which it or certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the Code with respect to Individual Retirement Funds. ERISA Plan and Individual Retirement Fund investors should consult with counsel to determine if participation in the Fund is a transaction that is prohibited by ERISA or the Code.

The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Potential Investors should consult with their legal advisors regarding the consequences under ERISA of the acquisition and ownership of Interests.

**NOTICE TO THE RESIDENTS OF AUSTRALIA**

NO OFFER FOR SUBSCRIPTION OR PURCHASE OF THE SHARES OFFERED HERBY, NOR ANY INVITATION TO SUBSCRIBE FOR OR BUY SUCH SHARES HAS BEEN MADE OR ISSUED IN AUSTRALIA, OTHERWISE THAN BY MEANS OF AN EXCLUDED ISSUE, EXCLUDED OFFER OR EXCLUDED INVITATION WITHIN THE MEANING OF SECTION 66(2) OR 66(3) OF THE CORPORATIONS LAWS. ACCORDINGLY, THIS CONFIDENTIAL OFFERING MEMORANDUM HAS NOT BEEN LODGED WITH THE AUSTRALIAN SECURITIES COMMISSION. FURTHER, THE SHARES OFFERED HEREBY MAY NOT BE RESOLD IN AUSTRALIA WITHIN A PERIOD OF SIX MONTHS AFTER THE DATE OF ISSUE OTHERWISE THAN BY MEANS OF AN EXCLUDED OFFER OR EXCLUDED INVITATION AS DESCRIBED ABOVE.

**NOTICE TO THE RESIDENTS OF BELGIUM**

THE LIMITED PARTNERSHIP INTERESTS ARE OR HAVE BEEN ISSUED OUTSIDE THE KINGDOM OF BELGIUM. THEY HAVE NOT BEEN AND MAY NOT BE OFFERED OR SOLD. DIRECTLY OR INDIRECTLY, IN BELGIUM EXCEPT IN CIRCUMSTANCES THAT DO NOT CONSTITUTE OR RESULT IN A PUBLIC OFFER OF THE LIMITED PARTNERSHIP INTERESTS, AS DEFINED, INTER ALIA, IN THE ROYAL DECREE OF JANUARY 9, 1991.

**NOTICE TO THE RESIDENTS OF FRANCE AND MONACO**

THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY TO THE PUBLIC IN THE REPUBLIC OF FRANCE OR THE PRINCIPALITY OF MONACO AND NEITHER THIS DOCUMENT, WHICH HAS NOT BEEN SUBMITTED TO THE COMMISSION DES OPERATIONS DE BOURSE, NOR ANY OFFERING MATERIAL OR INFORMATION CONTAINED THEREIN RELATING TO THE INTERESTS MAY BE SUPPLIED TO THE PUBLIC IN FRANCE OR MONACO OR USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION OR SALE OF INTERESTS TO THE PUBLIC IN FRANCE OR MONACO.

**NOTICE TO THE RESIDENTS OF HONG KONG**

THIS DOCUMENT DOES NOT CONTAIN AND IS NOT MEANT TO BE AN OFFER OF LIMITED PARTNERSHIP INTERESTS TO THE PUBLIC IN HONG KONG AND ACCORDINGLY NO STEPS HAVE BEEN TAKEN TO SEEK APPROVAL FOR THIS DOCUMENT OR ITS REGISTRATION IN HONG KONG FOR THE PURPOSES OF THE HONG KONG COMPANIES ORDINANCE OR OTHERWISE.

**NOTICE TO THE RESIDENTS OF ITALY**

THIS PRIVATE OFFERING MEMORANDUM IS SOLELY INTENDED FOR THE INDIVIDUALS TO WHOM IT IS DELIVERED AND MAY NOT BE CONSIDERED OR USED AS A PUBLIC OFFERING IN THE MEANING OF AND FOR THE PURPOSE OF THE ART. 1/18 TER L.N. 216/74.

IN ADDITION, ANY PERSON WHO IS IN POSSESSION OF THIS MEMORANDUM UNDERSTANDS THAT NO ACTION HAS OR WILL BE TAKEN WHICH WOULD ALLOW AN OFFERING OF THE LIMITED PARTNERSHIP INTERESTS TO THE PUBLIC IN ITALY.   ACCORDINGLY, THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE OFFERED, SOLD OR DELIVERED AND NEITHER THIS PRIVATE OFFERING MEMORANDUM NOR ANY OTHER OFFERING MATERIAL RELATING TO THE LIMITED PARTNERSHIP INTERESTS MAYBE DISTRIBUTED OR MADE AVAILABLE TO THE PUBLIC IN ITALY.   INDIVIDUAL SALES OF THE LIMITED PARTNERSHIP INTERESTS TO ANY PERSON IN ITALY MAY ONLY BE MADE ACCORDING TO ITALIAN SECURITIES, TAX AND OTHER APPLICABLE LAWS AND REGULATIONS.

**NOTICE TO THE RESIDENTS OF JAPAN**

THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY TO THE PUBLIC IN THE REPUBLIC OF JAPAN AND NEITHER THIS DOCUMENT, WHICH HAS NOT BEEN SUBMITTED TO THE MINISTRY OF FINANCE, NOR ANY OFFERING MATERIAL OR INFORMATION CONTAINED THEREIN RELATING TO THE INTERESTS, MAY BE SUPPLIED TO THE PUBLIC IN THE REPUBLIC OF JAPAN OR USED IN CONNECTION WITH ANY OFFER FOR SUBSCRIPTION OR SALE OF INTERESTS TO THE PUBLIC IN THE REPUBLIC OF JAPAN.

JAPANESE INVESTORS MAY BE SUBJECT TO FILING REQUIREMENTS UNDER THE FOREIGN EXCHANGE AND FOREIGN TRADE CONTROL LAW.  IT IS, THEREFORE, ADVISABLE TO CONSULT YOUR PROFESSIONAL ADVISOR IN THIS RESPECT.

**NOTICE TO THE RESIDENTS OF THE NETHERLANDS**

THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE OFFERED, TRANSFERRED OR SOLD, WHETHER DIRECTLY OR INDIRECTLY, TO ANY INDIVIDUAL OR LEGAL ENTITY IN THE NETHERLANDS AS PART OF THE INITIAL DISTRIBUTION OR AT ANY TIME THEREAFTER, OTHER THAN TO INDIVIDUALS OR LEGAL ENTITIES WHO OR WHICH TRADE OR INVEST IN SECURITIES IN THE CONDUCT OF THEIR PROFESSION OR TRADE (WHICH INCLUDES BANKS, BROKERS, DEALERS, INSURANCE COMPANIES, PENSION FUNDS, OTHER INSTITUTIONAL INVESTORS AND TREASURE DEPARTMENTS OF LARGE ENTERPRISES).

9572972.22

**NOTICE TO THE RESIDENTS OF SINGAPORE**

THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE OFFERED OR SOLD, NOR MAY ANY DOCUMENT OR OTHER MATERIAL IN CONNECTION WITH THE INTERESTS BE ISSUED, CIRCULATED OR DISTRIBUTED, EITHER DIRECTLY OR INDIRECTLY, TO PERSONS IN SINGAPORE OTHER THAN (I) UNDER CIRCUMSTANCES IN WHICH SUCH OFFER OR SALE DOES NOT CONSTITUTE AN OFFER OR SALE OF THE INTERESTS TO THE PUBLIC IN SINGAPORE OR (II) TO PERSONS WHOSE ORDINARY BUSINESS IT IS TO BUY OR SELL SHARES OR DEBENTURES, WHETHER AS PRINCIPAL OR AGENT.

**NOTICE TO THE RESIDENTS OF SWITZERLAND**

THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY ARE NOT SUBJECT TO REGULATION UNDER SWISS LEGISLATION RELATING TO MUTUAL FUNDS. THE USE OF THE TERM "FUND" IN THIS DOCUMENT IS NOT INTENDED TO IMPLY THAT THE PARTNERSHIP IS A MUTUAL FUND OR INVESTMENT COMPANY UNDER DELAWARE OR SWISS LAW.

**NOTICE TO THE RESIDENTS OF THE UNITED KINGDOM**

THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY HAVE NOT AND MUST NOT BE OFFERED OR SOLD IN THE UNITED KINGDOM BY MEANS OF ANY DOCUMENTS, EXCEPT IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE AN OFFERING TO THE PUBLIC WITHIN THE MEANING OF THE PUBLIC OFFERS OF SECURITIES REGULATIONS 1995. THIS DOCUMENT MAY ONLY BE ISSUED OR PASSED ON TO A PERSON WHO IS OF A KIND DESCRIBED IN ARTICLE 11(3) OF THE FINANCIAL SERVICES ACT 1986 (INVESTMENT ADVERTISEMENTS) (EXEMPTIONS) ORDER 1996 OR IS A PERSON TO WHOM THIS DOCUMENT MAY OTHERWISE BE LAWFULLY ISSUED OR PASSED ON UNDER THE FINANCIAL SERVICES ACT 1986.