# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

Nº 07 Civ. 3704 (RJS)
_____

LLYOD J. HELLER,

Plaintiff,

VERSUS

GOLDIN RESTRUCTURING FUND, L.P., GOLDIN CAPITAL PARTNERS, L.P., GOLDIN CAPITAL MANAGEMENT, L.P., GOLDIN ASSOCIATES, L.L.C., HARRISON J. GOLDIN, DAVID PAUKER, and LAWRENCE J. KRULE,

Defendants.

_____

OPINION AND ORDER
December 22, 2008
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff Lloyd J. Heller ("Heller" or "Plaintiff") brings this action against Defendants Goldin Restructuring Fund, L.P. ("Goldin Fund" or the "Fund"); Goldin Capital Partners, L.P. ("Goldin Partners"), the Fund's general partner; Goldin Capital Management, L.P. ("Goldin Management"), the Fund's manager; Goldin Associates, L.L.C. ("Goldin Associates"), a financial and strategic advice firm associated with the Fund; and individual defendants Harrison J. Goldin ("Harrison"), David Pauker ("Pauker"), and Lawrence J. Krule ("Krule"), who are the principals of Goldin Partners. (Compl. ¶ 1.)[1]  Heller brings a common law claim for breach of fiduciary duty, as well as a statutory claim for a violation of section 10(b) of the Securities Exchange Act of 1934, 15

_____

[1]  The Court utilizes the term "Defendants" to refer to Defendants collectively, and the term "individual Defendants" to refer only to Harrison, Pauker, and Krule.

U.S.C. § 78(j)(b) (the "Exchange Act"), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

Before the Court is Defendants' motion to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and Sections 21D and 21E of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA"). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. Facts[2]

Plaintiff Heller is a New York resident and the president of H. Heller & Co., a "plastics raw materials manufacturing business." (Compl. ¶ 11.) Although experienced in "broker discretionary" accounts, Heller labels himself an "investing neophyte." (*Id.*) Defendants are a set of interrelated individuals and entities involved or associated with managing and operating the Goldin Fund. (*Id.* ¶¶ 11-18.)[3] The instant

case arises out of events surrounding Heller's capital commitment to the Goldin Fund, which resulted in the loss of $443,769 in cash. (*Id.* ¶ 73.)

### 1. The Goldin Fund's Objectives and Formation

The Goldin Fund was an investment fund established in 2004 to invest in distressed and underperforming companies. (*Id.* ¶¶ 12, 22.) To finance this plan, the Fund intended to raise capital commitments of $200 million, which it would use to manage a diverse portfolio of eight to twelve investments, making individual investments of up to a maximum of 20% of committed capital in each underperforming company. (*Id.* ¶ 24.) These investment objectives were intended to ensure "a measure of risk diversification." (*Id.*)

Goldin Partners, the Fund's general partner, planned to raise the $200 million in a two-stage process. (*Id.* ¶ 25.) Initially, it would seek capital commitments until the "First Closing Date," the date on which the Fund would close on these initial investors' capital commitments and commence its operations. (*Id.*) After the "First Closing Date," Goldin Partners would continue to

---

[2]   The following facts are taken from Plaintiff's Complaint, and are not findings of fact by the Court. The Court, as it must, assumes these facts to be true for the purpose of deciding Defendants' motion, and construes them in the light most favorable to Plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). The Court only recites those facts relevant to the instant motion.

[3]   Specifically: Goldin Fund and Goldin Partners are Delaware limited partnerships formed on May 20, 2004. (Compl. ¶¶ 12-13.) Goldin Fund was formed between Goldin Partners, as general partner, and Harrison, as the initial limited partner. (*Id.* ¶ 12.) Goldin Fund commenced its activities on January 31, 2005. (*Id.*) As Goldin Fund's general partner, Goldin Partners is responsible for making investment decisions for the Fund. (*Id.* ¶ 13.) Goldin Management, also a Delaware limited partnership formed on May 20, 2004,

functions as Goldin Fund's manager. (*Id.* ¶ 14.) Goldin Associates is a Delaware limited liability company incorporated in 1995, which provides, *inter alia*, financial and strategic advice to distressed or underperforming companies and other interested parties. (*Id.* ¶ 15.) Goldin Partners and Goldin Management are affiliates of Goldin Associates. (*Id.* ¶¶ 13-14.) Defendant Harrison is the founding partner and senior managing director of Goldin Associates, one of three principals of Goldin Partners, and the "Key Person" of the Goldin Fund. (*Id.* ¶ 16.) Defendants Pauker and Krule are both managing directors of Goldin Associates, and are the other two principals of Goldin Partners. (*Id.* ¶¶ 17-18.)

seek additional capital commitments from new and existing investors until the "Final Closing Date," when the Fund would close on these subsequent commitments and no longer accept any further capital commitments. (*Id.*) Investors would be locked into their capital commitments from the time the Fund closed on their commitment until three years after the Final Closing Date, and would be required to make cash contributions as called on by the Fund during that time. (*Id.*)

Plaintiff alleges that "prospective investors greeted the Fund with a marked lack of enthusiasm." (*Id.* ¶ 26.) By the originally planned First Closing Date of July 31, 2004, the Fund had raised less than $40 million of the $200 million target. (*Id.*) As a result, Defendants chose to delay the First Closing Date, and thereby the commencement of the Fund's operations, by six months, until January 31, 2005. (*Id.* ¶ 27.) The Fund failed to raise any additional capital during these additional months, and by February 2005, the Goldin Fund had still only raised approximately $40 million, well short of its goal of raising $200 million in capital commitments. (*Id.* ¶ 28.)

### 2. Heller's Investment in the Goldin Fund

Heller and Harrison first met socially in January 2005. Heller subsequently met with all three individual Defendants on February 1, 2005, to discuss investing in the Goldin Fund (the "February 1 Meeting" or the "Meeting"). (*Id.* ¶ 29.) At the February 1 Meeting, the individual Defendants made various oral representations about the Goldin Fund, and also provided Heller with a set of written documents describing the Fund (the "Solicitation Documents"). (*Id.* ¶ 33.) The Solicitation Documents included, *inter alia*, the Fund's Confidential Offering

Memorandum, dated June 2004 (the "Offering Memorandum"); an unexecuted draft of the Fund's Amended and Restated Limited Partnership Agreement, dated June 8, 2004 (the "Draft LP Agreement"); a printed presentation on the Fund in the form of a slideshow, dated January 2005 (the "Presentation"); and the Fund's Subscription Documents (the "Subscription Documents"), including a Subscription Agreement. (*Id.*)[4]

---

[4] Plaintiff did not attach the Solicitation Documents to his Complaint. Defendants, however, attached four documents to their motion to dismiss: the Offering Memorandum, the Draft LP Agreement, the final, amended LP Agreement, and the Subscription Documents. (*See* Defs.' Mem. Exs. A-D.) "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment." *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)) (internal quotation marks omitted) (second alteration in original). Plaintiff does not object to the Court's consideration of these documents, and in fact, attached the same four documents to his Opposition. (*See* Pl.s' Opp'n at 5 n.3; Halebian Decl. Exs. A-D.) The Court finds that these documents are integral to the Complaint, and considers them in connection with resolving Defendants' motion to dismiss. *Cf. Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (noting that consideration of materials outside the complaint is permissible on a Rule 12(b)(6) motion to dismiss if the documents are integral to the complaint, if it is clear on the record that no dispute exists regarding the authenticity or accuracy of the documents, and if there exists no material disputed issues of fact regarding the relevance of the documents). In deciding to incorporate these four documents "by reference," the Court is "not constrained to accept the allegations of the complaint in respect of the construction of the [documents,] although — at this stage in the proceedings — we will strive to resolve any contractual ambiguities in [Plaintiff's] favor." *Int'l Audiotext*, 62 F.3d at 72.

During the February 1 Meeting, the individual Defendants explained the Goldin Fund's investment objectives, particularly emphasizing the Fund's targeted $200 million capitalization and goal of achieving portfolio diversification. The individual Defendants made these representations orally (*id.* ¶¶ 30-31) and through the written materials provided to Heller. For example, the first paragraph of the first page of the Offering Memorandum provided that "[t]he Fund is seeking to raise capital commitments of $200 million, which will be used to make individual investments, each up to a maximum of 20% of committed capital." (*See id.* ¶ 35; *see also* Defs.' Mem. Ex. A. at 1.) The Offering Memorandum later expanded on the Fund's investment objectives, highlighting the Fund's goal of achieving portfolio diversification with its $200 million capital commitment. (*See* Compl. ¶ 36; *see also* Defs.' Mem. Ex. A. at 10.) The Presentation began by noting the Fund's "Target $200M in invested capital," and addressed portfolio diversification in a later slide entitled "Investment Objectives," which stated that the Fund's objectives included, *inter alia*, "[b]uild[ing] a portfolio with specific limits on single-company and industry concentration" and "[c]omplet[ing] 8-12 transactions during a 3-year investment period, with an average investment of $15-25 million and a minimum investment of $5 million." (Compl. ¶¶ 37-38.)

Plaintiff alleges that — in conjunction with these written and oral representations concerning the Fund's capitalization and investment goals — the individual Defendants made several material misrepresentations and omissions at the February 1 Meeting. Specifically, Plaintiff alleges that the individual Defendants, *inter alia*, (1) failed to disclose that the Fund had

been unable to raise more than $40 million in capital commitments (*id.* ¶ 40); (2) did not disclose that the Fund had managed to raise only this amount even after engaging in lengthy and prolonged fund raising efforts, and that therefore, the Fund was unlikely to "be rescued by additional investors" (*id.* ¶¶ 40, 50-52, 82); (3) failed to explain the possible effect that such a capital shortfall would have on the Fund's ability to diversify its portfolio and meet its other stated investment objectives (*id.* ¶¶ 44-47, 82); (4) misrepresented that a prominent investor and businessman had committed approximately $40 million to the Goldin Fund (*id.* ¶¶ 42-43, 82); (5) misled Heller into believing that he would lose the opportunity to invest in the Fund if he did not do so immediately, when, in fact, the Fund would actually remain open to new capital commitments for at least another nine to twelve months after the February 1 Meeting (*id.* ¶¶ 53-54, 82); and (6) did not reveal that the Securities and Exchange Commission had investigated Harrison in the 1970s (*id.* ¶¶ 56-62, 82).[5]

"Relying on the truth and completeness" of Defendants' written and oral representations, Heller purchased a limited partnership interest in the Goldin Fund with a capital commitment of $1 million "shortly after" the February 1 Meeting. (*Id.* ¶ 64.) Heller did not learn about the Fund's undercapitalization until he received a letter and accompanying financial statement from Harrison, dated August 15, 2005, disclosing that the Fund had been operating during the

---

[5] These six categories of fraudulent omissions and misrepresentations provide a condensed version of the twenty-one individual misrepresentations and omissions alleged and enumerated by Plaintiff. (*See* Compl. ¶ 82.) This abridged inventory is adequate for purposes of the instant motion.

first quarter of 2005 with capital commitments totaling only $40,750,000 — "barely 20% of the Fund's $200 million target." (*Id.* ¶ 68.)

### 3. The Goldin Fund's Subsequent Investment and Heller's Losses

By June 2005, approximately five months after the actual First Closing Date of January 30, 2005, the Goldin Fund still possessed only $40 million in capital commitments. (*Id.* ¶ 66.) In that same month, the Fund decided to invest $15 million in a medical spa company. (*Id.* ¶ 67.) In November 2005, the Fund invested an additional $2 million more into the company, for a total investment of $17 million. (*Id.*) By so doing, Defendants invested 42% of the Goldin Fund's total capital commitment in a single venture. (*Id.*) The Fund did not make any other investments during this time period.

On March 24, 2006, nine months after the initial investment in the medical spa company, the Goldin Fund sold the company to another investor. (*Id.* ¶ 71.) In this sale, the Fund's entire investment in the medical spa company was effectively lost, apart from a residual equity stake in the acquirer, an amount valued at "zero to ten percent" of the original investment. (*Id.*)

Heller, after making various capital contributions,[6] lost a total of $443,769 in cash on Goldin Fund's failed medical spa investment. (*Id.* ¶¶ 72-73.) Heller also attests

that he remains obligated to the Fund for $556,231, the remainder of his $1 million capital commitment. (*Id.* ¶ 73.)[7]

### B. Procedural History

Heller filed his Complaint against Defendants on May 10, 2007, bringing a common law claim for breach of fiduciary duty, as well as a statutory claim for a violation of section 10(b) of the Exchange Act, and Rule 10b-5, promulgated thereunder. On May 22, 2007, the case was reassigned from the Honorable Robert W. Sweet, District Judge, to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the undersigned.

Defendants filed their motion to dismiss on October 22, 2007. Plaintiff filed his Opposition on November 28, 2007. Defendants filed their Reply on December 12, 2007.

### II. DISCUSSION

In resolving Defendants' motion to dismiss the Complaint, the Court examines each of Plaintiff's claims in turn. The Court first considers Defendants' argument that the Court should dismiss Plaintiff's claim for breach of fiduciary duty. The Court finds it unnecessary to address all of Defendants' various arguments with respect to this claim, as the Court concludes that Plaintiff's claim for breach of fiduciary duty is preempted by

---

[6] Heller contributed $385,632 as of June 30, 2005 and made a further contribution of $58,137 in September 2005, for a total of $443,769. (Compl. ¶ 72.) Heller made a further capital contribution of $21,265 in December 2005, but the Fund refunded this contribution in January 2006. (*Id.*)

[7] Despite Plaintiff's remaining liability, Plaintiff notes that "the Fund itself is probably no longer operationally viable." (Compl. ¶ 73.) Further, the Fund has offered to release Heller from his obligation to pay the remaining capital commitment in exchange for giving up his rights to any future benefit from the Fund's residual equity stake in the medical spa company's acquirer. (*Id.*)

the Martin Act.   Second, the Court rejects Defendants' argument that Plaintiff has failed to allege key elements of a claim for securities fraud, and holds that Plaintiff has adequately pleaded the necessary elements of a securities fraud action for purposes of section 10(b) and Rule 10b-5.   So finding, the Court grants Defendants' motion to dismiss the claim for breach of fiduciary duty and denies Defendants' motion to dismiss the claim for securities fraud.

### A.  Legal Standard

On a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all of the factual allegations in the Complaint and draw all reasonable inferences in Plaintiff's favor.   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998).   Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (citation omitted).   Ultimately, the Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 1974.   The Complaint must therefore satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).   If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed."  *Twombly*, 127 S. Ct. at 1974.

While the rules of pleading in federal court usually require only "a short and plain statement" of the plaintiff's claim for relief, Fed. R. Civ. P. 8, averments of fraud must be "stated with particularity," Fed. R. Civ. P. 9(b).   To comply with the requirements of Rule 9(b), a plaintiff must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

In the context of securities fraud complaints, the PSLRA has expanded on Rule 9(b)'s pleading requirements.  *See* 15 U.S.C. § 78u-4(b).   "The statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).[8]

### B.  Analysis

#### 1.  Breach of Fiduciary Duty

The Court finds that Plaintiff's common law claim for breach of fiduciary duty is preempted by the so-called Martin Act, N.Y. Gen. Bus. Law § 352 *et seq.* (the "Martin

---

[8]   Defendants argue that Plaintiff fails to meet the PSLRA's pleading requirement for scienter.   While the Court squarely considers this argument, *see infra* Part II.B.2.b, the Court notes here that Plaintiff has pleaded his claim for securities fraud with adequate "particularity" and "specificity" for all other purposes of the PSLRA and Rule 9(b).

Act" or the "Act").[9]  The Martin Act is New York's "blue sky" law, and prohibits various fraudulent and deceitful practices in the distribution, exchange, sale, and purchase of securities.  *See* N.Y. Gen. Bus. L. § 352-c(1)(c).  The Act "provides the New York Attorney General with the sole discretion to investigate securities violations within or from the state of New York."  *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 421 (S.D.N.Y. 2007).  As a result of the

New York Attorney General's sole authority to enforce the Act's provisions, "[t]he New York Court of Appeals has held that there is no private right of action under the Martin Act, and the vast majority of New York courts to consider the issue, as well as the Second Circuit, have extended that holding to preclude common law actions for breach of fiduciary duty . . . where the alleged misdeeds fall within the purview of the Martin Act." *Louros v. Kreicas*, 367 F. Supp. 2d 572, 595 (S.D.N.Y. 2005) (collecting cases); *see also, e.g.*, *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190 (2d Cir. 2001) (finding that a "claim under New York state law for breach of fiduciary duty. . . . is barred by the Martin Act . . .."); *Greene v. Hanover Direct, Inc.*, No. 06 Civ. 13308 (NRB), 2007 WL 4224372, at *5 (S.D.N.Y. Nov. 19, 2007) ("With respect to breach of fiduciary duty . . . New York courts have long-recognized that such claims are preempted by the Martin Act."); *Bayou Hedge Fund*, 534 F. Supp. at 422 (S.D.N.Y. 2007) (expressing agreement "with the analysis set forth in . . . a host of other state and federal decisions finding breach of fiduciary duty claims arising in the securities context to be preempted by the Martin Act," and noting that "[t]his analysis is consistent with the statute's broad reach and purpose"); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *22 (S.D.N.Y. Aug. 9, 2005) ("Indeed, the weight of authority holds that common law claims of negligent misrepresentation, negligence, and breach of fiduciary duty arising from securities fraud are preempted by the Martin Act.").

Notwithstanding this authority, Plaintiff argues that Defendants' alleged breach of fiduciary duty does not fall within the purview of the Martin Act because the Act only

---

[9]  The Martin Act applies if the underlying transaction was "within or from" New York. *See* N.Y. Gen. Bus. L. § 352-c(1)(c) (prohibiting acts if "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities . . . ."). There is consensus in this District that a transaction is "within or from" New York for purposes of the Martin Act if a plaintiff alleges that a "substantial portion of the events" giving rise to a claim occurred in New York. *See, e.g.*, *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 422 (S.D.N.Y. 2007) (finding that allegations that "a substantial part of the events o[r] omissions giving rise to this claim occurred in New York" were sufficient to apply the Martin Act); *Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 331 (S.D.N.Y. 2006) (finding that the Martin Act applies because, in part, "the Amended Complaint specifically states that [the claim] arises under New York law"); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *21-22 (S.D.N.Y. Aug. 9, 2005) (finding that allegations that "a substantial part of the events or omissions giving rise to the claims herein occurred in" New York were sufficient to apply the Martin Act); *cf. Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 165 (S.D.N.Y. 2001) (finding that the Martin Act does *not* apply where traders in London and Hong Kong negotiated the sale of securities with a purchaser situated in Beijing). Here, Plaintiff not only lives in New York (Compl. ¶ 11), but also alleges that venue is proper in this case because "several defendants reside, are headquartered, or conduct business in this district . . . [and] a substantial part of the events or omissions giving rise to the action occurred in th[e Southern] District [of New York]" (*id.* ¶ 9). The Court finds that such allegations are sufficient for the Martin Act to apply to the instant case.

applies to misconduct "in connection with the purchase or sale of securities." (Pl.'s Opp'n at 22.) Plaintiff posits that his "breach of duty claim, however, concerns only Defendants' conduct after Plaintiff had already subscribed to the Fund, rather than the conduct that induced Plaintiff to make his subscription." (*Id.*) In short, Plaintiff would have this Court draw a sharp distinction between breaches of fiduciary duty that occur contemporaneously with the purchase or sale of securities, and breaches that occur after the purchase or sale of securities.

The Honorable Leonard B. Sand, District Judge, rejected a similar argument in *Nathel v. Siegal*, No. 07 Civ. 10956 (LBS), 2008 WL 4684171 (S.D.N.Y. Oct. 20, 2008). In *Nathel*, the plaintiffs attempted to distinguish between a breach of fiduciary duty that occurred contemporaneously with the purchase and sale of securities, and a *subsequent* breach of fiduciary duty in "failing to make distributions and diverting those funds purportedly earmarked to purchase marketable securities." *Nathel*, 2008 WL 4684171, at *15 (internal quotation marks omitted). Judge Sand found this distinction untenable and "unpersuasive," because a "significant component" of the securities fraud that induced plaintiffs to invest involved the representations concerning the "financing arrangement of withholding distributions for the purchase of securities." *Id.* The Court finds Judge Sand's reasoning compelling, and holds that there is no requirement that the factual allegations supporting a breach of fiduciary duty claim occur contemporaneously with the purchase or sale of securities. Rather, all that is required is that the "breach of fiduciary duty arise[] from the alleged securities fraud." *Id.* This holding is supported by the extant case law in this District, which liberally construes the Martin

Act to require only that claims "aris[e] in the securities context," *Bayou Hedge Fund*, 534 F.3d at 422, or "involve[] securities," *Louros*, 367 F. Supp. 2d at 595, to fall within the Act's purview. *Cf. Castellano*, 257 F.3d at 190 ("[S]ustaining a cause of action for breach of fiduciary duty in the context of securities fraud would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney-General's exclusive enforcement powers thereunder." (citations and internal quotation marks omitted)).[10]

Here, Plaintiff attempts to distinguish between the purchase and sale of securities and Defendants' subsequent fiduciary duty to manage the Goldin Fund. Specifically, Plaintiff alleges that Defendants breached their fiduciary duty "to diversify the Fund's investments so as to minimize the risk of large losses; and the duty to manage the Fund in accord with its stated objective." (Compl. ¶ 75.) Following *Nathel*, the Court finds this distinction to be unpersuasive. A "significant component" of the conduct that, according to Plaintiff's allegations, induced him to invest in the Goldin Fund, involved misrepresentations and omissions concerning the undercapitalization of the Fund and the resultant inability of the Fund to diversify its investment portfolio and to fulfill its stated investment objectives. The Court thus holds that Plaintiff's "breach of fiduciary duty [claim] arises from the alleged securities fraud," *Nathel*, 2008 WL 4684171, at *15,

---

[10]  A plaintiff must also allege dishonesty or deception for his or her claim to be preempted by the Martin Act. *See Louros v. Kreicas*, 367 F. Supp. 2d 572, 595-96 (S.D.N.Y. 2005). In this case, Plaintiff's underlying claim for securities fraud alleges both dishonesty and deception by Defendants, and so satisfies this requirement.

and that therefore, Plaintiff's fiduciary duty claim is preempted by the Martin Act.[11]

## 2. Violation of Section 10(b) of the Securities Exchange Act of 1934

"Section 10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall provision' which creates a cause of action for manipulative practices by defendants acting in bad faith." *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)). Specifically, section 10(b) makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78(j)(b).

The Securities and Exchange Commission implemented this section of the Exchange Act by promulgating Rule 10b-5. Rule 10b-5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999). In relevant part, Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

Although the text of the Exchange Act does not explicitly provide for a private cause of action for section 10(b) violations, "[i]t is now established that a private right of action is implied under § 10(b)." *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). The Supreme Court recently articulated the elements necessary to sustain a private cause of action for securities fraud under section 10(b) and Rule 10b-5:

> In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008) (citing *Dura Pharms.*, 544 U.S. at 341-42); *see also, e.g.*, *Jay Dees Inc. v. Def. Tech. Sys., Inc.*, No. 05 Civ. 6954 (SAS), 2008 WL 4501652, at *4 (S.D.N.Y. Sept. 30,

---

[11] As the Court finds that Plaintiff's claim is preempted by the Martin Act, the Court does not consider Defendant's alternative arguments (1) that the parties contractually agreed to bar fiduciary duty claims except in cases of willful misconduct or gross negligence, and (2) that Defendants' investment activities were expressly permitted by certain of the Solicitation Documents, and therefore, no cause of action for fiduciary duty may lie. (*See* Defs.' Mem. at 8-13.)

9

2008) (following *Stoneridge*'s articulation of elements).[12]

In the instant action, Defendants argue that Plaintiff has failed to plead sufficiently three of these necessary elements: (1) material misrepresentations or omissions, (2) scienter, and (3) loss causation. The Court will examine each of these elements in turn.[13]

_____

[12] The Second Circuit has recognized a largely indistinguishable set of elements necessary to state a claim for relief under section 10(b) and Rule 10b-5, requiring that a plaintiff prove that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir. 1993) and *Burke v. Jacoby*, 981 F.2d 1372, 1378 (2d Cir. 1992)).

[13] The Court finds, and Defendants do not dispute, that Plaintiff has pleaded sufficient facts to satisfy the other three elements. First, to plead adequately connection, "the plaintiff must be an actual purchaser or seller of a security." *Lawrence v. Cohn*, 325 F.3d 141, 147 (2d Cir. 2003) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730-31, (1975)). Plaintiff fulfills this requirement. (*See* Compl. ¶ 64.) Second, "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). The Court finds that Plaintiff has established this connection by alleging that Defendants' misrepresentations and omissions at the February 1 Meeting prompted him to make a capital commitment in the Goldin Fund, resulting in his injury. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 769 (2008) ("[I]f there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance."); *see also infra* Part II.B.2.a.i. And third, Plaintiff adequately pleaded economic loss, as he alleges that he lost a total of $443,769 in cash due to Defendants' allegedly fraudulent conduct. (*See* Compl. ¶¶ 72-73.)

a. Material Misrepresentations or Omissions

The "material misrepresentation or omission" element is analyzed objectively from the perspective of the reasonable investor. *See In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 106-07 (2d Cir. 1998); *see also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 170 (2d Cir. 1999). "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)); *see also SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) ("To be material, the information need not be such that a reasonable investor would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available."). "Materiality is generally a question for the fact finder." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007). Thus, "[c]ourts do not grant motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on grounds of immateriality, unless the misstatements 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 625-26 (S.D.N.Y. 2005) (quoting *Ganino*, 228 F.3d at 162).

Under this standard, the Court finds that Defendants' allegedly fraudulent omissions and misstatements are material for purposes of properly pleading a claim for securities fraud under section 10(b) and Rule 10b-5. Defendants do not reference this standard or otherwise appear to contend that their alleged

misstatements and omissions fail to meet this standard for materiality. Rather, Defendants argue that "many" of their alleged misrepresentations and omissions are not "actionable as a matter of law" (Defs.' Mem. at 21) because (1) Plaintiff cannot base a securities fraud claim on any oral misrepresentations or omissions given Plaintiff's purported reliance on the Solicitation Documents; (2) several of the alleged misrepresentations and omissions are contradicted by the "plain language" of the Offering Memorandum and other documents provided to Plaintiff; and (3) certain other alleged misrepresentations are "forward-looking" statements that are not actionable were as a matter of law under the "bespeaks caution" doctrine. (See Defs.' Mem. at 21-25; Defs.' Reply at 8-10). The Court rejects all three of these arguments.

i. Plaintiff's Reliance on the Solicitation Documents

Defendants cite *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96 Civ. 3231 (RPP), 2001 WL 396521 (S.D.N.Y. Apr. 19, 2001), for the proposition that "Plaintiff cannot base a securities fraud claim on purported 'oral' misrepresentations or omissions when the Plaintiff previously represented specifically his reliance on the written offering documents." (Defs.' Mem. at 21-22.)

Initially, the Court notes that Defendants do not articulate whether this argument relates to the "materiality" or the "reliance" element of a Rule 10b-5 claim. Either way, *Silva* is inapposite to the instant case. The subscription agreement in *Silva* involved an *explicit* disclaimer that the "decision to enter into this agreement . . . has not been made upon any verbal or written representations . . .

." *Silva*, 2001 WL 396521, at *5. The plaintiff in *Silva* also signed a note further disclaiming reliance on any oral representations. *Id.* Based on these two unequivocal disclaimers, the court in *Silva* found that, "Plaintiff cannot now, when faced with investments gone bad, claim under Section 10(b) or Rule 10b-5 that it relied upon oral misrepresentations . . . ." *Id.*

In contrast, the Subscription Documents executed by Plaintiff in the instant case contain no such disclaimer. Rather, the Subscription Agreement provides that "[t]he Investor acknowledges that it has made an independent decision to invest in the Partnership and that, in making its decision to subscribe for an Interest, the Investor has relied solely upon the Memorandum, the Partnership Agreement, and *independent investigations made by the Investor*." (Defs.' Mem. Ex. C. at 2 (emphasis added).) On the same page, the Subscription Agreement further reads that:

> [t]he Investor has been provided an opportunity to obtain any additional information concerning the offering, the Partnership and all other information to the extent the Partnership or the General Partner possess such information or can acquire it without unreasonable effort or expense, and has been given the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the offering and other matters pertaining to this investment.

(*Id.*)

Thus, rather than disclaiming any reliance on oral representations, the Subscription

11

Agreement in this case explicitly entitles Plaintiff to rely upon any information that Defendants conveyed to him, orally or otherwise. Nowhere in the Subscription Documents was Plaintiff asked to represent that he relied solely on the written offering materials. The Court thus finds Defendants' argument that Plaintiff has contractually waived any reliance on oral misrepresentations to be void of merit.

### ii. The "Plain Language" of the Offering Memorandum

Defendants next argue that several alleged misrepresentations or omissions are contradicted by the "plain language of the Offering Memorandum" and other documents provided to Plaintiff. (Defs.' Mem. at 22.)

First, Defendants point out that the Offering Memorandum specified that the Fund was seeking a maximum of $200 million in capital commitments, and offered no guarantee that the Fund would actually receive $200 million. (*See, e.g.*, Defs.' Mem. Ex. A at 1.) Plaintiff does not dispute this fact, and in fact, incorporates it into his allegations of fraud. As noted, Plaintiff alleges that, at the February 1 Meeting, the individual Defendants represented that the Fund was seeking $200 million in capital commitments, and that this representation, repeated both orally and in writing, made it a material omission *not* to reveal that the Fund had only raised $40 million in capital commitments, despite lengthy fund-raising efforts. Thus, the Court finds that Defendants' written "disclosure" of the $200 million goal fails to render Defendants' alleged oral omissions and misrepresentations not fraudulent "as a matter of law."

Second, Defendants argue that "[i]n fact, Plaintiff was given documents showing the amount of the Fund's capital commitments as of the time of his investment." (Defs.' Mem. at 22.) The Court finds this argument to be contradicted by Defendants' own submissions, declaring that their disclosure that the Fund only contained approximately $40 million occurred on May 19, 2005. (*See id.* at 22 n.3.) Plaintiff's investment decision occurred more than three months earlier, shortly after the February 1, 2005 meeting. (Compl. ¶ 63.) Defendants written disclosure, made several months *after* Plaintiff made his securities purchase, did not, as a matter of law, serve to remedy their allegedly fraudulent misrepresentations and omissions. *See Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 598 (2d Cir. 1991).

Third, Defendants contend that the Offering Memorandum "stated expressly that there would be a final closing approximately nine months after the first closing," and that any argument that Defendants "pressured" Heller to invest quickly is "contradicted by the Offering Memorandum which specifically disclosed a second closing down the road." (*See* Defs.' Mem. at 23.) However, the Offering Memorandum handed to Plaintiff at the February 1 Meeting specifically indicated that the Goldin Fund's First Closing Date was "expected to occur on or about July 31, 2004." (Defs.' Mem. Ex. A at 2.) Given that the same clause of the Offering Memorandum also provided that the "final closing will occur *not later* than the nine-month anniversary of the first closing" (*id.* (emphasis added)), and that the meeting between Plaintiff and the individual Defendants occurred on February 1, 2005, the plain language of the Offering Memorandum does not "contradict" Plaintiff's allegation that Defendants pressured him into making a

hasty and ill-informed investment decision. Based on the facial evidence provided by the Offering Memorandum, the Final Closing Date would occur no later than three months after the February 1, 2005 Meeting, by April 31, 2005 (nine months after July 31, 2004), and possibly might have already occurred. Thus, the promise that the Final Closing would occur "down the road" from July 31, 2004 does not "contradict" Plaintiff's allegations that Defendants pressured him into making a quick investment decision on February 1, 2005, given that, to the best of Plaintiff's knowledge, the Final Closing Date might have already occurred.

Finally, although the Court has addressed all three of Defendants' arguments in isolation, the Court notes that Defendants' contentions are more properly put forth as arguments that their alleged misrepresentations or omissions, viewed in light of the written materials, were not statements or omissions "that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizen Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). Thus, while relevant, it is not necessarily dispositive that a written document "contradicts" an alleged oral misrepresentation. Rather, the inquiry is whether the enumerated written disclosures would change the outcome of any application of the "reasonable investor" test. The Court not only rejects Defendant's argument that the "plain language" of the Offering Memorandum "contradicts" Defendants' alleged misrepresentations and omissions, but also finds that the outcome of the "reasonable investor" test, which would consider *all* of Defendants' relevant alleged misrepresentations and omissions, tilts strongly in Plaintiff's favor.

### iii. The "Bespeaks Caution" Doctrine

The "bespeaks caution" doctrine functions as an inquiry into whether a "reasonable investor" would consider certain statements or omissions significant in light of all the disclosures made. As the Second Circuit has explained:

> Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering. We and other courts have referred to this rule of law as the "bespeaks caution" doctrine. Consequently, when cautionary language is present, we analyze the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.

*Halperin v. Ebanker*, 295 F.3d 352, 357 (2d Cir. 2002) (citations omitted). In essence, this judicially-created doctrine is a reformulation of the "reasonable investor" standard of materiality. However, whereas "[m]ateriality is generally a question for the fact finder," *Miller*, 473 F. Supp. 2d at 579, the "bespeaks caution" doctrine allows the Court to find that a statement or omission is immaterial as a matter of law.

13

Initially, the Court notes that the "bespeaks caution" doctrine only applies to forward-looking statements, and not to misrepresentations of present or historical fact. *See Stolz v. Family P'ship L.P.*, 355 F.3d 92, 96-97 (2d Cir. 2004). Several of Plaintiff's material allegations involve misrepresentations or omissions of present and historical fact, such as the allegations pertaining to (1) the undercapitalization of the Fund, (2) the investment made by a prominent investor, and (3) the Securities and Exchange Commission's investigation of Harrison in the 1970s. The bespeaks caution doctrine is clearly inapplicable to these misrepresentations.

In any event, application of the "bespeaks caution" doctrine does not change the Court's conclusion that, as a matter of law, Plaintiff has sufficiently pleaded the materiality requirement. Significantly, there is no cautionary language in the Solicitation Documents addressing the allegation that is at the centerpiece of Plaintiff's securities fraud claim — that Defendants failed to disclose that the Fund was severely undercapitalized as of the February 1 Meeting. The various cautionary provisions that appear in the Offering Memorandum are, for the most part, boilerplate, warning about the "Risks Associated With Investments in Securities," the "Risk of Limited Number of Investments," and the "Difficulty of Locating Suitable Investments." (*See* Defs.' Mem. Ex. A at 30.)

Plaintiff does not allege that he was defrauded by Defendants' failure to disclose the risks generally associated with securities investments. Rather, Plaintiff alleges that Defendants defrauded him by, *inter alia*, failing to disclose that the Goldin Fund was severely undercapitalized at the time that they

were soliciting his investment, representing that a sizeable investment had been made in the Fund (when in fact it had not), and pressuring him to make a hasty decision by leading him to believe that he would lose the opportunity to invest in the Goldin Fund if he did not do so immediately. *Cf. Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("The bespeaks caution doctrine does not apply where the specific risk is apparent and not disclosed. If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability."); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

While it is true that Plaintiff's claim for securities fraud includes the allegation that the Fund was unable to invest in the proper number of investments, Plaintiff alleges that this inability was due to the Fund's shortage of capital commitments, a fact that he alleges was withheld from him at the February 1 Meeting. The cautionary language in the Solicitation Documents does not address the Fund's potential inability to follow through on its investment plan due to a failure to raise sufficient capital commitments. In fact, the Offering Memorandum, insofar as it provides cautionary language in this regard, only contemplates the possibility that the Fund would be unable to find sufficient investment opportunities to spend its capital commitment. (*See, e.g.*, Defs.' Mem. Ex. A at 30) ("Difficulty of Locating Suitable Investments. The Fund may be unable to find a sufficient number of attractive opportunities

to meet its investment objectives or fully invest its committed capital."); *see also id.* ("Risk of Limited Number of Investments. . . . Since the Fund may make only a limited number of investments and since the Fund's investments generally will involve a high degree of risk, poor performance by even a single Portfolio Company could severely affect the total returns to Limited Partners.").) Such language neither warns Plaintiff that the Fund is currently undercapitalized nor discloses what effect such undercapitalization would have on the Fund's investment prospects. *Cf. Hunt v. Alliance N. Am. Gov't Income Tr. Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language contained in the prospectus does not necessarily foreclose liability because it warned investors of a different contingency than that which plaintiffs allege was misrepresented."); *In re Donald J. Trump Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1994) ("To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."). Further, the cautionary language in the Solicitation Documents in no way addresses Defendants' other allegedly fraudulent misrepresentations and omissions, such as the misrepresentation that a prominent investor had committed $40 million to the Goldin Fund, the failure to disclose the Securities and Exchange Commission's investigation of Harrison, or the misleading representation that Plaintiff was being given an opportunity to invest just before the Fund closed.

The Court thus finds that, notwithstanding the fact that the bespeaks caution doctrine only applies to forward-looking statements and not to misrepresentations or omissions of present or historical fact, *Stolz*, 355 F.3d at 96-97, there is no language in the Solicitation

Documents that "affect[s] the total mix of information" in a way that would make it unreasonable for Plaintiff to have relied on Defendants' alleged misrepresentations and omissions, *Halperin*, 295 F.3d at 357. So finding, the Court concludes that Plaintiff has alleged sufficient facts to satisfy the "materiality" requirement for purposes of properly pleading a cause of action for securities fraud under section 10(b) and Rule 10b-5.

### b.  Scienter

Under the PSLRA, in order to state a claim under section 10(b) and Rule 10b-5, it is necessary to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.  § 78u-4(b)(2).  "The requisite state of mind in a Rule 10b-5 action is 'an intent to deceive, manipulate or defraud.'"  *Ganino*, 228 F.3d at 168 (quoting *Ernst & Ernst*, 425 U.S. at 193 n.12).

The Second Circuit has held that a securities fraud plaintiff may establish the requisite intent either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006) (internal quotation marks and citations omitted).  In *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), the court noted that "both options for demonstrating scienter, either with motive and opportunity allegations or with allegations constituting strong circumstantial evidence of conscious misbehavior or recklessness, survive the PSLRA." *Id.* at 138-39.

15

Despite the continuing viability of these two methods of pleading scienter, the Second Circuit has instructed that courts "need and should not employ or rely on magic words such as 'motive and opportunity,'" and that the Circuit's "prior case law may be helpful in providing guidance" as to whether a securities fraud plaintiff has adequately pleaded scienter. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The *Novak* court provided four examples demonstrating how, under Second Circuit case law, a plaintiff may adequately plead scienter. Specifically, a plaintiff may do so by alleging facts sufficient to show that defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (citations omitted); *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (articulating these four examples from *Novak*); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d at 249 (same). The Court is mindful of these four particular examples as it conducts its analysis under the framework provided by the terminology of "motive and opportunity" and "conscious misbehavior or recklessness." *Cf. Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("As *Novak* explains, what is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of 'magic words such as 'motive and opportunity'' but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter.").

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 2510 (emphasis added). The Court must be careful to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original). The inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 2510 (internal citation omitted). Rather, the question before the Court on a motion to dismiss is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter *at least as strong* as any opposing inference?" *Id.* at 2511 (emphasis added).

Defendants argue that "[c]onsidered in their entirety, Plaintiff's allegations do not support an inference of scienter, much less a 'strong' or 'cogent' inference." (Defs.' Mem. at 18.)[14] The Court disagrees, and finds that

---

[14] Significantly, Defendants appear to misconstrue the central holding of *Tellabs*. Defendants argue that, "[a]t the very least, the inference of nonfraudulent intent is equally permissible as any inference of fraudulent intent. Under *Tellabs*, that is insufficient to satisfy the pleading requirement of scienter." (Defs.' Mem. at 20.) However, *Tellabs* clearly stands for the proposition that, if an "inference of non fraudulent intent is equally permissible as any inference of fraudulent intent," the complaint is properly pleaded. *See Tellabs*, 127 S. Ct. at 2510 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter

the facts alleged in Plaintiff's Complaint satisfy *Tellabs* and give rise to a "strong inference" of fraudulent intent both by establishing "motive and opportunity" and by demonstrating strong circumstantial evidence of recklessness.

The Second Circuit has elaborated on the factual allegations necessary to establish "motive and opportunity" to commit fraud: "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novaks*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)) (internal quotation marks omitted). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit*, 264 F.3d at 139. In other words, Plaintiff must allege that Defendants were motivated by more than just concerns "generally possessed by most corporate directors and officers," such as a desire to make the corporation appear profitable, or to keep stock prices high to increase officer compensation. *Id.*

In the instant case, the Court finds that the Plaintiff has sufficiently alleged that Defendants had both a motive and an opportunity to commit fraud. Plaintiff alleges that at the time of the February 1 Meeting, the Goldin Fund was seriously undercapitalized, and that Defendants were in need of capital commitments. Defendants took advantage of the opportunity presented by the February 1 Meeting to make various alleged misstatements and omissions, *inter alia*, failing to disclose that the Fund was undercapitalized, failing to disclose the effect that such undercapitalization would have, misrepresenting that a prominent businessman had committed $40 million to the Fund, and pressuring Plaintiff to make a quick investment decision. As for motivation, Defendants stood to receive Plaintiff's capital investment in the struggling, privately-held, Goldin Fund. *Cf. Scantek Med., Inc. v. Sabella*, No. 08 Civ. 453 (CM), 2008 WL 4667985, at *11 (S.D.N.Y. Oct. 17, 2008) (finding sufficient motive to deceive a purchaser of securities "because of [the securities'] negligible sales and need for funds"). Further, Defendants possessed a financial stake in the Fund, both in terms of management fees (*see* Defs.' Mem. Ex. A at 20) and, more significantly, returns on required personal investments made in the Fund (*see id.* at 17 ("On the First Closing Date . . . the General Partner and its Principals and affiliates will commit at least 1.5% of aggregate Capital Commitments to the Fund as, or on the same terms as, the Fund's limited partners . . .")). Indeed, Defendants candidly admit that they had a substantial financial stake in the Goldin Fund. (*See* Defs.' Mem. at 18 ("Defendants had as much at stake — indeed, more at stake — in this Fund than did Heller.").)

While it is true that "[t]he incentive to increase profit can be imputed to all corporations and their officers," *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005), Defendants' financial motivation is not merely the universal incentive of corporate officers to increase stock prices, *see Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[I]f

---

cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." (emphasis added)).

scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." (internal quotation marks and citation omitted)). Rather, Defendants possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake, to raise sufficient capital so that the Goldin Fund could reach its investment objectives. While the case law in this District is divided on whether the receipt of fees alone is enough to satisfy the "motive" requirement, *compare Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 187 (S.D.N.Y. 2006) (finding that "[u]nlike a motive to increase stock prices, shared by all corporate insiders, a motive to generate increased fees . . . would be 'a concrete and personal benefit to the individual defendants resulting from the fraud'" (quoting *Kalnit*, 264 F.3d at 139)), *with Steed Fin. LDC v. Laser Advisers, Inc.*, 258 F. Supp. 2d 272, 278 (S.D.N.Y. 2003) (holding that "a motive to commit the fraud because the better the funds' performance, the higher the[] fees is analogous to the argument previously rejected that an executive has a motive to commit fraud merely because his compensation is tied to stock price"), the Court finds that Plaintiff has adequately pleaded that Defendants were motivated by a "concrete and personal benefit," given not only Defendants' potential receipt of management fees, but also their additional *personal* financial investment in the under-capitalized Goldin Fund, a fund that needed to obtain a certain level of capital commitment in order to create a diverse investment portfolio and thereby achieve "a measure of risk diversification" for its investors. (Compl. ¶ 24.)

The Court also holds that Plaintiff has alleged facts demonstrating strong circumstantial evidence of recklessness. The *Novak* court "defined reckless conduct as, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (internal quotation marks and citations omitted). The *Novak* court conceded that "these general standards offer little insight into precisely what actions and behaviors constitute recklessness sufficient for § 10(b) liability," and therefore emphasized that the "actual facts of [the Circuit's] securities fraud cases . . . provide the most concrete guidance" in this regard. *Id.*

One such category of cases that have sufficed to plead scienter based on a theory of strong circumstantial evidence of recklessness are cases in which a securities fraud plaintiff "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Id.* "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*; *see also, e.g.*, *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39-40 (2d Cir. 2000); *Hall v. The Children's Place Retail Stores, Inc.*, No. 07 Civ. 8252 (SAS), 2008 WL 2791526, at *6 (S.D.N.Y. July 18, 2008); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 469 (S.D.N.Y. 2001).

Here, Plaintiff has alleged that Defendants had knowledge of facts, specifically, the current undercapitalization of the Fund (*see, e.g.*, Compl. ¶ 40), that explicitly contradicted their public statements at the February 1

Meeting, specifically, that a prominent investor had committed $40 million to the Fund (*see, e.g.*, *id.* ¶ 42). These allegations alone are enough to satisfy the pleading requirement for scienter. The Court thus finds that this alleged behavior, especially when considered in conjunction with the other alleged misstatements and omissions made by the individual Defendants during the course of the February 1 Meeting, constituted highly unreasonable conduct, and therefore recklessness, for purposes of properly alleging scienter.

In sum, the Court finds that Plaintiff has sufficiently pleaded a "strong" inference of scienter under both the "motive and opportunity" prong, by alleging facts demonstrating that Defendants "benefitted in a concrete and personal way from the purported fraud," and under the conscious misbehavior or recklessness prong, by alleging that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311.

The Court further concludes that a reasonable person would deem these inferences of scienter "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. Indeed, Defendants do not provide the Court with any cogent opposing inference of nonfraudulent intent. Defendants only point out that they: (1) did not receive any immediate cash when Plaintiff made his $1 million commitment, as Plaintiff was only required to make actual capital contributions on an "as needed" basis (Defs.' Mem. at 18); (2) disclosed the undercapitalization of the Goldin Fund to Plaintiff after he made his first cash contribution to the Fund (*id.*); (3) were

required to make their own capital commitments to the Fund, and therefore "had as much at stake — indeed, more at stake — in this Fund than did Heller" (*id.*); and (4) continued to seek capital commitments for nine to twelve months after the First Closing Date (*id.* at 19).

Even considered in isolation, Defendants' points are largely consistent with a "strong" inference of scienter. First, Plaintiff's allegations revolve around Defendants' motivation to raise capital commitments, not cash. Indeed, raising capital commitments was Defendants' undisputed objective at the February 1 Meeting. Second, the fact that the undercapitalization was not disclosed to Plaintiff until after he made his cash contribution supports the inference that Defendants fraudulently omitted to disclose the undercapitalization of the Fund until Plaintiff had already committed his capital and was therefore contractually bound by that commitment. The Court has already discussed how Defendants' third point also supports an inference of scienter — because Defendants had a personal monetary stake in the Fund, they had a financial incentive to try to raise the necessary capital commitments so that the Fund could meet its investment objectives. Fourth, the Fund's continued attempts to seek capital commitments underscores the Fund's serious need for additional investments, again, providing an inference that the Defendants had a motive to defraud Heller at the February 1 Meeting in order to induce his capital commitment.

Most significantly, Defendants fail to provide a strong or cogent inference explaining the individual Defendants' behavior at the February 1 Meeting. The individual Defendants might have forgotten to disclose that the Fund had only raised $40

million in capital commitments, or thought it was irrelevant to Plaintiff's investment decision. Perhaps Defendants were misinformed when they represented to Plaintiff that another investor had already invested $40 million. However, while these are certainly all *possible* inferences that the Court could draw based on the facts alleged by Plaintiff in his Complaint, the Court finds that Plaintiff's inference of scienter is cogent and *at least as compelling* as these opposing inferences, and therefore, that Plaintiff has sufficiently pleaded scienter for purposes of alleging a claim for securities fraud under section 10(b) and Rule 10b-5.

### c. Loss Causation

Finally, Plaintiff must demonstrate that Defendants' material misrepresentations and omissions caused the injuries that he suffered. *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003). This causation requirement has two aspects, transaction causation and loss causation. *ATSI Commc'ns*, 493 F.3d at 106. These separate causation requirements in a private federal securities fraud action approximately track the two causation requirements in a common law tort action. Transaction causation is akin to the tort law requirement of causation in fact. Like causation in fact, which mandates a "but for" analysis, transaction causation requires only an allegation that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent*, 343 F.3d at 197. Defendants do not contend that Plaintiff has failed to allege facts sufficient to establish transaction causation. (*See* Defs.' Mem at 20-21.) However, Defendants argue that Plaintiff failed to plead sufficient facts to establish loss causation. (*See id.*) Loss

causation is similar to the requirement of proximate causation in tort law, in that it "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the Plaintiff." *Emergent*, 343 F.3d at 197.[15]

The Second Circuit has clarified the concept of loss causation. In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), the Circuit found that "the tort analogy is imperfect." *Id.* at 173. Proximate causation in tort law requires only that the damages suffered be a foreseeable consequence of the alleged wrong. *See id.*; *see also Emergent*, 343 F.3d at 197. However, loss causation requires "both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173 (emphasis in original); *see also ATSI Commc'ns*, 493 F.3d at 107 (following *Lentell*).[16] "'Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss,' a plaintiff may plead that it is 'the materialization of the undisclosed condition or event that causes the loss.'" *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289

---

[15] The PSLRA codified the common law requirement of loss causation: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

[16] The Court agrees with the Honorable Shira A. Scheindlin, District Judge, that under the language of *Lentell*, "[t]here are several possible methods of pleading loss causation, including 'direct causation,' 'materialization of risk,' and 'corrective disclosure.'" *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) (citations omitted). In the instant case, the Court — borrowing Judge Scheindlin's terminology — focuses its analysis on the "materialization of risk" method. *See id.*

(S.D.N.Y. 2008) (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 298, 307-08 (S.D.N.Y. 2005)); *see also, e.g., In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005) (finding that "the loss causation requirement will be satisfied if [Defendants'] conduct had the effect of concealing the circumstances that bore on the ultimate loss").

Plaintiff's Complaint posits that the individual Defendants made a series of misrepresentations and omissions at the February 1 Meeting.  Specifically, Plaintiff alleges that, *inter alia*, the individual Defendants failed to disclose the Fund's failure to raise more than $40 million as of February 1, 2005 or the effect that such a failure would have on the Fund's investment prospects, and instead misrepresented that one investor had committed $40 million to the Fund.  Plaintiff also alleges that the individual Defendants pressured him into making a capital commitment to the undercapitalized Fund by misrepresenting that he was being given an opportunity to invest just before the Fund closed, when in fact the Fund would remain open to new capital commitments for at least another nine to twelve months.  The underlying "concealed risk" of these various misrepresentations and omissions was the undercapitalization of the Goldin Fund.

Construing all facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently pleaded that the monetary loss that he incurred was foreseeable and "caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173.  Plaintiff's Complaint specifically alleges:

Heller was never warned, and the [D]efendants never disclosed, that the Fund might commence operations so severely under-capitalized that it could not possibly meet its stated investment objective and prudently diversify its portfolio.  This, however, was exactly what took place. . . .  Heller's capital contribution . . . [was] lost in a single venture because of [D]efendants' abandonment of the prudent diversification promised by the Fund's declared investment objective.

(Compl. ¶¶ 5-6.)  In short, Plaintiff alleges that the monetary loss that he suffered was caused by the foreseeable materialization of the concealed risk — namely, that the undercapitalization of the Goldin Fund, and the Fund's subsequent inability to follow through on its investment strategy of obtaining a diverse portfolio of eight to twelve "distressed" companies, led to a high-risk investment in only one company, which resulted in Plaintiff's monetary losses.  The Court finds that such allegations suffice to satisfy the requirement of loss causation.[17]

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss the claim for breach of fiduciary duty, and denies

---

[17]   The Court notes that Plaintiff has not pleaded sufficient facts to establish loss causation with respect to his allegations that the Defendants failed to disclose the SEC's prior investigation of Harrison.  (*See* Compl. ¶¶ 56-62; 82.)  Plaintiff has not pleaded *any* facts to suggest that this failure had any impact on the Goldin Fund's subsequent losses, and therefore, Plaintiff's own losses (for example, by pleading that Harrison's past misconduct was related to the Fund's inability to raise capital).  The Court therefore finds that this misrepresentation is not actionable under section 10(b) and Rule 10b-5.

Defendants' motion to dismiss the claim for a violation of section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder. Defendants are ordered to submit responsive pleadings to Plaintiff's Complaint within thirty calendar days of this Opinion and Order. The Clerk of the Court is respectfully directed to terminate the motion located at document number 11.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: December 22, 2008
New York, New York

\* \* \*

Plaintiff is represented in this matter by Adam C. Mayes and John Halebian, Lovell Stewart & Halebian LLP, 500 Fifth Avenue, New York, NY 10110, and Defendants are represented by Michael Barry Carlinsky, Quinn Emanuel Urquhart Oliver & Hedges LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010.